No. 15-16440, 15-16626

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

MANUEL DE JESUS ORTEGA MELENDRES, ET AL.,
*Plaintiffs-Appellees,*

v.

MARICOPA COUNTY; JOSEPH M. ARPAIO,
*Defendants-Appellees,*

**and**

DENNIS L. MONTGOMERY,
*Proposed Intervenor-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA
2:07-cv-02513-GMS
The Honorable G. Murray Snow
United States District Judge

SUPPLEMENTAL EXCERPTS OF RECORD
VOLUME I

**Stanley Young**
**Michelle L. Morin**
COVINGTON & BURLING LLP
333 Twin Dolphin Drive, Suite 700
Redwood shores, CA 94065-1418
Telephone: (650) 632-4700
Facsimile: (650) 632-4800
syoung@cov.com
mmorin@cov.com

Cecillia D. Wang
ACLU FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 343-0775
Facsimile: (415) 395-0950
cwang@aclu.org

*Attorneys for Plaintiffs-Appellees*
***MANUEL DE JESUS ORTEGA MELENDRES, ET AL.***

**Dan Pochoda**
ACLU FOUNDATION OF ARIZONA
3707 N. 7th St., Ste. 235
Phoenix, AZ 85014
Telephone: (602) 650-1854
Facsimile: (602) 650-1376
dpochoda@acluaz.org

**Andre Segura**
ACLU FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad Street, 17th Floor
New York, NY 10004
Telephone: (212) 549-2676
Facsimile: (212) 549-2654
asegura@aclu.org

**Anne Lai**
401 E. Peltason Dr.
Law 4800-P
Irvine, CA 92697-8000
Telephone: (949) 824-9894
Facsimile: (949) 824-0066
alai@law.uci.edu

**Jorge Martin Castillo**
MEXICAN AMERICAN LEGAL
DEFENSE AND EDUCATIONAL
FUND
634 South Spring Street, 11th Floor
Los Angeles, CA 90014
Telephone: (213) 629-2512
Facsimile: (213) 629-0266
jcastillo@maldef.org

*Attorneys for Plaintiffs-Appellees*

*MANUEL DE JESUS ORTEGA MELENDRES, ET AL.*

# INDEX TO THE SUPPLEMENTAL EXCERPTS OF RECORD

## VOLUME I

| Document Description | District Court Dkt No. | Date Filed | Pages (SER) |
|---|---|---|---|
| Order Denying Petition, *Arpaio, et al. v. U.S. District Court for the District of Arizona, et. al.*, Case No. 15-72440 , Doc. No. 14 | Request for Judicial Notice | 09/15/2015 | SER001-SER002 |
| Order Denying Petition, *Montgomery v. U.S. District Court (In re Dennis L. Montgomery)*, Case No. 15-71433, Doc. No. 2 | Request for Judicial Notice | 05/12/2015 | SER003 |
| Order (to Show Cause) | 880 | 02/12/2015 | SER004-SER030 |
| Transcript of Proceedings (Evidentiary Hearing on 4/24/2015) | 1030 | 04/25/2015 | SER031-SER046 |
| Transcript of Proceedings (Evidentiary Hearing on 4/23/2015) | 1027 | 04/24/2015 | SER047-SER054 |
| Reply of Larry Klayman to Opposition of Plaintiffs to Counsel's Motion to Appear Pro Hac Vice | 1223 | 08/10/2015 | SER055-SER093 |
| Declaration of Cecillia Wang in Support of Plaintiffs' Response in Opposition to Sheriff Arpaio and Chief Deputy Sheridan's Motion for Recusal or Disqualification of the Court | 1166 | 07/10/2015 | SER094-SER139 |
| Plaintiffs' Opposition to Motion to Stay | 1175 | 07/16/2015 | SER140-SER147 |
| Sheriff Joseph Arpaio and Chief Deputy Sheridan's Response to Putative Intervenor Dennis Montgomery's Supplement to Motion for Reconsideration | 1145 | 06/03/2015 | SER148-SER150 |

| Document Description | District Court Dkt No. | Date Filed | Pages (SER) |
|---|---|---|---|
| Notice of Appearance of Counsel for Movant-Appellant Michael Zullo, *Michael Zullo v. Maricopa County*, Case No. 15-17269, Doc. No. 7 | Request for Judicial Notice | 12/02/2015 | SER151-SER155 |
| Emergency Petition for Writ of Mandamus for Recusal Pursuant to 28 US.C. § 455 and/or 28 US.C. § 144, *Montgomery v. U.S. District Court (In re Dennis L. Montgomery)*, Case No. 15-71443, Doc. No. 1 | Request for Judicial Notice | 05/11/2015 | SER156-SER191 |
| Amended Complaint, *State of Texas et al v. United States of America et al*, Case No. 1:14-cv-00254, Doc. No. 14 | Request for Judicial Notice | 12/09/2014 | SER192-SER196 |
| Complaint, *Arpaio v. Obama et al*, Case No. 1:14-cv-01966, Doc. No. 1 | Request for Judicial Notice | 11/20/2014 | SER197-SER236 |
| Civil Docket Sheet, *Arpaio v. Obama et al*, Case No. 1:14-cv-01966 (11/20/2014-11/21/2014) | Request for Judicial Notice | | SER237-SER238 |
| Civil Docket Sheet, *State of Texas et al v. United States of America et al*, Case No. 1:14-cv-00254 (12/03/2014-4/09/2015) | Request for Judicial Notice | | SER239-SER245 |

## VOLUME II

| Document Description | District Court Dkt No. | Date Filed | Pages (SER) |
|---|---|---|---|
| Civil Docket Sheet, *Melendres v. Arpaio*, Case No. 2:07-CV-02513-GMS (12/7/2007-1/13/2016) | | | SER246-SER467 |

Dated: January 20, 2016

By: */s/ Michelle L. Morin*

Stanley Young
syoung@cov.com
Michelle L. Morin
mmorin@cov.com
COVINGTON & BURLING LLP
333 Twin Dolphin Drive, Suite 700
Redwood Shores, CA 94065-1418
Telephone: (650) 632-4700
Facsimile: (650) 632-4800

Dan Pochoda
dpochoda@acluaz.org
ACLU FOUNDATION OF
ARIZONA
3707 N. 7th St., Ste. 235
Phoenix, AZ 85014
Telephone: (602) 650-1854
Facsimile: (602) 650-1376

Anne Lai
alai@law.uci.edu
401 E. Peltason, Suite 3500
Irvine, CA 92697-8000
Telephone: (949) 824-9894
Facsimile: (949) 824-0066

Cecillia D. Wang
cwang@aclu.org
ACLU FOUNDATION
Immigrants' Rights Project
39 Drumm Street
San Francisco, California 94111
Telephone: (415) 343-0775
Facsimile: (415) 395-0950

Andre Segura
asegura@aclu.org
ACLU FOUNDATION
Immigrants' Rights Project
125 Broad Street, 17th Floor
New York, NY 10004
Telephone: (212) 549-2676
Facsimile: (212) 549-2654

Jorge Martin Castillo
jcastillo@maldef.org
MEXICAN AMERICAN LEGAL
DEFENSE AND EDUCATIONAL
FUND
634 South Spring Street, 11th Floor
Los Angeles, California 90014
Telephone: (213) 629-2512
Facsimile: (213) 629-0266

*Attorneys for Plaintiffs-Appellees*

# CERTIFICATE OF SERVICE

I hereby certify that on January 20, 2015, I electronically filed the foregoing

Supplemental Excerpts of Record - Volume I with the Clerk of the Court for the United States

Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all Participants in the case who are registered CM/ECF users will be served

by the appellate CM/ECF system.


Date: January 20, 2016     */s/ Michelle L. Morin*
           Michelle L. Morin

FILED

UNITED STATES COURT OF APPEALS

SEP 15 2015

FOR THE NINTH CIRCUIT

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| In re: JOSEPH M. ARPAIO, in his individual and official capacity as Sheriff of Maricopa County, Arizona, and GERARD A. SHERIDAN. | No. 15-72440<br><br>D.C. No. 2:07-cv-02513-GMS<br>District of Arizona,<br>Phoenix |
| JOSEPH M. ARPAIO, in his individual and official capacity as Sheriff of Maricopa County, Arizona, and GERARD A. SHERIDAN,<br><br>        Petitioners,<br><br>DENNIS L. MONTGOMERY,<br><br>        Intervenor - Pending,<br><br>v.<br><br>UNITED STATES DISTRICT COURT FOR THE DISTRICT OF ARIZONA, PHOENIX,<br><br>        Respondent,<br><br>MANUEL DE JESUS ORTEGA MELENDRES, on behalf of himself and all others similarly situated; et al.,<br><br>        Real Parties in Interest. | ORDER |

AT/MOATT

Before: REINHARDT, TASHIMA, and RAWLINSON, Circuit Judges.

Petitioners' motions to file an oversized petition for writ of mandamus and oversized reply in support of the motion for stay are granted. The petition and reply have been filed.

Petitioners have not demonstrated that this case warrants the intervention of this court by means of the extraordinary remedy of mandamus. *See Bauman v. U.S. Dist. Court*, 557 F.2d 654-55 (9th Cir. 1977) (citation omitted). The district court's July 10, 2015 order denying petitioners' motion for recusal is not clearly erroneous as a matter of law. *Id.* Accordingly, the petition is denied.

All pending motions are denied as moot.

**DENIED**.

AT/MOATT                                                                 15-72440

FILED

UNITED STATES COURT OF APPEALS

MAY 12 2015

FOR THE NINTH CIRCUIT

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| In re: DENNIS L. MONTGOMERY. | No. 15-71433 |
| | D.C. No. 2:07-cv-02513-GMS |
| DENNIS L. MONTGOMERY, | District of Arizona, Phoenix |
| Petitioner, | |
| v. | ORDER |
| UNITED STATES DISTRICT COURT FOR THE DISTRICT OF ARIZONA, PHOENIX, | |
| Respondent, | |
| COUNTY OF MARICOPA; et al., | |
| Real Parties in Interest. | |

Before: GOODWIN, FARRIS, and FRIEDLAND, Circuit Judges.

Petitioner has not demonstrated that this case warrants the intervention of
this court by means of the extraordinary remedy of mandamus. *See Bauman v.
U.S. Dist. Court*, 557 F.2d 650 (9th Cir. 1977). Accordingly, the emergency
petition is denied.

No further filings will be entertained in this closed case.

**DENIED**.

SL/MOATT

1

2

3

4

5

6                    **IN THE UNITED STATES DISTRICT COURT**

7                       **FOR THE DISTRICT OF ARIZONA**

8

9   Manuel de Jesus Ortega Melendres, on          No. CV-07-02513-PHX-GMS
    behalf of himself and all others similarly
10  situated; et al.                              **ORDER TO SHOW CAUSE**

11                        Plaintiffs,

12  v.

13  Joseph M. Arpaio, in his individual and
    official capacity as Sheriff of Maricopa
14  County, AZ; et al.

15                        Defendants.

16

17        Pending before the Court is Plaintiffs' Request for an Order to Show Cause (Doc.

18  843) and the opposition thereto by Defendants and those non-parties who have specially

19  appeared in this action. (Docs. 838–42, 844.) For the reasons stated below, Plaintiffs'

20  Request is granted.

21                              **BACKGROUND**

22        In December 2007, Latino motorists brought a class action under 42 U.S.C. § 1983

23  against the Maricopa County Sheriff's Office and Sheriff Joseph Arpaio, among others,

24  alleging that Defendants engaged in a custom, policy, and practice of racially profiling

25  Latinos, and a policy of unconstitutionally stopping persons without reasonable suspicion

26  that criminal activity was afoot, in violation of Plaintiffs' Fourth and Fourteenth

27  Amendment rights. (Doc. 1, *amended by* Doc. 26.) The Plaintiffs sought declaratory and

28  injunctive relief to prevent Defendants from engaging in racial profiling and exceeding

the limits of their authority to enforce federal immigration law. (Doc. 1 at 19–20.)

After pre-trial discovery was closed, the parties filed competing motions for summary judgment; Plaintiffs' motion included a request for the entry of a preliminary injunction. (Docs. 413, 421.) This Court granted the Plaintiffs' motion in part, and entered a preliminary injunction on December 23, 2011.[1] (Doc. 494.) The injunction prohibited MCSO from "detaining individuals in order to investigate civil violations of federal immigration law," and from "detaining any person based on actual knowledge, without more, that the person is not a legal resident of the United States." (*Id.* at 39.) The injunction further stated that, absent probable cause, officers may only detain individuals based on reasonable suspicion that "criminal activity may be afoot." (*Id.* at 5 (quoting *Terry v. Ohio*, 392 U.S. 1, 27, 30 (1968).) The Court explained that being present in the country without authorization to remain does not, in and of itself, violate any criminal statute and, therefore, "actual knowledge, let alone suspicion, that an alien is illegally present is not sufficient to form a reasonable belief he has violated federal criminal immigration law." (*Id.* at 7.) Moreover, Hispanic appearance, an inability to speak English, and proximity to the border do not supply reasonable suspicion that a crime was being committed sufficient to stop a vehicle to investigate the immigration status of the occupants. (*Id.* at 6.)

Seventeen months later and following a bench trial, the Court issued its Findings of Fact and Conclusions of Law in May 2013 in which it found MCSO liable for a number of constitutional violations in its operations and procedures. (Doc. 579 at 115–31.) After allowing the Parties, at their request, to attempt to negotiate the terms of a consent decree, in October 2013 the Court ordered supplemental injunctive relief to remedy the violations it outlined in its Findings and Conclusions and defined enforcement mechanisms for such remedies. (Doc. 606.) This Court has continuing authority over the enforcement and implementation of that order.

---

[1] The Ninth Circuit affirmed the preliminary injunction in September 2012. *See Melendres v. Arpaio*, 695 F.3d 990 (9th Cir. 2012).

SER005

Around this time, Chief Deputy Jerry Sheridan was videotaped during an October 2013 training session for deputies about to engage in a large-scale patrol, where he referred to this Court's order as "ludicrous" and "crap," and incorrectly stated that this Court had found only a small number of officers had unconstitutionally used race as a factor in traffic stops. (*See* Doc. 662 at 22–23.) On the recording, which did not surface until early the next year, both Chief Deputy Sheridan and Sheriff Arpaio are seen apparently directing deputies not to take seriously the Court's requirement that they track the race and ethnicity of individuals whom they stop. (*Id.* at 23.) This Court has since held a number of hearings to address the repeated mischaracterization and condemnation of its Orders by MCSO officials. (*See* Docs. 662; 672; 776 at 61–68.) For example, at a March 2014 community meeting, Deputy Chief David Trombi told residents that the Court had only found that MCSO deputies detained Latinos fourteen seconds longer than other drivers, which was not in the Court's Findings of Fact. (Doc. 672 at 14.) In April 2014, Deputy Chief John MacIntyre made a statement to the press denying that the Court had concluded the Sheriff's Office had engaged in racial profiling. (Doc. 684 at 4.) In lieu of contempt, the Court entered an enforcement order requiring that a corrective statement summarizing the Court's holding and emphasizing that the order was to be followed, pending appeal, be distributed within MCSO. (Docs. 680, 684.)

On May 14, 2014, Defendants informed the Court that a former member of the Human Smuggling Unit, Deputy Charley Armendariz, was found to be in possession of hundreds of personal items, many of which appear to have been appropriated from members of the Plaintiff class. (*See* Doc. 700 at 12–13.) Deputy Armendariz was a regular participant in the HSU's saturation patrols, both large and small scale. He also testified at trial and was personally implicated by the allegations of two representatives of the Plaintiff class regarding his involvement in a 2008 immigration sweep in which two Hispanic American citizens were allegedly profiled and illegally detained on the basis of their suspected undocumented status. (Doc. 576.) After his apparent suicide, in addition to the numerous personal items apparently seized from persons he had stopped, MCSO

- 3 -

SER006

also discovered numerous video recordings of traffic stops Armendariz had conducted, apparently going back several years. (Doc. 700 at 11.) Some of those videos revealed what MCSO characterized as "problematic activity" on the part of Deputy Armendariz during the stops. (*Id.* at 35, 57.) Other officers, and at least one supervisor of Armendariz who also testified at the trial in this action, were depicted on these recordings during one or more problematic stops. (*Id.* at 35.)

Upon questioning by the Court, Chief Deputy Sheridan acknowledged that many, if not all, deputies made audio recordings of their traffic stops pursuant to departmental practice and had done so for some time. (*Id.* at 29–31.) Further, Sheridan stated that there was reason to believe that some deputies videotaped their own traffic stops, that there was no departmental policy that prevented deputies from doing so, and that some video devices had been purchased in earlier years by MCSO or through other government programs for use during traffic stops. (*Id.* at 21, 23–24.) Prior to May 2014, there was apparently no agency-wide policy that governed the collection and catalogue of such recordings. (*Id.* at 24.)

In light of the inappropriate activity observable on Deputy Armendariz's videotapes and the ambiguity surrounding other officers' use of video- and audio-recording devices during the time period in which pre-trial discovery in this case was occurring, the Court ordered Defendants to immediately formulate and obtain the Monitor's approval of a plan designed to quietly retrieve all recordings made by officers that might still be in existence. (*Id.* at 25–27.) The Court emphasized that the substance of the hearing was not to be shared with those outside the Courtroom. (*Id.* at 7, 50–51, 69.) Within two hours of this hearing, however, Chief Deputy Sheridan met with Sheriff Arpaio and attorneys for MCSO. An e-mail was circulated immediately thereafter by Deputy Chief Trombi (who was not present at the hearing), at the direction of Chief Deputy Sheridan, to twenty-seven Departmental Commanders—including the supervisor who had been present during one of Armendariz's problematic stops. (*See* Doc. 795, Attach. 1, at 3–4.) The e-mail advised MCSO commanders that they should "simply

SER007

gather" all such recordings from their personnel. (*Id.* at 4.) When, later that afternoon, the Monitor met with MCSO officials to develop a retrieval strategy, neither the Sheriff nor Chief Deputy Sheridan informed the Monitor that MCSO had already broadcast its collection efforts. (*Id.* at 4–5.) In the end, MCSO conducted a survey-approach of its present and past employees to collect any outstanding recordings (*Id.* at 4), incurring the additional risk that advertising their collection efforts might prompt officers to destroy existing recordings rather than surrender them to MCSO leadership.

Even so, the ensuing investigations unearthed previously undisclosed recordings of traffic stops undertaken by the HSU and at the apparent direction of other MCSO departments. They have also unearthed documents apparently requiring officers to make such recordings during the period of time relevant to Plaintiffs' claims. In addition, dozens of personal identifications have been found in offices formerly occupied by the HSU. There is evidence that, during the period relevant to this lawsuit, a number of deputies were also confiscating items of personal property—such as identifications, license plates, Mexican currency and passports, credit cards, cell phones, purses, and religious shrines—from individuals detained in conjunction with immigration enforcement activities. These items were apparently routinely retained by deputies, destroyed, or deposited in collection bins in the various administrative districts of MCSO.

While these materials appear to have been requested by Plaintiffs prior to the trial of this lawsuit, it does not appear that any of them were identified or provided to the Plaintiff class. There is also evidence that at least some recordings made during the period relevant to the Plaintiffs' claims are no longer in existence. Moreover, the Armendariz videotapes resulted in administrative interviews with MCSO personnel that have apparently revealed that Defendants, as a matter of regular practice and operation, continued actively enforcing federal immigration law by conducting immigration interdiction operations, and detaining persons after officers concluded that there was no criminal law basis for such detention, for at least seventeen months after this Court issued its preliminary injunction. Plaintiffs previously contacted Defendants in October 2012

SER008

about suspected violations of the injunction after MCSO published News Releases pertaining to three immigration enforcement endeavors. (Doc. 843, Ex. A, at A1–A5.) The Court also noted in its May 2013 Findings of Fact and Conclusions of Law that "as a matter of law . . . MCSO has violated the explicit terms of this Court's preliminary injunction set forth in its December 23, 2011 order because the MCSO continues to follow the LEAR policy and the LEAR policy violates the injunction." (Doc 579 at 114.)

## DISCUSSION

### I.      Contempt Power

Federal courts have the authority to enforce their Orders through civil and criminal contempt. *Spallone v. United States*, 493 U.S. 265, 276 (1990). In addition to the Court's inherent power, Title 18, Section 401 of the United States Code provides:

> A court of the United States shall have power to punish by fine or imprisonment, or both, at its discretion, such contempt of its authority, and none other, as—
>
> . . .
>
> (3) Disobedience or resistance to its lawful writ, process, order, rule, decree, or command.

18 U.S.C. § 401(3); *United States v. Powers*, 629 F.2d 619, 624 (9th Cir. 1980) ("Section 401 applies to both criminal and civil contempt."). Within the enumerated statutory limits of this power, a district court has wide latitude in determining whether there has been a contemptuous defiance of its orders. *Stone v. City & Cnty. of San Francisco*, 968 F.2d 850, 856 (9th Cir. 1992). Because an injunctive decree binds not only party-defendants but also those who are represented by them, are subject to their control, or are in privity with them, contempt charges may be brought against non-parties to the underlying litigation who are also bound by an injunction but fail to comply with its terms.[2] For non-party respondents to be held liable in contempt for violating a court's

---

[2] *See* Fed. R. Civ. P. 65(d)(2) (defining scope of individuals bound by a court order to include the parties, the parties' officers, agents, servants, employees, and attorneys; and other persons who are in "active concert or participation with" the parties and their officers, agents, etc., provided they receive actual notice of the order); Fed. R.

SER009

order, they must have had notice of the order and either abet the defendant or be legally identified with him. *Peterson v. Highland Music, Inc.*, 140 F.3d 1313, 1323 (9th Cir. 1998) (quoting *N.L.R.B. v. Sequoia Dist. Council of Carpenters, AFL-CIO*, 568 F.2d 628, 633 (9th Cir. 1977)). The Ninth Circuit's rule regarding contempt "has long been whether defendants have performed 'all reasonable steps within their power to insure compliance' with the court's orders." *Stone*, 968 F.2d at 856 (quoting *Sekaquaptewa v. MacDonald*, 544 F.2d 396, 404 (9th Cir. 1976)).

The moving party bears the initial burden of establishing by clear and convincing evidence that the contemnors violated a specific and definite order of the court. *Balla v. Idaho State Bd. of Corrs.*, 869 F.2d 461, 466 (9th Cir. 1989). The burden then shifts to the contemnors to demonstrate why they were unable to comply. *Donovan v. Mazzola*, 716 F.2d 1226, 1240 (9th Cir. 1983). The contemnors must show that they took every reasonable step to comply. *Sekaquaptewa*, 544 F.2d at 406. In assessing whether an alleged contemnor took "every reasonable step," a district court may consider a history of noncompliance. *Stone*, 968 F.2d at 857. A party's subjective intent is irrelevant to a finding of civil contempt.[3] *Id.* at 856.

A court's exercise of its contempt authority must be restrained by the principle that only the least possible power adequate to the end proposed should be used in contempt cases. *Young v. U.S. ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 801 (1987) (internal quotation marks omitted). If contemptuous conduct is punished criminally, Federal Rule of Criminal Procedure 42(a) requires the appointment of a federal prosecutor, notice to the contemnor of the charges against him, and a trial. *See* Fed. R.

---

Civ. P. 71 (noting that the procedure for enforcing an order against a non-party is the same as against a party); *United States v. Baker*, 641 F.2d 1314 (9th Cir. 1981) (finding that non-party fishers were bound by and could be criminally prosecuted for contempt for non-compliance with an injunction issued by a federal court to manage the state salmon fishing industry, because the evidence was sufficient to prove that the defendants had notice of the injunction and violated it intentionally).

[3] "A party cannot disobey a court order and later argue that there were 'exceptional circumstances' for doing so. This proposed 'good faith' exception to the requirement of obedience to a court order has no basis in law." *In re Crystal Palace Gambling Hall, Inc.*, 817 F.2d 1361, 1365 (9th Cir. 1987).

SER010

Crim. P. 42; *Powers*, 629 F.2d at 625. The Supreme Court has suggested that a trial judge should first consider the feasibility of prompting compliance through the imposition of civil contempt, utilizing criminal sanctions only if the civil remedy is deemed inadequate. *See Young*, 481 U.S. at 801. The Court does so through these proceedings.

## II.   Application

In their Request for an Order to Show Cause, as supplemented by the telephonic status conference held with the parties and specifically named non-parties on January 15, 2015, Plaintiffs have provided sufficient evidence that Defendants and their specified agents have committed contempt insofar as their conduct amounted to disobedience of (1) the Court's preliminary injunction; (2) the Federal Rules governing pre-trial discovery;[4] and (3) the Court's oral directives at the sealed hearing held on May 14, 2014.[5]

At its December 4, 2014 hearing, the Court expressed concern whether, if a contempt finding was appropriate, civil contempt alone would be sufficient to vindicate the constitutional substantive rights involved and compensate the Plaintiff class for its injuries resulting from the contemnors' behavior, particularly in light of the scope of individuals possibly affected by their contempt of the preliminary injunction. Nevertheless, out of deference to the elected office held by Sheriff Arpaio and because the "principle of restraint in contempt counsels caution" in this Court's exercise of its

---

[4] Plaintiffs' Request for an Order to Show Cause outlines two grounds for civil contempt: the violation of the preliminary injunction and the conduct surrounding the May 15, 2014 hearing and development of an evidence-retrieval plan with the Monitor. (Doc. 843 at 5.) After reviewing the briefs, the Court held a telephonic conference with the parties regarding the possible pre-trial discovery violations and whether or not any such violations should be included in these contempt proceedings. (See Doc. 858 at 14–18.) At that time, Plaintiffs orally moved for an Order to Show Cause on this basis, and Defendants consented to resolve any questions involving MCSO's obligation to disclose and produce audio and video evidence of traffic stops at the hearing in April. (*Id.*)

[5] The Court specifies below the factual basis on which it deems Plaintiffs have set forth evidence sufficient to present a prima facie case of contempt with respect to the various parties and non-parties named in this Order. Additional facts and/or persons subject to contempt may become known during the expedited discovery process that the Court concurrently authorizes. A failure to include facts in this Order does not prevent the parties from relying on them at the evidentiary hearing to the extent they relate to the grounds for which the parties and non-parties have been ordered to show cause.

SER011

powers, the Court noted that it would hold civil contempt hearings first to assess the adequacy of civil remedies before referring the matter, if appropriate, for criminal contempt prosecution. *Id.*; *see also United States v. Rylander*, 714 F.2d 996, 1001 (9th Cir. 1983). Accordingly, this Order to Show Cause and the noticed hearings to be held in April 2015 only contemplate civil contempt charges. If further action proves necessary, the Court will give separate notice, appoint a prosecutor pursuant to Rule 42, and initiate criminal proceedings that are separate from this matter.

### A.    Preliminary Injunction Violations

A party may be held in civil contempt when, after receiving notice, it fails to take all reasonable steps within its power to comply with a specific and definite injunctive decree. *In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d 693, 695 (9th Cir. 1993). The preliminary injunction detailed that MCSO lacked the authority to enforce civil federal immigration law and, concomitantly, lacked the authority to detain persons not suspected of violating any state or criminal law based on the belief, however reasonable, that such persons were present in the country unlawfully. (Doc. 494 at 39–40.) The Court orders the following individuals/entities to show cause why they should not be held in contempt for their failure to abide by and apprise MCSO deputies of the terms of the preliminary injunction:

### 1.    Maricopa County Sheriff's Office

Defendant MCSO does not appear to contest that it received notice of the injunction and that it failed to implement the order. By MCSO's own admission, the preliminary injunction was also not distributed within the HSU—the special operations unit which bore the primary responsibility for enforcing state and federal immigration laws and conducting interdiction patrols. (Doc. 804 at 5 ("MCSO has concluded[] that this Court's order was not communicated to the line troops in the HSU."); Doc. 843, Ex. F, at 62 (Dep. of Lt. Joseph Sousa at 178:6–23, *United States v. Maricopa Cnty.*, No. 2-12-cv-00981-ROS (D. Ariz. filed May 10, 2012) ("I don't remember a briefing board because it would be contradictory to the LEAR policy . . . .").) Nor was the preliminary

SER012

injunction communicated to any other MCSO patrol officer. (*See* Doc. 843 at 8 n.1.) As a result, MCSO immigration enforcement activities continued apace despite the issuance of the preliminary injunction.

While it continued this immigration enforcement activity in violation of the injunction, MCSO also wrongfully believed that it could consider Hispanic ancestry in making law enforcement decisions—such as whom to detain to investigate immigration violations. In addition to a Fourth Amendment violation, this error in belief would have resulted in the violation of the Fourteenth Amendment rights of persons of Hispanic ancestry who were detained and investigated by MCSO for immigration violations due to their ethnic heritage, regardless of whether the initial stop resulted in a further detention.

There is also evidence that, during the period relevant to this lawsuit, a number of deputies confiscated items of personal property—such as identifications, license plates, credit cards, cell phones, purses, Mexican currency and passports and religious shrines—from individuals detained in conjunction with immigration enforcement activities and who were members of the Plaintiff class. These items were apparently routinely kept by deputies, destroyed, or deposited in collection bins in the various administrative districts of MCSO. The confiscation of these items apparently continued during the period in which MCSO was enjoined from all immigration enforcement and illustrates further damage that was inflicted as a result of MCSO's violation of the preliminary injunction.

The MCSO officials who received notification of the injunction when it was issued via an e-mail from then-counsel Timothy Casey[6] have conceded that this failure was the result of inaction on their part. (Doc. 804 at 5–6.) As a result of these shortcomings, the order enjoining Defendant from enforcing federal immigration law, operating under the LEAR policy, and unconstitutionally detaining persons based solely on the belief that they were in the country without authorization was never implemented.

---

[6] Defendants have identified an e-mail from Casey to Chief Deputy Sheridan, Executive Chief (Retired) Brian Sands, Chief MacIntyre, and Lieutenant Sousa regarding the injunction shortly after its filing. (Doc. 804 at 5–6.)

SER013

Plaintiffs have identified sufficient evidence confirming the occurrence of violations of this Court's injunction. The Armendariz videotapes, for example, demonstrate that Deputy Armendariz participated in immigration enforcement well after the issuance of the preliminary injunction and even the trial in this matter. (*See* Doc. 843 at 12.) The MCSO investigations that stemmed at least in part from the Armendariz videotapes resulted in an acknowledgement by Defendants that the HSU continued to conduct immigration interdictions as a part of its regular operations well after the issuance of the preliminary injunction and at least up to the entry by this Court of its Findings of Fact and Conclusions of Law. (Doc. 804 at 5.)

Plaintiffs have also provided evidence that civil immigration laws were being enforced by regular MCSO patrol deputies—e.g., including those not in the HSU—and that such immigration enforcement was occurring as a matter of MCSO policy and directive. (*See* Doc. 843, Ex. A, at A3–A8 (detailing three other possible violations of the preliminary injunction).) On September 20, 2012, MCSO deputies apparently detained five Mexican nationals on the belief that they were "clearly recent border crossers" and summoned HSU officers to the scene to question them. (*Id.*, Ex. 2, at A3–A4 (News Release, MCSO, ICE Refuses to Accept Illegal Aliens from Sheriff's Deputies During Human Smuggling Operation, Sept. 21, 2012).) The MCSO press release regarding the incident details that, after detectives were unable to charge two of the men for any state crimes, they nevertheless continued to detain these individuals and attempted to transfer them to U.S. Immigration and Customs Enforcement, "as [had] been the practice during the last six years." (*Id.* at A5.) In at least two other instances over the next few weeks, individuals stopped by MCSO deputies on the belief that they were in the country without authorization but who could not be charged with any crime were apparently detained pursuant to department policy until they could be transferred to ICE or U.S. Customs and Border Patrol. (*See id.*, Ex. B, at A4 (discussing MCSO's "back-up plan"); *see also id.*, Ex. B, at A8.) This course of action—detaining individuals based solely on suspected civil immigration violations pending an inquiry to federal authorities—would have been

SER014

in direct contradiction of the terms of the preliminary injunction. This is true regardless of whether deputies believed to be operating at the direction of federal officers, to the extent that obedience necessitated conduct that violated this Court's Orders. (*See id.*, Ex. B, at 2–3.)

### 2.    Sheriff Joseph M. Arpaio

Defendant Joseph M. Arpaio is the head of MCSO, its chief policy maker, and has "final authority over all of the agency's decisions." (Doc. 530 at 6.) Moreover, as a named Defendant, he has been under a duty at all times during this litigation to take such steps as are necessary to reasonably ensure MCSO is in compliance with this Court's Orders. To this end, Sheriff Arpaio received a Notice of Electronic Filing through his lawyer when the injunction was issued. Sheriff Arpaio has confirmed under oath that he was aware of the order when it came out and "discussed it with [his] attorneys." (Doc. 843, Ex. B, at 31–32 (Dep. of Sheriff Joseph M. Arpaio at 65:13–67:20, *Maricopa Cnty.*, No. 2-12-cv-00981-ROS).) A front-page article published in the Arizona Republic on December 24, 2011, the day after the injunction was filed, corroborates Arpaio's knowledge of the preliminary injunction, noting his intention to appeal it but nevertheless obey its terms in the meantime.[7]

Plaintiffs have proffered evidence that Arpaio failed to take reasonable steps to implement the preliminary injunction's proscriptions. *See Sekaquaptewa*, 544 F.2d at 406. In a related case brought by the U.S. Department of Justice, Sheriff Arpaio stated that he could not recall giving any instructions to ensure his office complied with the preliminary injunction's terms. (Doc. 843, Ex. B, at 32 (Arpaio Dep. at 67:25, *Maricopa Cnty.*, No. 2-12-cv-00981-ROS).) Plaintiffs have also identified evidence that suggests, to the contrary, Sheriff Arpaio directed operations and promulgated policies that violated the terms of the preliminary injunction. For example the September 21, 2012 press release described above in which MCSO announced ICE's refusal to accept custody over

---

[7] *See* J.J. Hensley, *Judge Curbs MCSO Tactics*, Ariz. Republic, December 24, 2011, at A1.

SER015

two Mexican nationals against whom MCSO could bring no criminal charges, Sheriff Arpaio is credited with organizing a "back up plan" in which suspected illegal aliens not taken by ICE would be transferred to Border Patrol: "as directed by the Sheriff," the deputies took the two suspects detained near the Mexico border that could not be arrested to a CBP station. (Doc. 843, Ex. 2 at 7.) The press release further quotes Sheriff Arpaio as saying "Regardless of the Obama Administration[' s policy, I am going to continue to enforce all of the illegal immigration laws," (*id.* at 8), despite the preliminary injunction prohibiting him from doing so.

Similarly, according to another MCSO press release, on September 26, 2012 Sheriff Arpaio personally ordered deputies to transport two persons for whom no criminal charges could be brought to Border Patrol after ICE refused to take custody of them. (*Id.*, Ex. 2, at 9 (News Release, Sheriff's Deputies Execute Search Warrant at Construction Company, September 27, 2012).) An additional MCSO press release dated October 9, 2012 again emphasized that it was Sheriff Arpaio's personal directive that deputies detain persons believed to be in the country without authorization but who could not be charged with crimes until they could be transported to Border Patrol agents: "[m]y back up plan is still in place and we will continue to take these illegal aliens not accepted by ICE to the Border Patrol." (*Id.*, Ex. 2, at 11 (News Release, 2nd Time ICE Refuses to Accept Illegal Alien From Sheriff's Deputies Since September, October 9, 2012).)

Sheriff Arpaio's public pronouncements, in conjunction with MCSO's admission that the HSU continued to conduct immigration interdictions as part of its regular law enforcement activities, contextualize his July 12, 2012 trial testimony as reflecting a more problematic enforcement approach than just continuing the LEAR policy on an *ad hoc* basis—which itself violated the preliminary injunction. At trial, Arpaio testified that, despite the federal government revoking MCSO's 287(g) authorization in 2009, he believed his agency "still had the authority, pursuant to a legitimate arrest, to determine that person was here illegally. And then if there was no state charge to book that person into the jail, [to] turn that person over to ICE." (Doc. 572 at 502.) In response to

SER016

questioning by defense counsel, Sheriff Arpaio testified to some instances in which MCSO continued to retain custody of individuals who could not be lawfully detained on any criminal charges and attempt to transfer them to federal Border Patrol agents:

> Q:      And you have that authority today [July 24, 2012]. In any of your law enforcement actions can you, if you come across someone unlawful, detain them?
>
> A:      Yes. . . . I think probably in the last two weeks we've made over forty arrests of illegal aliens coming into our county, and a few we did not have the state charge, including some young children, and ICE did accept those people. . . . We haven't had any problem yet turning those that we cannot charge in state court over to ICE.

(*Id.* at 502–03.) From his testimony and other public statements he has made, a prima facie case has been made that Arpaio directed his deputies to carry out immigration enforcement operations and promulgated a policy within MCSO that individuals who could not lawfully be detained on any criminal charges should still be held solely on suspicion of unlawful presence for months after the Court enjoined such practices.

### 3.      Chief Deputy Gerald Sheridan

Sheridan has held the position of MCSO's Chief Deputy since November 2010. (Doc. 840 at 3.) The position is second-in-command in the department and is responsible for supervising all of MCSO's operations on both the enforcement and detention sides. (Doc. 530 at 6.) Neither MCSO nor Sheridan denies that he was a recipient of the e-mail from Timothy Casey to which the December 23, 2011 order was attached. (Doc. 840 at 4.) Nevertheless, in his Memorandum re: Criminal Contempt Sheridan asserts that he was not aware of the preliminary injunction when it was issued and it was not his responsibility to disseminate such information. (*Id.*)

Chief Deputy Sheridan's deposition testimony in *United States v. Maricopa County*, provided by Plaintiffs, appears to be inconsistent with these statements. Under oath, Sheridan indicated that it was his responsibility to communicate the injunction to inferior MCSO officers but that he assumed Executive Chief Sands would "deal with" it. (Doc. 843, Ex. D, at 46–49 (Dep. of Gerard Sheridan at 122:1–125:7, *Maricopa Cnty.*,

- 14 -

No. 2-12-cv-00981-ROS).) Sheridan concedes, however, that he never discussed this purported delegation with Sands. (*Id.*) Neither MCSO nor Sheridan took any steps to ensure MCSO's compliance with the injunction. (Doc. 840 at 4.)

In addition, the Court may evaluate Sheriff Arpaio and Chief Deputy Sheridan's history of non-compliance with respect to other and related orders of this Court in determining whether contempt is merited in this instance. *See Stone*, 968 F.2d at 857.

### 4. Executive Chief Brian Sands

Before his retirement, Chief Sands was the Chief of Enforcement at MCSO and reported directly to the Chief Deputy. (Doc. 530 at 6.) With respect to the injunction's execution, Sands allegedly understood it to be the attorney's responsibility to communicate the order to his subordinates, but could not confirm whether or not any directives to this effect had actually been given. (Doc. 843, Ex. C, at 43 (Dep. of Brian Sands at 185:12–20, *Maricopa Cnty.*, No. 2-12-cv-00981-ROS).) Therefore, it appears that Executive Chief Sands may also have failed to take reasonable steps to communicate the injunction to the appropriate individuals within MCSO after receiving notice of it from defense counsel.

### 5. Deputy Chief John MacIntyre

Deputy Chief John McIntyre acknowledges that he received notice of the preliminary injunction from Timothy Casey shortly after its issuance. (Doc. 839 at 3.) He further acknowledges that he did nothing to communicate the existence and/or terms of the order to patrol personnel. (*Id.*) MacIntyre justifies his inaction on the grounds that he believed to be under no obligation to implement the preliminary injunction within MCSO. (*Id.* at 3; Doc. 838 at 2.) However, as Plaintiffs note, there is evidence suggesting that Deputy Chief MacIntyre may bear accountability. In addition to his duties deriving from his rank as a commander, MacIntyre is an attorney who consults with the County Attorney's Office and outside counsel as needed in MCSO's defense. (Doc. 235, Ex. 1, at 12.) Furthermore, in 2009 at least MacIntyre appears to have been a principal contact within MCSO for outside counsel relating to matters involving the Melendres litigation.

SER018

(Doc. 235 at 7.) MacIntyre also assumed responsibility for MCSO's disregard of the document retention notice sent to Casey as outside counsel for Defendants, (*see* Doc. 235 at 7–8, Ex. 3, at 3), that resulted in court-imposed sanctions for spoliation of evidence. (Doc. 261.) Thus, at some points over the course of this litigation, MacIntyre has apparently been under just such an obligation to ensure Defendants' compliance with its duties that he now contests. (*See* Doc. 838.)

### 6.  Lieutenant Joseph Sousa

Beginning in 2007, Sousa was the unit commander for the HSU. (Doc. 530 at 7.) Lieutenant Sousa was noticed by Timothy Casey of the preliminary injunction and, in his role as a supervisor, had the ability to direct and oversee the routine policing of inferior officers including Deputy Armendariz. Based on the evidence Plaintiffs have presented of persistent immigration interdiction patrols being conducted by the HSU after December 2011, Plaintiffs have sufficiently demonstrated that Lieutenant Sousa may not have taken all reasonable steps as required to ensure the injunction was being complied with by line officers in his division.

------------------------

Defendants, joined by the specially appearing non-parties, argue that they had no fault for the deficiencies that resulted in the preliminary injunction not being shared with officers, citing "a lack of communication throughout the department." (Doc. 842 at 14, 18.) This argument lacks merit. Apart from the evidence in the record that MCSO and Sheriff Arpaio have had no difficulty communicating their enforcement priorities throughout the department, the nature of an injunction is such that compliance is mandatory even if it requires some effort by the party bound; the standard by which a party's efforts to comply are judged is one of reasonableness. *See Sekaquaptewa*, 544 F.2d at 406.

Rather than offering evidence that any reasonable steps were undertaken to encourage compliance with the injunction, Defendants insist that their subsequent "good faith" efforts to disseminate the terms of the May 2013 permanent injunction to MCSO

- 16 -

personnel should excuse their noncompliance with the previous order. (Doc. 842 at 19.) As has been previously noted, bad faith is not a prerequisite to a finding of civil contempt. *Stone*, 968 F.2d at 856. Further it does little to ameliorate the harms incurred by the Plaintiff class in the seventeen months after the injunction was issued that in 2013—pursuant to a subsequent order—Defendants "implemented a new policy . . . to ensure all deputies received proper training and guidance to ensure compliance with the Court's Order." (*See* Doc. 842 at 19.) The history of MCSO's compliance with the permanent injunction, which incorporated and extended the terms of the preliminary injunction, does not illustrate good faith on the part of MCSO; rather, it illustrates and justifies, in part, the very necessity of this Order to Show Cause.

In evaluating the appropriateness of a contempt order, Defendants' record of compliance and non-compliance with this Court's previous orders may be considered. In March and April 2014, the Court held several hearings to address misrepresentations of its orders by multiple high-ranking MCSO officials, including Sheriff Arpaio and Chief Deputy Sheridan. (*See* Docs. 662, 672.) Sheridan, in addition to describing the permanent injunction as "ludicrous," averred that attorneys had informed him the Court's May 2013 order was unconstitutional—a statement that he later repudiated in a hearing before this Court. These hearings also confirmed that other MCSO command staff members, without having read this Court's orders, were repeating Sheridan's mischaracterizations to members of the general public. Sheriff Arpaio and Chief Deputy Sheridan both apologized to the Court, and agreed to sign and promulgate a corrective statement within MCSO. After the text of the statement was drafted by both parties and submitted to the Court for approval, however, Sheriff Arpaio rescinded his assent to sign and distribute it. In the end, the Court coerced the statement's transmission to and signature by all MCSO law enforcement personnel, other than Sheriff Arpaio or Chief Deputy Sheridan, via court order under the Monitor's supervision. (Doc. 680.) The Defendants' compelled circulation of the memorandum correcting their previous contemptuous mischaracterizations of this Court's orders, therefore, is not an example of past

compliance and in no way mitigates the need for the present hearings.

### B.     Pre-Trial Discovery Violations

The Federal Rules of Civil Procedure require parties to reasonably and diligently respond to discovery requests. As the Advisory Committee explains, "[i]f primary responsibility for conducting discovery is to continue to rest with the litigants, they must be obliged to act responsibly and avoid abuse." Fed. R. Civ. P. 26(g) (Advisory Committee Notes); *cf. Qualcomm Inc. v. Broadcom Corp.*, No. 05CV1958-B, 2010 WL 1336937 (S.D. Cal. Apr. 2, 2010) (discussing the good faith and professional obligations inuring to litigants and counsel to search for and produce responsive documents). In addition to Rule 37, the Court possesses inherent powers to punish misconduct in discovery proceedings by an order finding the offending person in contempt. Fed. R. Civ. P. 37(d); *Shillitani v. United States*, 384 U.S. 364, 370 (1966). Individuals who are not parties to a lawsuit may be held in contempt for their noncompliance with a discovery order. *U.S. Catholic Conference v. Abortion Rights Mobilization, Inc.*, 487 U.S. 72, 79 (1988).

During the pre-trial phase of litigation Plaintiffs submitted a number of formal discovery demands, including requests for admissions, requests for documents, and interrogatories, for records on MCSO's traffic stops:

> Describe all documents that an MCSO officer may request, review, reference or create during, or as a result of, a Routine Traffic Stop, including the purposes of each document identified and the factors that guide the exercise of an officer's discretion, if any, to request such documents from a driver or passenger.

(Pls.' 1st Set Interrogs. at 5.)

> If incident histories or summaries of the traffic stops conducted in the above-listed operations are not contained with MCSO's computer aided dispatch (CAD) database that was produced to Plaintiffs, please explain in detail: (1) what documents would reflect those traffic stops; (ii) how such documents are created and maintained; and (iii) who would have access to, or control over, those documents.

(Pls.' 2d Set Interrogs. at 4.)

SER021

> [Produce] [a]ll documents relating to all traffic stops performed by every MCSO supervisor, officer, posse member or volunteer for years 2005 to present that may include one or more of the following [information][8]. . . [and] [a]ll documents relating to MCSO's policies, practices, instructions, or training pertaining to traffic stops of any type. . . .

(Pls.' 1st Req. Produc. at 7–8.)

> [Produce] [a]ll documents relating to MCSO's Human Smuggling Unit, Illegal Immigration and Interdiction Unit . . . or volunteer posses as they pertain to . . . MCSO's enforcement of federal immigration law, state immigration law . . . and [t]he performance of Routine Traffic Stops.

(*Id.* at 9.) The term "document" was defined broadly by Plaintiffs to include all

> matters, instruments or other tangible things, including any electronically stored information ("ESI") contained on computer diskette or other media, within the scope of Federal Rules of Civil Procedure 26 and 34, including, without limitation: any and all correspondence, memoranda, complaints, grievances, citations, booking papers, arrestee statements, arrest reports, incident reports, field reports, departmental reports, disciplinary reports or "write-ups," draft reports, preliminary reports, final reports and underlying materials, witness statements, witness interview summaries, field interrogation cards, meeting minutes, meeting agendas, notes of meetings, bulletins, written briefings, intra- and interoffice communications, including CAD and MDT reports, policies, manuals, training materials, books of account, worksheets, desk diaries, appointment books, daily logs, end-of-shift logs, expense accounts, and records of every type and description, all written, recorded and graphic matter of every type and description, electronic mail, electronic databases, radio logs, recordings, transcriptions of recordings, notes of conversations, telegraphic communications, pamphlets, schedules, studies, books, computer printouts, photographs and photographic records, maps, charts, tapes (including video tapes), transcriptions of tapes, and any other device or medium on or through which

---

[8] The location, time and duration of the stop; The specific reason(s) or justification(s) for the stop; any and all details about the vehicle, such as plate number, make, model and year; The names of driver(s) and passenger(s); The age, gender and race or ethnicity of the driver(s) and passenger(s); Whether any driver or passenger was questioned, warned, cited, searched, arrested, detained or investigated and the reason(s) therefor; The specific questions asked of driver(s) and passenger(s); Any database checks run on the driver(s), passenger(s) or vehicle; Whether a search was conducted and the basis therefor; If searched, whether any contraband was found; and Whether any driver or passenger was referred to, held for, or subsequently transferred to the custody of ICE and the reason(s) therefor. (Pls.' 1st Req. Produc. at 7–8.)

- 19 -

SER022

information of any type is transmitted, recorded, or preserved.
The term "document" also means every copy of a document
where such copy is not an identical.

(*E.g.*, *id.* at 3–4.) Despite these requests, Defendants apparently never disclosed to Plaintiffs that (1) some—if not the majority—of MCSO deputies had audio-recording devices issued to them as a matter of policy; (2) such audio-recording devices were in use during the relevant discovery periods; (3) at least some MCSO deputies had body- and/or vehicle-mounted video-recording devices issued to them during the relevant discovery periods; (4) at least some MCSO deputies recorded their on-duty activities with privately purchased video equipment during the relevant discovery periods; (5) HSU procedures apparently required some video recordings of traffic stops to be made; (6) HSU maintained a catalog of DVDs containing recordings of traffic stops by officers; and (7) at least some MCSO deputies had video cameras issued to them as a supervisory measure to monitor their on-duty activities. Defendants apparently never identified nor produced to Plaintiffs the associated physical copies of these audio and video recordings. In addition, dozens of personal identifications and items of personal property have been found in offices previously used by the HSU and elsewhere, along with a number of boxes of written reports pertaining to HSU operations. There is also no evidence that they were ever provided to the Plaintiffs as part of Defendants' pre-trial discovery obligations in this matter.

These materials appear to be relevant both to the merits of Plaintiffs' civil rights claims and for impeachment purposes, and their production prior to trial may have led to the admission at trial of evidence of additional infringements suffered by the Plaintiff class as a result of MCSO's actions. Such evidence may have resulted in a broader scope of injunctive relief ultimately entered by this Court. MCSO leadership has acknowledged that officers—both within the HSU and in other units—were regularly making audio recordings of their traffic stops pursuant to departmental practice and that some deputies even videotaped their traffic stops using devices purchased by MCSO for such purpose. (Doc. 700 at 21, 23–24.) There is also evidence that MCSO officers routinely confiscated

- 20 -

items of personal property from members of the Plaintiff class during periods that were either subject to discovery disclosure and/or during the time that the MCSO was violating the preliminary injunction. Plaintiffs have sufficiently demonstrated the likelihood that Defendants had at least some of this knowledge at a time in which they had an obligation under the Federal Rules of discovery to disclose it. For these reasons, Defendants MCSO and Sheriff Arpaio are ordered to show cause why the non-disclosure of this evidence does not constitute a contemptuous violation of Defendants' pre-trial discovery obligations.

In addition to the named Defendants, Deputy Chief MacIntyre is also ordered to show cause why he should not be held in contempt for abetting Defendants' discovery violations. MacIntyre has already once borne responsibility for evidence spoliation at an earlier stage in this litigation: in July 2008, counsel for Plaintiffs wrote a letter to Timothy Casey demanding the preservation of all MCSO records that had to do with immigration patrols since the initial putative class action complaint was filed and any subsequent crime suppression operations. Deputy Chief MacIntyre is an attorney who also served as Casey's contact within MCSO at this time and admitted that he "simply, albeit regrettably, forgot to forward [the demand for documents] to others at the MCSO. . . ." (Doc. 235, Ex. 3, at 3.) In an affidavit, MacIntyre explained that his

> standard practice upon receiving requests for the production of MCSO documents in litigation or requests to preserve MCSO documents in litigation . . . [is] to forward such requests for handling to the MCSO Legal Liaison Division, and the appropriate personnel within the MCSO that . . . may have documents potentially responsive to the particular request.

(*Id.* at 2–3.) His statements as to the role he played in MCSO's discovery process are sufficient evidence that he may also have been responsible for Defendants' failure to disclose the evidence at issue now.

## C.   Failure to Cooperate with May 14, 2014 Oral Orders

The third ground on which Plaintiffs assert that Defendants should be ordered to show cause relates to Defendants' non-compliance with the Court's May 14, 2014

- 21 -

Orders. In sealing the hearing in which the Armendariz evidence was disclosed, the Court commanded that the information discussed therein be kept confidential. (Doc. 700 at 7, 50–51, 69.) The Court then directed Defendants to "quietly" develop an evidence collection protocol to retrieve outstanding recordings, such as those made by Armendariz, that were in the possession of patrol deputies. (*Id.* at 25–27.) The following persons are ordered to show cause why their conduct subsequent to this hearing did not constitute contempt of Court:

### 1.    Maricopa County Sheriff's Office

The Maricopa County Sheriff's Office is responsible for its leaders' apparent sharing of confidential information discussed under seal with non-participants, in contravention of this Court's order. At the hearing, both MCSO and the Court acknowledged the need for confidentiality to preserve the efficacy of an ongoing criminal investigation and to discourage the destruction of evidence by culpable parties within MCSO. (*Id.* at 5, 22–23.) In the early afternoon, Deputy Chief Trombi was summoned into a meeting that included Sheriff Arpaio, Chief Deputy Sheridan, and MCSO's attorneys and directed to e-mail division commanders about collecting past video recordings of patrol operations. (Docs. 795, Attach. 1, at 4; Doc. 803 at 59.) Neither Trombi nor any of the twenty-seven MCSO commanders he subsequently notified by memorandum were present at this hearing.

The resulting e-mail from Trombi to division commanders, and the survey-approach strategy of collecting the recordings described in the e-mail and ultimately employed by MCSO, also apparently constituted disobedience to the Court. During the hearing, the Court indicated that what it expected from MCSO with respect to a video-retrieval course of action

> is a thought-through plan that is executed very quickly, because this is all, likely, already through part of the department, in which you can quietly gather up such material, such data, and that you can determine where it was held, when it was held, and if any particular officer says it was deleted, when that deletion occurred, and from where. Or destruction, if it was held on DVDs like Armendariz's.

- 22 -

(Doc. 700 at 27.) At numerous points the Court discussed the Monitor's involvement in the development of a retrieval plan,[9] and near the end of the hearing the Court concluded,

> I'm going to direct the monitor to work with you on a plan *that he can approve* that's your best thinking about how you can, without resulting in any destruction of evidence, gather all the recordings, and then based on what you find, and/or maybe beginning before you can assess what you find, depending upon your thoughts, you result in an appropriate and thorough investigation.

(*Id.* at 41 (emphasis added).) Tim Casey, representing MCSO, affirmatively stated that the investigation was within the "purview" of the Monitor's authority: "[W]e agree that Bob Warshaw and his team, because of the Armendariz material, have the need, as an officer of the Court, to investigate those matters." (*Id.* at 39–40.) In the end, the executive leaders of MCSO and their legal counsel pursued an independent plan without consulting the monitoring team, communicated that plan to subordinate personnel, and failed to inform the Monitor at the first available opportunity that they had done so. Chief Deputy Sheridan and Christine Stutz, another attorney for MCSO who had been present during the earlier meeting with Trombi, later met with the monitoring team for several hours discussing investigative strategies for retrieving outstanding recordings without mentioning that a contrary decision had already been reached and implemented.

### 2.      Sheriff Joseph Arpaio

Sheriff Arpaio, a named Defendant in this case, was present at the hearing in which the Court ordered MCSO to develop a plan to comprehensively collect any outstanding recordings of traffic stops while minimizing the risk of evidence destruction. He was also apparently present at the meeting in which Deputy Chief Trombi was instructed by Chief Deputy Sheridan to e-mail commanders. In clear terms, the Court ordered Arpaio to take "full and complete steps to investigate who may have been aware

---

[9] (*See, e.g.*, Doc. 700 at 27 ("I will have my monitor work with you to develop a pro—if you want his assistance."); *id.* at 29 ("[D]o your best, and I mean your level best, come up with a plan, review it with the monitor if you will, if you need to, to recover all of that data.").)

SER026

that this activity was going on, no matter how high up the chain it goes," and "to be involved in the supervision and the understanding and the direction of . . ." such investigations. (*Id.* at 37.) Arpaio assented, and further acknowledged the role the Monitor would play:

> The Court:    All right. And you will cooperate completely with my monitor.
>
> Arpaio:    Yes, I—
>
> The Court:    And no information will be withheld from him. . . . You will cooperate with the monitor, Sheriff?
>
> Arpaio:    Yes. If we have some differences . . . we will bring that forward and try to alleviate any problems.
>
> The Court:    And do that in a timely fashion. But with–to me. But in the meantime, I believe that all records and all activity pursuant to any of these investigations is under his authority. And Mr. Casey, if you have any problem with that, it's time to let me know now.
>
> Casey:    No.

(*Id.* at 38–39.) Despite his statements to the Court, Sheriff Arpaio apparently failed to take such steps as were necessary to ensure MCSO was in compliance with this Court's May 14, 2014 orders as they related to evidence collection and administrative oversight. As MCSO's elected leader, Arpaio may delegate the authority vested in him by the residents of Maricopa County to his subordinates. Ultimately, however, he must bear responsibility for any deficiencies on their part that causes MCSO as an agency to violate this Court's directives.

### 3.    Chief Deputy Gerald Sheridan.

Chief Deputy Sheridan was also present at the May 14 hearing. Apparently at the direction of Sheriff Arpaio, Sheridan bore primary responsibility for collecting outstanding recordings and investigating MCSO personnel implicated by the tapes as having engaged in problematic police practices. (*Id.* at 37, 40.) Sheridan has admitted that, despite the sealed nature of the hearing and his admonition that he would work with

SER027

1    the Monitor, (*see id.* at 42), he instructed Deputy Chief Trombi to send the e-mail to

2    commanding officers that countermanded the Court's order and preemptively

3    undermined the arrangement subsequently agreed to in consultation with the monitoring

4    team. (Doc. 803 at 59.)

5    **III.   Remedies**

6           Civil contempt sanctions are imposed to coerce obedience to a court order, or to

7    compensate injured parties for harm resulting from the defendant's contemptuous

8    behavior, or both. *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821,

9    827–28 (1994). Given the remedial purpose of the sanction, a finding of civil contempt

10   should be accompanied by conditions by which the contempt judgment may be purged.

11   *United States v. Bright*, 596 F.3d 683, 696 (9th Cir. 2010). In contrast, a criminal

12   contempt proceeding punishes intentional disobedience with a judicial order and, thus,

13   vindicates the authority of the court. *Bagwell*, 512 U.S. at 828. The crime of contempt is

14   completed when the contumacious conduct occurs, regardless of whether the subject later

15   complies with the order he or she violated. The same conduct may give rise to both civil

16   and criminal contempt. *Rylander*, 714 F.2d at 1001.

17          It is the Court's expectation that these contempt proceedings will allow for the

18   development of an evidentiary record sufficient for the Court to evaluate whether it can

19   fashion an appropriate judicial response that vindicates the rights of the Plaintiff class,

20   and whether other remedies may be appropriate. To this end, the Parties have proposed a

21   number of suggestions for providing remuneration to the individuals harmed by

22   Defendants' violations of the injunction and/or an award of damages to the Plaintiff class

23   as a whole. (Doc. 843 at 22–25.) However, the feasibility of these measures remains to be

24   seen: Defendants have cautioned, for example, that the compensatory purpose of civil

25   contempt could prove impractical under the circumstances. (Doc. 842 at 17; Doc. 858 at

26   30.) The viability of crafting suitable civil relief for each of the grounds on which

27   contempt is charged will be of chief interest to the Court if Defendants, or their

28   subordinates, are ultimately adjudged to be in contempt of court.

SER028

**CONCLUSION**

Based upon the foregoing facts, Plaintiffs have set forth sufficient evidence that MCSO and the aforementioned individuals acted in contempt of this Court's "lawful writs, processes, orders, rules, decrees, or commands" by (1) failing to implement and comply with the preliminary injunction; (2) violating their discovery obligations; and (3) acting in derogation of this Court's May 14, 2014 Orders. *See* 18 U.S.C. § 401(3).

After an appropriate hearing, the Court will determine whether these individuals have committed contempt of court and the sanctions for any such violations. In conjunction with this Order to Show Cause, an order has also been filed granting Plaintiffs' requests for expedited discovery in anticipation of an evidentiary hearing in these matters.

**IT IS THEREFORE ORDERED** setting an evidentiary hearing for **April 21, 22, 23, and 24, 2015.** Proceedings will begin daily at **9:00 a.m.** in Courtroom 602 of the Sandra Day O'Connor Courthouse at 401 W. Washington Street, Phoenix, Arizona 85003.

**IT IS FURTHER ORDERED** that the following parties are to appear before the Court and show cause, as indicated, why the Court should not impose sanctions on them pursuant to 18 U.S.C. § 401 and/or Federal Rule of Civil Procedure 37(d): the Maricopa County Sheriff's Office, Sheriff Joseph Arpaio, Chief Deputy Gerald Sheridan, Executive Chief (ret.) Brian Sands, Deputy Chief John MacIntyre, Lieutenant Joseph Sousa.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

SER029

1       **IT IS FURTHER ORDERED** that the Clerk of the Court is **DIRECTED** to

2 submit a copy of this Order to Show Cause to the United States Marshal for service upon

3 the following: the Maricopa County Sheriff's Office, Joseph Arpaio, Gerald Sheridan,

4 Brian Sands, John MacIntyre, and Joseph Sousa. A copy of this Order shall also be

5 provided to the United States Attorney for the District of Arizona.

6       Dated this 12th day of February, 2015.

7

8                         Honorable G. Murray Snow

9                         United States District Judge

SER030

1              UNITED STATES DISTRICT COURT

2               FOR THE DISTRICT OF ARIZONA

3

4    Manuel de Jesus Ortega        )
     Melendres, et al.,            )
5                                  )
                  Plaintiffs,      )   CV 07-2513-PHX-GMS
6                                  )
                  vs.              )   Phoenix, Arizona
7                                  )   April 24, 2015
     Joseph M. Arpaio, et al.,     )   8:41 a.m.
8                                  )
                  Defendants.      )
9    _____)

10

11

12

13

14

15          REPORTER'S TRANSCRIPT OF PROCEEDINGS

16          BEFORE THE HONORABLE G. MURRAY SNOW

17       (Evidentiary Hearing Day 4, pages 818-1030)

18

19

20

21

22   Court Reporter:        Gary Moll
                            401 W. Washington Street, SPC #38
23                          Phoenix, Arizona  85003
                            (602) 322-7263
24
     Proceedings taken by stenographic court reporter
25   Transcript prepared by computer-aided transcription

1                        A P P E A R A N C E S

2

3   For the Plaintiffs:          Cecillia D. Wang, Esq.
                                 AMERICAN CIVIL LIBERTIES UNION
4                                FOUNDATION
                                 Immigrants' Rights Project
5                                39 Drumm Street
                                 San Francisco, California  94111
6                                (415) 343-0775

7                                Stanley Young, Esq.
                                 Hyun S. Byun, Esq.
8                                COVINGTON & BURLING, L.L.P.
                                 333 Twin Dolphin Drive, Suite 700
9                                Redwood Shores, California  94065
                                 (650) 632-4700
10
                                 Daniel J. Pochoda, Esq.
11                               Joshua D. Bendor, Esq.
                                 AMERICAN CIVIL LIBERTIES
12                               FOUNDATION OF ARIZONA
                                 3707 N. 7th St., Suite 235
13                               Phoenix, Arizona  85014
                                 (602) 650-1854
14
                                 Andre I. Segura, Esq.
15                               AMERICAN CIVIL LIBERTIES UNION
                                 FOUNDATION
16                               Immigrants' Rights Project
                                 125 Broad Street, 17th Floor
17                               New York, New York  10004
                                 (212) 549-2676
18
    For the Defendants:          Michele M. Iafrate, Esq.
19                               IAFRATE & ASSOCIATES
                                 649 N. 2nd Avenue
20                               Phoenix, Arizona  85003
                                 (602) 234-9775
21
    For the Defendant Maricopa County:
22
                                 Richard K. Walker, Esq.
23                               WALKER & PESKIND, P.L.L.C.
                                 16100 N. 71st Street
24                               Suite 140
                                 Scottsdale, Arizona  85254
25                               (480) 483-6336

1                     A P P E A R A N C E S

2

3  For the Defendant Arpaio:   A. Melvin McDonald, Esq.
                                JONES, SKELTON & HOCHULI, P.L.C.
4                               2901 N. Central Avenue, Suite 800
                                Phoenix, Arizona  85012
5                               (602) 263-1700

6  For Chief Deputy Sheridan: Lee D. Stein, Esq.
                                MITCHELL STEIN CAREY
7                               One Renaissance Square
                                2 North Central Avenue
8                               Suite 1900
                                Phoenix, Arizona  85004
9                               (602) 358-0290

10  For Executive Chief Sands:  Greg S. Como, Esq.
                                LEWIS BRISBOIS BISGAARD
11                              & SMITH, L.L.P.
                                Phoenix Plaza Tower II
12                              2929 N. Central Avenue
                                Suite 1700
13                              Phoenix, Arizona  85012-2761
                                (602) 385-1040

14
   For Deputy Chief MacIntyre: Gary L. Birnbaum, Esq.
15                              DICKINSON WRIGHT, P.L.L.C.
                                Attorneys at Law
16                              1850 N. Central Avenue, Suite 1400
                                Phoenix, Arizona  85004
17                              (602) 285-5000

18  For Lieutenant Sousa:       David S. Eisenberg, Esq.
                                DAVID EISENBERG, P.L.C.
19                              2702 N. 3rd Street
                                Suite 4003
20                              Phoenix, Arizona  85004
                                (602) 237-5076

21
   ALSO PRESENT:                Chief Robert Warshaw
22                              Chief John Girvin
                                Chief Raul Martinez
23                              Karen Clark, Esq.
                                Ralph Adams, Esq.

24

25

SER033

1                           I N D E X

2    Witness:                                              Page

3    GERALD SHERIDAN

4    Direct Examination by Ms. Wang                        821
     Cross-Examination by Ms. Iafrate                      922
5    Direct Examination by the Court                       965
     Cross-Examination Continued by Ms. Iafrate            966
6    Further Examination by the Court                      967

7

8                         E X H I B I T S

9    No.      Description                              Admitted

10   147      Azcentral opinion article by Jerry Sheridan,   906
              *Here are the facts in profiling suit vs.*
11            *MCSO* dated 1/12/2014

12   204C     Video Clip 3 of October 18, 2013 Crime        911
              Suppression Briefing
13
     204D     Video Clip 4 of October 18, 2013 Crime        913
14            Suppression Briefing

15   204E     Video Clip 5 of October 18, 2013 Crime        914
              Suppression Briefing
16
     204G     Video Clip 7 of October 18, 2013 Crime        916
17
              Suppression Briefing

18

19

20

21

22

23

24

25

1    A.  Yes, sir.

2    Q.  There is -- is it Sergeant Anglin as well?

3    A.  Yes, sir.  For a short time he was involved in the case.

4    Q.  And somebody from your posse?

5    A.  Yes, sir.                                               17:08:18

6    Q.  And they spent a lot of time in Seattle?

7    A.  Yes, sir.

8    Q.  Did you report to Sheriff Arpaio about what they were

9    doing?

10   A.  Yes, sir.                                               17:08:26

11   Q.  How often did you report to Sheriff Arpaio about what they

12   were doing?

13   A.  We got weekly updates, sometimes twice a week.

14   Q.  Think he understood what they were doing?

15   A.  I would think so, yes.                                  17:08:41

16   Q.  You heard him yesterday say that the DOJ was wiretapping me

17   and other judges, and that that was part of that investigation.

18        You heard that testimony, didn't you?

19   A.  Yes, sir.

20   Q.  I didn't hear you say anything about that.  Was that part   17:08:58

21   of the investigation?

22   A.  I -- it's my recollection that I don't believe you were.

23   There were wiretaps.  I know that there were wiretap numbers

24   that were from my phone and the sheriff's phone in about 2008.

25   I certainly don't recall yours.                            17:09:30

SER035

1        What maybe the sheriff was confusing that with, there

2    were -- there was information that Dennis Montgomery gave us

3    that certain law offices, Jones, Skelton & Hochuli, Ogletree

4    Deakins, two law firms that represented us in the DOJ case,

5    were breached.  One in particular with Mr. Popolizio, who was          17:10:06

6    representing us.

7    Q.  Well, let's go back to my question.

8    A.  I'm getting there, Your Honor.

9    Q.  Okay.

10   A.  Because you're next.                                              17:10:19

11   Q.  Okay.

12   A.  And also there was some information that your e-mail from

13   the court was possibly there -- there might have been an e-mail

14   from the -- the DOJ to you.

15       But understand, Dennis Montgomery gave us no evidence           17:10:45

16   that showed the contents of any of those e-mails except one

17   sentence from Mr. Popolizio's e-mail that talked about

18   something about his daughter and a soccer game.

19       It's a very long story.  I don't think you have

20   time -- I can tell it in --                                          17:11:14

21   Q.  I don't want to hear it, but I will let you tell it later

22   because we'll decide if we're going to take this up later.

23       But in your description of the investigation I didn't

24   hear anything about the DOJ at all.  So why would

25   Mr. Montgomery have been looking at my computer to see if the        17:11:28

1    DOJ was sending me e-mails?

2    A.  Okay.  Here's where the plot thickens a little bit with

3    Mr. Montgomery.  Mr. Montgomery worked for the CIA.  And I

4    don't remember the years, but it was '07 to '10 for a few

5    years, and he took --                                      17:11:58

6    Q.  When you say '7 to '10 for a few years, I don't -- I didn't

7    understand that.

8    A.  2007 to 2010, sometime -- I may have the dates wrong,

9    because this has been a few years, and I've had other things on

10   my mind since this thing kind of got cold.                 17:12:15

11         He would -- when he worked for the CIA, he pulled data

12   from American citizens for the CIA.  I mean, we heard a lot

13   about this a few years ago; it was very much in the media.  And

14   he said he was one of the individuals that was tasked with

15   doing that, and he knew that was incorrect, it was wrong, and   17:12:38

16   so he made backup copies that he took and he kept.  And he was

17   mining that data to find these e-mail breaches, to find the

18   bank information that he originally came to us with.

19   Q.  Well, so he found information that the DOJ had sent a

20   communication to my computer?                              17:13:05

21   A.  Something to that effect, yes.

22   Q.  And he brought that to you, and did he have the actual

23   content of the communication?

24   A.  No, sir.

25   Q.  How did he know -- how did he arrive at the conclusion that  17:13:17

1   the DOJ had accessed my computer?

2   A.  Again, we were always very skeptical of what he was giving

3   us.  However, he was giving us information on occasion that was

4   credible.

5         We had a seated justice in Washington -- I can't                    17:13:42

6   recall his name; I have it written down on my pad, Your

7   Honor -- that is a member of the FISA court in Washington, D.C.

8   We had Mr. Mon -- because the sheriff and I were concerned

9   about the CIA wiretapping our phones.  This justice actually

10  confirmed that these were typical wiretap numbers, and so it                17:14:16

11  did give Mr. Montgomery a little more credibility with us.

12        And we continued to work with him, we continued to

13  keep him on our informant payroll, so to speak, as he was

14  producing information.  But it became very slow, it became very

15  stale, and we finally realized that he was stringing us along.             17:14:49

16  Q.  You know, with all due respect, we did hear the sheriff say

17  yesterday that he -- some pretty critical comments about the

18  Department of Justice.  Do you remember those?

19        Maybe I misremember.  I'll scratch that.

20        Let me ask you this:  If in fact the sheriff thought          17:15:19

21  there might have been some improper collusion between me and

22  the Department of Justice, can you blame him if he wanted to

23  investigate that further?

24  A.  Could I blame the sheriff?

25  Q.  Yeah.                                                                   17:15:33

1    A.  Well, there was -- there was really nothing to think that

2    there was any collusion.

3    Q.  Well, I certainly agree with that, but Mr. Montgomery was

4    an expensive proposition for the MCSO, was he not?

5    A.  He was.                                                      17:15:48

6    Q.  Did you ever hear the sheriff describe his work as an

7    investigation of a conspiracy, or something of that nature,

8    between the Department of Justice and me?

9    A.  No, sir.

10   Q.  Did you ever hear him describe it as an investigation of me   17:16:04

11   to anyone at the MCSO?

12   A.  No, sir.  As a matter of fact, I made quite sure, and I

13   believe in the presence of the sheriff, with detective --

14   Sergeant Anglin and Detective Mackiewicz when this information

15   came forward that they were not, it was -- and I don't normally  17:16:29

16   do this because it's not my style, but I told them:  This is a

17   direct order from me.  You are not to investigate any

18   information involving Judge Snow.  If any further information

19   comes up, I want to know immediately.  Nothing ever did

20   materialize.                                                     17:16:52

21   Q.  So Montgomery brought you some information?

22   A.  Initial.  And when we say "information," what Montgomery

23   would do, because -- I'll try and give you the two-second

24   version.  When you send an e-mail, it goes out in bits and

25   pieces and it could go all over the world.  It could go to      17:17:13

1     Indonesia and back within seconds.  And it comes back in your

2     computer, the system puts it back together.

3          Montgomery has that data, or he says he does, in

4     those -- in that format.  He needs -- or he says he needed

5     supercomputers to put that information together.  He doesn't      17:17:36

6     have one.  He's got this huge one in his garage, and it takes

7     forever to run programs.  And so he would come back with

8     information.

9          Our primary focus, Your Honor, was the fraud, the bank

10    fraud, the -- excuse me, the computer fraud of him hacking into   17:17:57

11    person -- people's personal bank accounts.

12    Q.  Are you uncomfortable telling me who the target of this

13    investigation was?

14    A.  No, because there were about 50,000 people.  Some of them

15    very prominent people.                                           17:18:14

16    Q.  Well, the sheriff told me that the target was the

17    Department of Justice.  Do you remember that?

18    A.  I -- I'm sorry, I don't.

19    Q.  Oh.  Who would have had to sign off on these

20    investigations?                                                  17:18:30

21    A.  I don't --

22    Q.  When I say the target of the investigation, in other words,

23    he thought the Department of Justice was doing the bugging.  Do

24    you remember that?  And the investigation was trying to find

25    out the Department of Justice's bugging of judges and your       17:18:42

SER040

1    defense attorney and your offices.

2           Do you remember him saying that?

3    A.   I -- I don't remember.

4    Q.   He didn't mention anything about banks, that I recall.

5    A.   Well, when I think it's Dennis Montgomery and what we were      17:19:01

6    doing with him, it was really the bank fraud, it was the DOJ

7    wiretapping our phones going into the e-mail accounts of our

8    counsel, and there was something in there about your e-mail

9    also.

10          So, you know, the DOJ was on our radar screen because,      17:19:26

11   you know, personally if they did do an illegal wiretap on my

12   phone, I would have liked to -- I would like to know that.

13   Q.   I would, too.  You didn't call me.

14   A.   Probably good thing.

15          And so that's how -- that's how that happened.  So        17:19:52

16   when you say sign off on it, now, we were working with the

17   Arizona Attorney General's Office, as they were going to

18   prosecute this case if we were ever able to bring it to a

19   conclusion.

20          And it was also our intent and it is also our intent      17:20:16

21   to gather -- to complete gathering this information, because

22   Montgomery has promised us -- we're no longer paying him, we

23   haven't been paying him for a while -- some further

24   information, and to package this up and forward it to the

25   Federal Bureau of Investigation.  That was going to be our --    17:20:41

1    our final conclusion to tie up this case.

2    Q.  Let me ask you, Montgomery's simply a computer consultant,

3    isn't he?

4    A.  Well, that's what he is now.  He did work for, and this had

5    been verified, and you can google his name and find all kinds          17:21:01

6    of crazy stuff about him, but there were some pieces of

7    information that were verified and credible also.  So like many

8    informants that we deal with, there's a very shady side of them

9    and then there's also a very credible side for them.

10   Q.  Well, why in the world did you have to designate him as a           17:21:24

11   confidential informant if there isn't anything he was doing

12   that was confidential was there?

13   A.  Well, he was working with us confidentially.

14   Q.  Well, why can't you just hire him as a consultant?

15   A.  Because he was -- well, I don't know.  This is the way we           17:21:41

16   handled him.

17   Q.  Well, you don't have -- there's certain protections from

18   disclosure if you designate somebody as a confidential

19   informant, aren't there?

20   A.  Yes, sir.                                                          17:21:54

21   Q.  That don't apply to just consultants?

22   A.  That's correct.

23   Q.  So I can do a public information request, you gotta give me

24   your consultants, but you don't have to give me your

25   confidential informants, do you?                                       17:22:06

1    A.  No, but when the -- somebody leaks to members of the media

2    who he is, he's no longer confidential.

3    Q.  Well, but what was he doing that he needed to be

4    confidential for?

5    A.  Well, it could have shown --                                    17:22:26

6    Q.  He hadn't infiltrated organized crime, had he?

7    A.  Could have shown that either the Department of Justice or

8    the CIA was breaching American citizens' personal information,

9    and he had at least 50,000, that I remember, of citizens that

10   lived here in Maricopa County.                                     17:22:52

11   Q.  But I still don't understand.  Do you have a definition of

12   what a confidential informant is anywhere in your operations

13   manual?

14   A.  Yes, sir, we do.

15   Q.  And is it written so broadly that Dennis Montgomery          17:23:02

16   qualifies?

17   A.  I believe so.

18   Q.  Who all has to sign off -- you purchased a bunch of

19   equipment for him.

20   A.  We did, but we never gave it to him.                          17:23:17

21   Q.  You authorized travel and overtime and pay for your

22   detectives to go to Seattle?

23   A.  Yes, sir.

24   Q.  Why were you doing this out of Seattle?

25   A.  That's where he lives.                                        17:23:35

1   Q.  Why did your detectives have to go to Seattle?

2   A.  That's where his massive computer system is.

3   Q.  Who -- did they have to be there with him?

4   A.  Well, that was always the discussion, because we wanted to

5   be there when he found the information.  And he worked a lot          17:23:48

6   harder when our detectives were there than when they weren't.

7   Q.  Was it worth paying their overtime and travel and all those

8   expenses?

9   A.  Well, now that we look back, and hindsight's 20/20,

10  probably not.                                                         17:24:07

11  Q.  Let me ask this:  Did you ever get any referrals that you

12  handled within PSB related to this investigation?

13  A.  I don't believe so, no, sir.

14          THE COURT:  Well, I thank you for your patience.  We

15  will probably be resuming this matter in June, but I think it's       17:24:27

16  time to let you go.  Thank you.

17          THE WITNESS:  Thank you, Your Honor.

18          MS. WANG:  Your Honor, I did have redirect.  Do you

19  want me just to defer that till June?

20          THE COURT:  I had assumed you were going to redirect.         17:24:40

21  How long is it?  I assumed you were going to defer.  I'm sorry.

22          MS. WANG:  I'm happy to defer the redirect, Your

23  Honor.

24          THE COURT:  I think it makes sense.  We've gone pretty

25  late in the day.                                                      17:24:48

```
 1              MS. WANG:  Happy to do that.

 2              THE COURT:  Thank you.

 3              MS. WANG:  Thank you.

 4              THE COURT:  So you can step down.

 5              Do you know, do we want to set a status conference on      17:24:53

 6    what we're going to do and how we're going to handle things

 7    for, say, how about May 8th?  I'll --

 8              MS. WANG:  Your Honor --

 9              THE COURT:  Go ahead.

10              MS. WANG:  I'm sorry, Your Honor.  May we do that        17:25:11

11    telephonically, for those of us who are out of town?

12              THE COURT:  Yes.

13              MS. WANG:  Thank you.

14              THE COURT:  Ms. Clark, did you need to be heard?

15              MS. CLARK:  There's a record I need to make with the     17:25:18

16    Court.

17              THE COURT:  Come forward.

18              (Pause in proceedings.)

19              THE COURT:  Ms. Clark would like to make a record with

20    the courtroom cleared, so I'm going to do our scheduling first     17:25:48

21    and then we'll hear from Ms. Clark.

22              How about May 8th?  That's Friday, May 8th.

23              MR. McDONALD:  I leave for Iowa --

24              THE COURT:  Can you get a microphone?

25              MR. McDONALD:  Yes.                                      17:26:06
```

1                    C E R T I F I C A T E

2

3

4

5

6         I, GARY MOLL, do hereby certify that I am duly

7    appointed and qualified to act as Official Court Reporter for

8    the United States District Court for the District of Arizona.

9         I FURTHER CERTIFY that the foregoing pages constitute

10   a full, true, and accurate transcript of all of that portion of

11   the proceedings contained herein, had in the above-entitled

12   cause on the date specified therein, and that said transcript

13   was prepared under my direction and control.

14

15

16         DATED at Phoenix, Arizona, this 25th day of April,

17   2015.

18

19                              s/Gary Moll

20                    _____

21

22

23

24

25

1                   UNITED STATES DISTRICT COURT

2                   FOR THE DISTRICT OF ARIZONA

3

4    Manuel de Jesus Ortega          )
     Melendres, et al.,              )
5                                    )
                    Plaintiffs,      )   CV 07-2513-PHX-GMS
6                                    )
                    vs.              )   Phoenix, Arizona
7                                    )   April 23, 2015
     Joseph M. Arpaio, et al.,       )   8:34 a.m.
8                                    )
                    Defendants.      )
9    _____ )

10

11

12

13

14

15             REPORTER'S TRANSCRIPT OF PROCEEDINGS

16             BEFORE THE HONORABLE G. MURRAY SNOW

17        (Evidentiary Hearing Day 3, pages 512-817)

18

19

20

21

22   Court Reporter:          Gary Moll
                              401 W. Washington Street, SPC #38
23                            Phoenix, Arizona  85003
                              (602) 322-7263
24
     Proceedings taken by stenographic court reporter
25   Transcript prepared by computer-aided transcription

SER047

1                        A P P E A R A N C E S

2

3    For the Plaintiffs:          Cecillia D. Wang, Esq.
                                  AMERICAN CIVIL LIBERTIES UNION
4                                 FOUNDATION
                                  Immigrants' Rights Project
5                                 39 Drumm Street
                                  San Francisco, California  94111
6                                 (415) 343-0775

7                                 Stanley Young, Esq.
                                  Hyun S. Byun, Esq.
8                                 COVINGTON & BURLING, L.L.P.
                                  333 Twin Dolphin Drive, Suite 700
9                                 Redwood Shores, California  94065
                                  (650) 632-4700
10
                                  Daniel J. Pochoda, Esq.
11                                Joshua D. Bendor, Esq.
                                  AMERICAN CIVIL LIBERTIES
12                                FOUNDATION OF ARIZONA
                                  3707 N. 7th St., Suite 235
13                                Phoenix, Arizona  85014
                                  (602) 650-1854
14
                                  Andre I. Segura, Esq.
15                                AMERICAN CIVIL LIBERTIES UNION
                                  FOUNDATION
16                                Immigrants' Rights Project
                                  125 Broad Street, 17th Floor
17                                New York, New York  10004
                                  (212) 549-2676
18
     For the Defendants:          Michele M. Iafrate, Esq.
19                                IAFRATE & ASSOCIATES
                                  649 N. 2nd Avenue
20                                Phoenix, Arizona  85003
                                  (602) 234-9775
21
     For the Defendant Maricopa County:
22
                                  Richard K. Walker, Esq.
23                                WALKER & PESKIND, P.L.L.C.
                                  16100 N. 71st Street
24                                Suite 140
                                  Scottsdale, Arizona  85254
25                                (480) 483-6336

1                          A P P E A R A N C E S

2

3    For the Defendant Arpaio:  A. Melvin McDonald, Esq.
                                JONES, SKELTON & HOCHULI, P.L.C.
4                               2901 N. Central Avenue, Suite 800
                                Phoenix, Arizona  85012
5                               (602) 263-1700

6    For Chief Deputy Sheridan: Lee D. Stein, Esq.
                                MITCHELL STEIN CAREY
7                               One Renaissance Square
                                2 North Central Avenue
8                               Suite 1900
                                Phoenix, Arizona  85004
9                               (602) 358-0290

10   For Executive Chief Sands:  Greg S. Como, Esq.
                                 LEWIS BRISBOIS BISGAARD
11                               & SMITH, L.L.P.
                                 Phoenix Plaza Tower II
12                               2929 N. Central Avenue
                                 Suite 1700
13                               Phoenix, Arizona  85012-2761
                                 (602) 385-1040
14
     For Deputy Chief MacIntyre: Gary L. Birnbaum, Esq.
15                               DICKINSON WRIGHT, P.L.L.C.
                                 Attorneys at Law
16                               1850 N. Central Avenue, Suite 1400
                                 Phoenix, Arizona  85004
17                               (602) 285-5000

18   For Lieutenant Sousa:       David S. Eisenberg, Esq.
                                 DAVID EISENBERG, P.L.C.
19                               2702 N. 3rd Street
                                 Suite 4003
20                               Phoenix, Arizona  85004
                                 (602) 237-5076
21
     ALSO PRESENT:               Chief Robert Warshaw
22                               Chief John Girvin
                                 Chief Raul Martinez
23

24

25

1                          I N D E X

2     Witness:                                          Page

3     JOSEPH M. ARPAIO

4     Direct Examination Continued by Mr. Young         518
      Cross-Examination by Ms. Iafrate                  587
5     Redirect Examination by Mr. Young                 614
      Examination by the Court                          625

6

      JOSEPH SOUSA

7

      Direct Examination by Ms. Wang                    661
8     Cross-Examination by Ms. Iafrate                  757
      Cross-Examination by Mr. Como                     779
9     Redirect Examination by Ms. Wang                  789
      Recross-Examination by Ms. Iafrate                797

10

11

12                          E X H I B I T S

13

      No.     Description                             Admitted

14

      78      MCSO News Release, *Sheriffs Deputies Raid*    561
15            *Phoenix Business for Employees using False ID,*
              *All Arrested Suspected of Being in US Illegally*
16            dated 9/20/2012

17    84      MCSO News Release, *Sheriffs Deputies Execute*  565
              *Search Warrant at Concrete Company in Glendale*
18            dated 10/18/2012

19    85      MCSO Shift Summary (Sonoran Concrete)           565
              DR 12-156907 dated 10/18/2012
20            (MELC157123 - MELC156125)

21    87      MCSO News Release, *72st Operation Targeting*   570
              *False Identifications Used to Gain Employment*
22            dated 3/14/2013

23

24

25

1                      E X H I B I T S

2    No.      Description                                    Admitted

3    88       MCSO Shift Summary (America's Taco Shop)          571
             DR 12-108378, DOJ Ex. 284 dated 3/14/2013
4            (MCS001291219 - MCS001291221)

5    132      E-mail chain from Sousa re "FW: Updated stats"  756
             and attaching "Criminal Employments stats
6            03-28-12.doc; 03-28-12.doc" dated 3/28/2012
             (MELCl114928 - MELCl 14931)
7
     168      MCSO Memorandum from Sousa re "Document           706
8            Production Request Regarding Request IAM-22"
             dated 1/12/2015 (MELC 114948)
9
     169      E-mail chain from Sousa re "Current HSU Ops       677
10           Manual" originally dated March 27, 2012, then
             January 13, 2015, and attaching HSU ops manual
11           (MELCl114960 - MELCl14967)

12   180      MCSO News Release, *West Valley*                  568
             *Asian/International Supermarket Under*
13           *Investigation by Sheriff's Office, Arpaio*
             *Says* dated 1/17/2013 (MELC109370 - MELC109371)
14
     182      MCSO News Release, *6 Adults and One Juvenile*    572
15           *Detained in Human Smuggling Operation* dated
             5/18/2013 (MELC167859 - MELC167860)
16
     193A     A Video Clip 1 of Story re Crime Sweep,           580
17           October 19, 2013

18   193B     Video Clip 2 of Story re Crime Sweep,             582
             October 19, 2013
19
     193C     Video Clip 3 of Story re Crime Sweep,             582
20           October 19, 2013

21   195A     Video Clip 1 of KNVX after 1070 Decision,         527
             June 25, 2012
22
     196A     Video Clip 1 of Fox Latino at Republican          545
23           Convention, August 31, 2012

24

25

1                        E X H I B I T S

2   No.      Description                              Admitted

3   196C     Video Clip 3 of Fox Latino at Republican    547
             Convention, August 31, 2012
4
    196D     Video Clip 4 of Fox Latino at Republican    548
5            Convention, August 31, 2012

6   196E     Video Clip 5 of Fox Latino at Republican    550
             Convention, August 31, 2012
7
    197A     Video Clip 1 of Fox News after after 1070   536
8            Decision, June 26, 2012

9   198A     Video Clip 1 of Univision after 1070 Decision,   529
             June 25, 2012
10
    198B     Video Clip 2 of Univision after 1070 Decision,   530
11           June 25, 2012

12  199A     Video Clip 1 of CNN June 25, 2012           533

13  199B     Video Clip 2 of CNN June 25, 2012           534

14  200A     Video Clip 1 of Fox Cavuto June 25, 2012    539

15  201A     Video Clip 1 of Maldonado Interview published   521
             April 13, 2012
16
    201B     Video Clip 2 of Maldonado Interview published   524
17           April 13, 2012

18  203      Video Excerpt from The Joe Show, released   585
             February 26, 2014
19
    212`     Email Chain from J. Sousa to J. Spurgin, et.   725
20           al., re "Master Stat Sheet for Op Desert Sky"
             dated March 31, 2011 (MELC172485 - MELC172503)
21           Sousa Depo Exhibit 192

22  216      Email from J. Sousa to M. Trowbridge, et al.,   668
             re "The Saving of Emails for Ongoing Lawsuits
23           per Att Tim Casey" dated March 27, 2012
             (MELC173868 - MELC173870)
24

25

1    reasonable steps to enforce my order.

2         Do you admit under that guideline that you are in

3    contempt for failing to -- to abide by the May 14th hearing

4    instructions I gave you?

5    A.  I would have to say yes.                                        11:44:06

6    Q.  All right.  Now, it's important for me to understand when

7    I'm evaluating what kind of relief -- and I am going to give

8    some relief, clearly, to the plaintiff class, and it may be

9    quite extensive or it may be limited.  And it's something that

10   I've got to consider in conjunction with the parties, and I     11:44:25

11   think it's going to require some careful thought.

12        But to me it is very important whether that contempt

13   that you and perhaps Chief Deputy Sheridan -- civil contempt --

14   committed on May 14 was an isolated incident or was a pattern

15   that reflects a hesitancy on the sheriff's office, on the       11:44:48

16   sheriff's department and on your part, or even a desire to

17   subvert the orders of this Court, so I'm going to ask you some

18   more questions about that.

19        Did you -- I may have already asked you.  Did you

20   impose any discipline on Chief Deputy Sheridan for violating my  11:45:11

21   order and giving that direction to Chief Deputy Trombi?

22   A.  No, sir.

23   Q.  Has there been any investigation regarding that?  I know

24   there have been some investigations that my monitor and I have

25   insisted on, and there were a few investigations that were      11:45:24

1

2                    C E R T I F I C A T E

3

4

5

6

7          I, GARY MOLL, do hereby certify that I am duly

8     appointed and qualified to act as Official Court Reporter for

9     the United States District Court for the District of Arizona.

10          I FURTHER CERTIFY that the foregoing pages constitute

11    a full, true, and accurate transcript of all of that portion of

12    the proceedings contained herein, had in the above-entitled

13    cause on the date specified therein, and that said transcript

14    was prepared under my direction and control.

15

16

17          DATED at Phoenix, Arizona, this 24th day of April,

18    2015.

19

20

21                    _____s/Gary Moll_____

22

23

24

25

FILED _____ LODGED
_____ RECEIVED _____ COPY

AUG 1 0 2015

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY_____ DEPUTY

Larry Klayman
Freedom Watch, Inc.
2020 Pennsylvania Avenue N.W., Suite 345
Washington, D.C. 20006
(310) 595-0800
leklayman@gmail.com
Attorney for Dennis Montgomery

*Pro Hac Vice Pending*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| MANUEL de JESUS ORTEGA MELENDRES, on behalf of himself and all others similarly situated; *et al.* | |
| Plaintiff, | Civil Action No. CV-07-2513-PHX-GMS |
| v. | |
| JOSEPH M. ARPAIO, in his individual And official capacity as Sheriff of Maricopa County, Arizona; *et al.* | |
| Defendants | |
| DENNIS L. MONTGOMERY | |
| Intervenor | |

## REPLY OF LARRY KLAYMAN TO OPPOSITION OF PLAINTIFFS TO COUNSEL'S MOTION TO APPEAR PRO HAC VICE

Larry Klayman, Movant for admittance *pro hac vice* on behalf of Dennis L. Montgomery, and Dennis L. Montgomery, hereby files this Reply to Plaintiffs' opposition to movant's Motion to Appear pro hac vice within this lawsuit.

## I.      RIGHT TO COUNSEL OF ONE'S OWN CHOOSING

A person is entitled to his choice of counsel, including an attorney appearing *pro hac vice*:

"A defendant's right to the counsel of his choice includes the right to have an out-of-state lawyer admitted pro hac vice." *United States v. Lillie*, 989 F.2d 1054, 1056 (9th Cir. 1993); *see also*

- 1 -

SER055

*Panzardi-Alvarez v. United States*, 879 F.2d 975, 980 (1st Cir. 1989)("[A] decision denying a pro hac vice admission necessarily implicates constitutional concerns."), *cert. denied*, 493 U.S. 1082, 110 S. Ct. 1140, 107 L. Ed. 2d 1045 (1990).

"It is hardly necessary to say that, the right to counsel being conceded, a defendant should be afforded a fair opportunity to secure counsel of his own choice." *Powell v. Alabama*, 287 U.S. 45, 53, 53 S.Ct. 55, 58, 77 L.Ed. 158 (1932).   The right to retain counsel of choice stems from a defendant's right to decide what kind of defense he wishes to present.   *United States v. Nichols*, 841 F.2d 1485, 1502 (10th Cir.1988).

"Attorneys are not fungible" and often "the most important decision a defendant makes in shaping his defense is his selection of an attorney." *United States v. Laura*, 607 F.2d 52, 56 (3d Cir.1979); *Nichols*, 841 F.2d at 1502. *See also Chandler v. Fretag*, 348 U.S. 3, 10, 75 S.Ct. 1, 5, 99 L.Ed. 4 (1954) ("a defendant must be given a reasonable opportunity to employ and consult with counsel; otherwise the right to be heard by counsel would be of little worth"); *Glasser v. United States*, 315 U.S. 60, 75, 62 S.Ct. 457, 467, 86 L.Ed. 680 (1942) ("[defendant] wished the benefit of the undivided assistance of counsel of his own choice. We think that such a desire on the part of an accused should be respected.")

When a defendant decides to retain counsel, the choice of counsel rests in his hands, not with others. *United States v. Richardson*, 894 F.2d 492, 496 (1st Cir.1990); *Wilson v. Mintzes*, 761 F.2d 275, 280 (6th Cir.1985). A defendant's right to retain counsel of his choice therefore represents " 'a right of constitutional dimension'" *United States v. Cunningham*, 672 F.2d 1064, 1070 (2d Cir.1982) (citing *United States v. Wisniewski*, 478 F.2d 274, 285 (2d Cir.1973)), the denial of which may rise to the level of a constitutional violation. *Birt v. Montgomery*, 725 F.2d 587, 592 (11th Cir.) (*en banc*), cert. denied, 469 U.S. 874, 105 S.Ct. 232, 83 L.Ed.2d 161 (1984); *Wilson*, 761 F.2d at 278-79.

- 2 -

Dennis Montgomery has a right to choose those attorneys whom he believes will be knowledgeable enough about his circumstances to represent him effectively and meaningfully. This is his Sixth Amendment right. As important, Mr. Montgomery is disabled and suffers from a severe brain aneurism. Exhibit 1. He is effectively bankrupt, and cannot afford to pay counsel, particularly given his medical expenses. And, this case has become so contentious and filled with invective by the Plaintiffs, the ACLU, and their collaborators at the Phoenix New Times and the Arizona Republic, to name just a few of the publications which hate Defendants because they do not comport with their political agendas for the so-called right for illegal aliens to remain in this county and country, even when they are convicted criminals, no other lawyer would want and will weigh in to represent Mr. Montgomery for fear of being retaliated against by this Court, who has threatened to destroy Sheriff Arpaio, and vilified by the media.

In the matter before this Court, Movant and Freedom Watch have made it clear, on the Court record, that they do not intend to challenge any testimony by Sheriff Arpaio, his deputies, the Maricopa County Sheriff's Office (MCSO), or the Cold Case Posse. Also, it is Movant and Freedom Watch's expressed position that the issue of the "credibility" of Dennis Montgomery is not properly before this Court, so there is no need to take any adverse position to prior testimony here. And, Mr. Montgomery does not intend to do so in any event before this sitting trial judge in this case, who is subject to likely disqualification. *See Petition for Writ of Mandamus filed in In re Joseph M. Arpaio*, No. 15-72440 (9th Cir. Filed August 6, 2015).

In addition, Dennis Montgomery is not seeking to take any position with regard any other issues remaining in the post-judgment proceedings in this case or the testimony involving the allegations of contempt of the Court's injunction brought by the Plaintiffs.

Dennis Montgomery seeks to intervene in this case only because his intellectual property, documents, data and work have been seized by the Court in disregard of his work-product and

- 3 -

attorney-client privilege and his proprietary rights. The U.S. District Court for the District of Nevada has already ruled that (1) the data and intellectual property belongs to Dennis Montgomery, (2) none of the data or information is classified, (3) the U.S. Government was required to return all of the data and information to Dennis Montgomery, and (4) the government lawyers were apparently found to have deceived that Court in falsely claiming that the data, information, and/or intellectual property did not belong to Dennis Montgomery and/or was classified. See *Dennis Montgomery and the Montgomery Family Trust v. eTreppid Technologies, LLC, Warren Trepp and the U.S. Department of Defense*, Case Nos. 3:06-CV-00056-PMP-VPC and 3:06-CV-00145-PMP-VPC, Order, Judge Philip M. Pro, March 19,2007, and *In the Mater of the Search of:  The Residence Located at 12720 Buckthorne Lane, Reno, Nevada, and Storage Units 136, 140, 141, 142 and 143, Double R Storage, 888 Madestro Drive, Reno, Nevada,* Case Nos. 3:06-CV-0263-PMP-VPC and 3:06-MJ-00023-VPC, Order, Magistrate Judge Valerie P. Cooke, November 28, 2006. These Orders are *res judicata* and are now final.

## II.     THERE IS NO CONFLICT OF INTEREST IN LARRY KLAYMAN'S REPRESENTATION OF DENNIS MONTGOMERY

There is no conflict with the undersigned counsel representing Mr. Montgomery, as the client only seeks to intervene to protect his property rights. There is no desire or need to wade into the substance of the dispute with Plaintiffs or the Court. The emails produced by the ACLU in its opposition do not show any conflict. Having talked with Sheriff Arpaio after the undersigned counsel saw these attorney-client privileged and work product emails in the ACLU's opposition, the Sheriff stated that he had no recollection of ever having dictated, written, or signed the email of April 29, 2015. In any event, the email, which was probably dictated by Michele Iafrate, who frankly has not represented the Sheriff zealously and within the bounds of the law, strongly speaks of the Sheriff having a conflict with Mike Zullo, who is his trusted colleague. And, it merely states

- 4 -

SER058

that there is a "conflict in Arizona," not with the undersigned counsel. Further it has never been in dispute that the undersigned counsel does not represent Sheriff Arpaio in Arizona. That the undersigned counsel represents the Sheriff in a court challenge in the District of Columbia, actually shows that he is on the same side of the Sheriff and not in conflict with him. The undersigned this has no conflict here.

### III.   CONFLICT OF INTEREST EXISTS BETWEEN ACLU AND INTERVENOR

If anybody should be forced to withdraw from this case it should be the ACLU as their lawyers have created a direct conflict of interest with the rights of Dennis Montgomery, who this Court made part of this case.  Mr. Montgomery sought the legal assistance of the ACLU with the legal issues he faces, including stopping prior defamation of him to silence and discredit him as a whistleblower attempting to reveal illegal and unconstitutional conduct by the U.S. Government, disclosing the information about misconduct as a whistleblower in a way to bring about change pursuant to the law, and repairing the damage to his reputation from the defamation and smears brought to silence and discredit him, as well as protecting his intellectual and other property rights, as well as other rights.

When Mr. Montgomery sought the legal assistance of the ACLU as not only professional experts as attorneys and otherwise, but also as so called experts recognized worldwide as specialists in these areas, a fiduciary duty of trust owed by the ACLU to Mr. Montgomery was created.

Creating a direct conflict of interest between Mr. Montgomery and the *Melendres* Plaintiffs, the ACLU harmed Mr. Montgomery in order to advance the interests of the *Melendres* Plaintiffs who favor illegal immigration and have set out to destroy Sheriff Arpaio, his deputies, and others who seek to enforce the laws of Arizona against them.  Mr. Montgomery, the *Melendres* Plaintiffs, and the ACLU, are adverse in an actual conflict of interest with him.

- 5 -

SER059

As a result of this conflict, Mr. Montgomery has been forced to file suit against the ACLU. A copy of the complaint for this lawsuit has been attached as Exhibit 2 and is incorporated herein by reference. Mr. Montgomery has also filed ethics complaints which are also pending against the ACLU lawyers, including Cecillia Wang and Daniel Pochada, for their violation of the attorney client relationship with him. This latest filing compounds their illegal and unethical actions, as they cannot take a position adverse to Mr. Montgomery or his chosen counsel. In this regard, the ACLU, an ultra-leftist organization which despises conservatives like the undersigned counsel, has sought to smear him with baseless attacks. The hard fact is that the undersigned counsel has continuously been a member in good standing of the District of Columbia and Florida bars for 38 years, as set forth in the pro hac vice application, and the few issues he has had with judges are not unusual for a strong trial lawyer. For instance, just in the O.J. Simpson case of years back, famed trial lawyer Johnnie Cochran and Assistant District Attorneys Marsha Clark and Christopher Darden were sanctioned multiple times just in that case. They were not denied continuing pro hac vice status. This shows the absurdity of the ACLU's desperate arguments to deny Mr. Montogomery who is seriously ill and cannot afford counsel he has to pay, the keep the undersigned from representing him with regard to simply protecting his property rights as an intervenor. The ACLU has such venom toward Sheriff Arpaio and all who are associated with him, including the undersigned counsel, that they have lost all sense of ethical right and wrong and will even violate attorney client relationships, improperly obtain and maintain privileged communications, and take actions to harm anyone who believes in legal immigration. The ACLU's conduct is harmful to all who believe in the rule of law and its unethical opposition is no exception.

WHEREFORE, for the foregoing reasons, this Court should grant the pro hac vice application of Larry Klayman.

SER060

Dated: August 10, 2015

Respectfully submitted,

/s/ Larry Klayman
Larry Klayman
Freedom Watch, Inc.
2020 Pennsylvania Avenue N.W., Suite 345
Washington, D.C. 20006
(310) 595-0800
leklayman@gmail.com

Attorney for Dennis Montgomery

## CERTIFICATE OF SERVICE

I hereby certify that on August 10, 2015, I served the foregoing document by U.S. Mail on the following counsel of record:

Stanley Young, Esq.
Andrew Carl Byrnes, Esq.
333 Twin Dolphin Road
Redwood Shores, California 94065
syoung@cov.com
650-632-4700
Attorneys for Plaintiffs

Daniel Pochoda, Esq.
ACLU FOUNDATION OF ARIZONA
3707 N. 7th Street, Suite 235
Phoenix, Arizona 85014
dpochoda@acluaz.org
602-650-1854
Attorney for Plaintiffs

Cecilia D. Wang, Esq.
ACLU FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, California 94111
cwang@aclu.org
415-343-0775
Attorney for Plaintiff Melendres

Thomas P. Liddy, Esq.
CIVIL SERVICES DIVISION
MARICOPA COUNTY ATTORNEY'S OFFICE
222 North Central Avenue, Suite 1100

SER061

Phoenix, Arizona 85005
liddyt@mcao.maricopa.gov
602-506-8541
Attorney for Defendant Joseph Arpaio and Maricopa County Sheriff's Office

Michele M. Iafrate, Esq.
IAFRATE & ASSOCIATES
649 North Second Avenue
Phoenix, Arizona 85003
miafrate@iafratelaw.com
602-234-9775
Attorney for Defendant Joseph Arpaio and Maricopa County Sheriff's Office

Deborah L. Garner, Esq.
IAFRATE & ASSOCIATES
649 North Second Avenue
Phoenix, Arizona 85003
dgarner@iafratelaw.com
602-234-9775
Attorney for Defendant Joseph Arpaio and Maricopa County Sheriff's Office

Melvin McDonald, Esq.
JONES SKELTON & HOCHULI, PLC
2901 N. Central Avenue, Suite 800
Phoenix, Arizona 85012-2728
mmcdonald@jshfirm.com
602-263-1700
Attorney for Defendant Sheriff Joseph Arpaio

Andre Segura, Esq.
ACLU FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad Street, 18th Fl.
New York, New York 10004
asegura@aclu.org
212-549-2676
Attorney for Plaintiffs

Anne Lai, Esq.
UCI School of Law
401 E. Peltason Drive. Suite 3500
Irvine, California 92616
alai@law.uci.edu
949-824-9894
(Service via Email)

Jorge M. Castillo, Esq.

- 8 -

MALDEF
634 S. Spring Street, 11th Fl.
Los Angeles, California 90014
jcastillo@maldef.org
213-629-2512
Attorney for Plaintiffs

Richard K. Walker, Esq.
WALKER & PESKIND, PLLC
16100 N. 71st Street, Suite 140
Scottsdale, Arizona 85254-2236
rkw@azlawpartner.com
480-483-6336
Attorney for Defendant Maricopa County

Respectfully submitted,

/s/ Larry Klayman

SER063

# Exhibit 1



January 6, 2015

Re: Dennis Lee Montgomery  (DOB 7/11/1953)

To Whom It May Concern:

Mr. Dennis Montgomery unfortunately sustained recent multi-infarct strokes with resultant severe left sided weakness and impaired vision.  He completed Swedish inpatient rehab unit under my guidance on 6/21/2014.  He is now in outpatient PT, OT to work on ongoing left sided weakness and speech therapy for stroke related cognitive and memory impairments along with swallowing difficulties.  He has severe left shoulder pain impacting his stroke recovery.  He will also undergo neuropsychological testing to evaluate his cognitive strengths and weakness.

Lastly, he is having false visual imagery related to his stroke and is being followed by neuro-ophthalmology with Dr. Eugen May.

Please feel free to contact me if you have any questions.

Sincerely,

Paul Chuwn Lim, MD
Medical Director of Swedish Rehabilitation Services
Swedish Physical Medicine and Rehabilitation
1600 E Jefferson Street, Suite #600 | Seattle, WA 98122
(clinic) 206-320-2600 | (fax) 206-320-4054

Joe Eskridge, M.D.

Swedish Neuroscience Institute
550 17th Ave # 500
Seattle WA 98122
206.320.4144

June 27, 2014

To Whom It May Concern

Dear Sirs,

I, Dr. Joe Eskridge recently treated Dennis Montgomery who is a 60 year old man who suffered from a cerebral aneurysm. His aneurysm was detected in 2011. He does not smoke and does not have any congenital blood vessel diseases that contribute to aneurysm development.

High blood pressure can accelerate aneurysm growth and increase the risk of rupture and stroke. Stress can increase blood pressure and contribute to aneurysm growth. On a more probable than not basis stress related hypertension caused the development and growth of his aneurysm.

I have performed over 5000 brain artery repair and embolization procedures over the past 30 years. I was Professor of Radiology and Neurosurgery at the University of Washington Medical School from 1987-2004.

Sincerely yours,

Joe Eskridge, M.D.

 **SWEDISH** MEDICAL CENTER

May 27, 2014

Re: Dennis Lee Montgomery  (DOB 7/11/1953)

To Whom It May Concern:

Mr. Dennis Montgomery underwent aneurysm surgery on 5/16/2014 that was unfortunately complicated by multi-infarct strokes with resultant severe left sided weakness and impaired vision.  He is currently on the Swedish inpatient rehab unit and will be here until at least late June 2014.  He will not be able to testify out of state as a result of his current disability.

Please feel free to contact me if you have any questions.

Sincerely,

Paul Chuwn Lim, MD
Medical Director of Swedish Rehabilitation Services
Swedish Physical Medicine and Rehabilitation
1600 E Jefferson Street, Suite #600 | Seattle, WA 98122
(clinic) 206-320-2600 | (fax) 206-320-4054

Exhibit 2

SER068

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| DENNIS L. MONTGOMERY<br>Miami, Florida[1]<br><br>                Plaintiff,<br><br>    v.<br><br>AMERICAN CIVIL LIBERTIES FOUNDATION<br>ACLU<br>125 Broad Street, 18th Floor<br>New York, New York 10004<br><br><br>          and<br><br>SUSAN N. HERMAN, ESQ.<br>President<br>ACLU<br>125 Broad Street, 18th Floor<br>New York, New York 10004<br><br><br>          and<br><br>CECILLIA D. WANG, ESQ.<br>ACLU<br>Immigrants' Rights Project<br>39 Drumm Street<br>San Francisco, California 94111<br><br><br>          and<br><br>DANIEL J. POCHADA, ESQ.<br>ACLU of Arizona<br>3707 North 7th Street, Suite 235<br>Phoenix, Arizona 85014<br><br><br>          and<br><br>MICHAEL "MIKE" GERMAN, ESQ.<br>ACLU<br>125 Broad Street, 18th Floor<br>New York, New York 10004 | Civil Action No. _____ |

---

[1]    Street address not listed for security reasons.

SER069

and

ANDRE IVAN SEGURA, ESQ.
ACLU
125 Broad Street, 18th Floor
New York, New York 10004

and

JOSHUA BENDOR
ACLU
3707 North 7th Street, Suite 235
Phoenix, Arizona 85014

Defendants.

## COMPLAINT

Plaintiff Dennis L. Montgomery, by counsel, sues the Defendants, jointly and severally, in this civil action for Breach of Fiduciary Duty, Professional Malpractice, Common Law Defamation *Per Se*, General Defamation, Defamation by Implication and Intentional Infliction of Emotional Distress. As grounds therefore, Plaintiff alleges as follows:

**I.   JURISDICTION AND VENUE**

1.   This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 under diversity of citizenship. The parties are citizens of different states and the amount in controversy exceeds $75,000.

2.   Venue is proper for Defendants pursuant to 28 U.S.C. § 1391(b)(1) and 28 U.S.C. § 1391(e).

**II.   THE PARTIES**

3.   Dennis L. Montgomery is a natural person, an individual, a citizen of the United States and is a citizen of Florida.

2

SER070

4.      Defendant American Civil Liberties Union Foundation ("ACLU") by its own description: "is a 501(c)(3) organization that provides legal representation free of charge to individuals and organizations in civil rights and civil liberties cases, and educates the public about the civil liberties implications of pending and proposed state and federal legislation, provides analyses of pending and proposed legislation, directly lobbies legislators, and mobilizes its members to lobby their legislators."

5.      Defendant Cecillia D. Wang, Esq., is an individual who is an attorney employed by and working for the ACLU, admitted to the bar in the State of California and also appears *Pro Hac Vice* in the State of Arizona in *Melendres v. Arpaio*, Civil Action No. CV-07-2513-PHX-GMS, in the U.S. District Court for the District of Arizona.

6.      Defendant Daniel Pochoda, Esq., is an individual who is an attorney employed by and working for the ACLU, admitted to the bar in the State of Arizona and also appears as counsel in *Melendres v. Arpaio*.

7.      Defendant Michael ("Mike") German, Esq., is an individual who is an attorney employed by and working for the ACLU, and the other Defendants, acting in concert, on information and belief, admitted to the bars in the State of New York and the District of Columbia who on behalf of the ACLU consulted with Dennis Montgomery, provided legal advice to Montgomery, directed Montgomery to take action, and engaged in an attorney-client relationship on behalf of the ACLU, along with the other individual Defendants, with Plaintiff.

8.      Defendant Susan N. Herman, Esq., is the current President of the ACLU and upon information and belief, resides in New York and is a member of the bar in the State of New York. She acted in concert with the other Defendants herein and had full knowledge of the facts and circumstances set forth in this Complaint, particularly since Plaintiff's activities as a

3

SER071

whistleblower involve matters of great national security interests. The ACLU represents

whistleblowers like Plaintiff, such as Edward Snowden, and has brought lawsuits that attempt to

seek redress for the illegal and unconstitutional actions of the National Security Agency ("NSA")

and other U.S. Government intelligence agencies in spying indiscriminately on the American

people without regard to any probable cause that they are in contact with terrorists. *See American

Civil Liberties Union v. Clapper*, Case no. 14-42. U.S. Court of Appeals for the Second Circuit,

Decided May 7, 2015.

9.    Defendant Andre Ivan Segura is an individual who is an attorney employed by

and working for the ACLU, admitted to the bar in New York and also appears *Pro Hac Vice* as

counsel in *Melendres v. Arpaio*.

10.    Defendant Joshua Bendor is an individual who is an attorney employed by and

working for the ACLU, is a member of the bar of Arizona and is one of the counsel for Plaintiffs

in *Melendres v. Arpaio*.

11.    All of the allegations and counts of this Complaint refer or relate to the tortious,

illegal conduct of each and every named Defendant, who acted individually and in concert,

jointly and severally, to severely damage Plaintiff Montgomery.

III.    **FACTS COMMON TO ALL COUNTS**

12.    Plaintiff Montgomery sues for harm and damages in this district, Florida, and

nationwide to himself as an individual and person, including for financial harm to his individual

business reputations and his individual and business and professional opportunities, his

ownership of intellectual and other property rights, breach of fiduciary duty, the loss of legal

rights through Defendants actions and failure to act on his behalf as his counsel, and defamation.

13.    Plaintiff is in poor health and requests expeditious handling of the lawsuit.

4

SER072

14.     The Plaintiff sought legal assistance from the ACLU starting in early June 2013.

15.     Dennis Montgomery consulted with the ACLU and the other Defendants herein, including but not limited to the ACLU's lead litigation attorney, Mike German, at the ACLU's national headquarters, with regard to his efforts as a whistleblower having information about the unconstitutional and illegal acts by the National Security Agency ("NSA"), the Central Intelligence Agency ("CIA") and other U.S. Government intelligence agencies.

16.     Trusting in an attorney-client relationship, Dennis Montgomery disclosed to the ACLU and the other Defendants confidential information, identified legal issues of concern, and asked for and received legal advice.

17.     The Plaintiff entrusted to the ACLU information about government abuses potentially more egregious than those that Edward Snowden revealed.

18.     But unlike Snowden, Montgomery sought and seeks to come forward legally and through proper channels.  Addressing those abuses through proper legal and governmental channels was the primary reason for Montgomery entering into an attorney client relationship with the ACLU and the other Defendants herein.

19.     Because the ACLU, Mike German and the other individual Defendants, acting in concert, consulted with and gave Dennis Montgomery legal advice and an evaluation of his legal risks and situation and asked for actions to further future legal and other actions by the ACLU on Montgomery's behalf, an attorney-client relationship was actually established with each and every one of the Defendants and a duty of care and fiduciary duty was owed to Plaintiff by each of the Defendants.

20.     The ACLU, Mike German and the other individual Defendants, acting in concert, specifically requested that Dennis Montgomery send the ACLU even more information and

5

documentation so that the ACLU could further their legal representation of Montgomery. The ACLU, German and the other Defendants, acting in concert, gave Montgomery legal advice, including advice they told Plaintiff would further his interests and the public in blowing the whistle on illegal and unconstitutional acts by the NSA, CIA and other U.S. Government agencies, as they had given and continued to give to client whistleblowers like Edward Snowden.

21.     Believing in and trusting the ACLU's and the other Defendants legal representation of him, Montgomery followed German's and the other individual Defendants', acting in concert, legal advice by sending the additional information and documentation.

22.     However, the Defendants subsequently neglected to actually help Montgomery with the ordinary standard of care required of lawyers.

23.     Because of the Defendants' failure to perform legal assistance for the Plaintiff to the professional standards of care required of attorneys, the Plaintiff lost legal rights.

24.     Because of the Defendants' failure to perform legal assistance for the Plaintiff to the professional standards required of attorneys, the Plaintiff also continued to lose money in his career, professional, occupation, and employment, his intellectual and other property rights, and continued to suffer harm and damage to his reputation.

25.     But then the Defendants suddenly began attacking and defaming Dennis Montgomery, starting in April 2015,[2] as part of their attacks on Sheriff Joe Arpaio ("Sheriff Arpaio") of Maricopa County, Arizona, his deputies, his office, and the Cold Case Posse of Maricopa County, alleging that these persons and entities engaged in an illegal criminal conspiracy with Dennis Montgomery.

---

[2]     The ACLU likely published attacks on Montgomery to journalists and others earlier. In late 2014, news articles began attacking Montgomery by citing unnamed sources.

SER074

26.     Defendants' intent was to destroy Sheriff Arpaio and Plaintiff as they were seen as adverse to Defendants' immigration agenda, which is based on having as many illegal aliens remain in the United States such that they can ultimately get voter cards and vote for leftist and Democrat political candidates, supportive of the Defendants' leftist agendas.

27.     In addition, the Defendants' attacks on Sheriff Arpaio, his office, deputies and the Cold Case Posse of Maricopa County, were calculated to raise huge donations for Defendants, as the leftwing and other supporters of the ACLU despise and oppose Sheriff Arpaio and all persons and entitles associated with him.

28.     The ACLU and the other Defendants, acting in concert, had and continue to have actual knowledge that their defamation and disparagement of Dennis Montgomery, later in 2015, is false, because Dennis Montgomery had also approached and consulted with the ACLU in 2013 to help protect him against those very same smears and defamation and help him repair the damage to his reputation as a whistleblower and to further his coming forward on behalf of the American people as a whistleblower.

29.     The Defendants ACLU, Cecillia Wang, Daniel Pochoda, Michael German, Andre Segura and Susan Herman, acting in concert, and their supporters, have become so motivated by their deep-seated hatred for and opposition to Sheriff Arpaio and his office, who they claim violated the civil rights of illegal immigrants, that they are willing to harm other clients, such as Plaintiff, and violate their lawyerly duties in their rush to damage Sheriff Arpaio, his office, his deputies and the Cold Case Posse of Maricopa County.

30.     Sheriff Arpaio actually enforces those laws that the ACLU is trying to overturn and therefore the ACLU is determined to make an example out of Sheriff Arpaio and those

7

SER075

persons and entities associated with him and to publicly destroy them, even if the ACLU and the other Defendants have to betray their own former clients to do so.

31.     Meanwhile, Plaintiff Montgomery had also been approached by Sheriff Arpaio and the Maricopa County Sheriff's Office ("MCSO") under MCSO's "Cold Case Posse" project concerning the same topics as his consultation with the ACLU, as it concerned Arizona citizens and illegal surveillance of them by the federal government.

32.     Introduced through Sheriff Arpaio and the MCSO "Cold Case Posse," the Plaintiff met with the Attorney General of Arizona seeking action on the same topics and concerns about which he had consulted with the ACLU and sought its legal assistance.

33.     However, now the Defendants have twisted, misrepresented and falsified facts concerning these events in public and in court pleadings in their hatred of and their determination to harm Sheriff Arpaio and those persons and entities associated with them.

34.     Importantly, and unlike the public at large, the ACLU and the other Defendants have actual knowledge of the truth about these matters, because the Plaintiff confidentially disclosed in a private attorney client communications the truth about highly sensitive information regarding the U.S. Government's actions, to the ACLU and the other Defendants.

35.     Daniel Pochoda, acting in concert with the other Defendants, while speaking for the ACLU specifically in relation to *Melendres v. Arpaio*, *supra*, and specifically in attacking Sheriff Arpaio, defamed Dennis Montgomery in a <u>New York Times</u> article June 15, 2015, written by Ms. Fernanda Santos, Phoenix, Arizona, Bureau Chief, titled "Twists Outnumber Judges (So Far) in Case Against Arizona Sheriff."

> "*This guy [Sheriff Arpaio] hired a person [Dennis Montgomery] previously found to be a con man*," said Dan Pochoda, senior counsel for the American Civil Liberties Union of Arizona, which represents the plaintiffs in the case against Sheriff Arpaio.

SER076

(Emphasis added.)

36.     The Defendants' defamation, disparagement and smears of the Plaintiff are far more damaging than mere news reporting because of the public impression and public image of the legal expertise, fame, reputation, and perceived credibility of the ACLU proclaiming that the Plaintiff has been previously been found to be a con man and a criminal.

37.     The factual assertion that **Dennis Montgomery is** "**_a con man_**," and that he has been previously found to be a con man, is defamation *per se.*

38.     The underlying bases of these allegations are services Plaintiff provided to the U.S. Government.

39.     Therefore, the Defendants' statement is not only a false representation of criminal conduct, but also constitutes the making of false statements to the U.S. Government which is a crime under 18 U.S.C. § 1001 and also constitutes the violation of the False Claims Act 31 U.S.C. §§ 3729 − 3733 by submitting an alleged claim for payment based upon fraud or misrepresentation, which is also a crime.

40.     The Defendants' statements are defamation *per se* on at least two grounds, claiming commission of a criminal act and dishonesty in one's trade or business.

41.     The original version of the article was mass-distributed in physical form in an estimated 1.3 to 1.8 million newspapers physically distributed in Florida, nationally and internationally on June 15, 2015, on the Internet, in Florida and elsewhere. *See* Exhibit A.

42.     The article was revised on June 16, 2015, but the Defendants' defamation is identical in both versions and was also published in print form and on the Internet in Florida, nationally, internationally, and elsewhere.  *See* Exhibit B.

SER077

43.     Daniel Pochoda and Cecillia Wang, and the other individual Defendants acting in concert with each other, thus attacked their own former client Dennis Montgomery in public and in court pleadings, and thereby violated their ethical and fiduciary responsibilities of loyalty and confidentiality.

44.     The Defendants, acting in concert, have actual knowledge that Dennis Montgomery cannot fully defend himself against this defamation and these public disparagement and smears because of legal restrictions on what he can disclose under the national security laws of the United States.  Therefore, the ACLU feels free to lie about Montgomery and his work with Sheriff Arpaio and the persons and entities associated with Sheriff Arpaio, taking advantage of Montgomery's precarious situation.

45.     Indeed, Dennis Montgomery sought to intervene in the *Melendres* litigation to stop the repetition of this same defamation, disparagement and smears and to protect his intellectual and other property interests, which Defendants, in concert, compromised and damaged in their advocacy against Plaintiff in this case in particular.

46.     Incredibly, and without legal bases, the Defendants unethically and illegally opposed Montgomery's efforts to intervene, including by smearing his chosen current attorneys as much as they smear Montgomery, in opposition to the goals of their former client on behalf of their current clients the *Melendres* Plaintiffs.

47.     On information and belief, Cecillia Wang, Daniel Pochoda, the ACLU and the other ACLU individual Defendants, acting in concert with each other, distributed the same or similar defamatory and derogatory statements to other journalists and news organizations, not only to The New York Times.

SER078

48.     Furthermore, apparently starting in April 2015, Defendants representing Plaintiff and acting under the authority of the ACLU, including but not limited to Cecillia Wang, Daniel Pochoda, Andre I. Segura, Michael German, Joshua Bendor and Susan Herman, acting in concert with each other, have repeatedly (as a course of conduct) threatened, incited, and sought to stir up criminal prosecution of Dennis Montgomery along with their main targets Sheriff Joe Arpaio, Chief Deputy Jerry Sheridan and other personnel of the Maricopa County Sheriff's Office ("MCSO") as well as the Maricopa County Cold Case Posse.

49.     Threatening criminal prosecution to gain advantage in civil litigation is prohibited by the ethical obligations of the legal profession.  Seeking to orchestrate and incite criminal prosecution of a former client is a violation of the fiduciary and other duties of loyalty and confidentiality owed to a client.

50.     In Footnote 2 on Page 9, of the Defendants' pleading **Response in Opposition to Sheriff Arpaio and Chief Deputy Sheridan's Motion for Recusal or Disqualification of the Court** filed by the ACLU in *Melendres v. Arpaio* in the U.S. District Court for the District of Arizona, Civil Action No. CV-07-2513-PHX-GMS, attached as Exhibit C, the ACLU, acting in concert with the individual Defendants, accused Dennis Montgomery of committing crimes.

> Even more troubling, as the Court noted in a post-hearing status conference, the evidence indicates that Dennis Montgomery informed MCSO personnel—with Chief Deputy Sheridan's knowledge—that he was using a database of information "harvested by the CIA and confiscated by him" in his investigation, and also purported to be tracking telephone calls between the Court, the Attorney General, the Assistant Attorney General, and the U.S. Attorney for the District of Arizona. Tr. of May 14, 2015 at 44:22-45:2, 45:10-16; Wang Decl., Ex. C, F. ***This implicates possible violations of federal criminal laws by MCSO personnel in the course of the MCSO-Montgomery investigation.*** See, e.g., 18 U.S.C. §§ 793(b)-(f) (taking or communication of documents relating to national defense); 798 (disclosure of classified information); 1503 (intimidation of federal court and

11

SER079

obstruction of justice); 1509 (obstruction of court orders); 1924 (unauthorized removal of classified information); 2511 (intercepting electronic communications); 2701 (unlawful access to stored communications).

*(Emphasis added.)*

51.     As shown in the entire course of events and public statements involving the lawsuit, Ms. Wang and Mr. Pochoda and the other ACLU attorneys and other Defendants, acting in concert with each other, make these allegations with the intention to cause criminal prosecution to be initiated against the Plaintiff Dennis Montgomery (as part of their efforts to incite criminal prosecution of Sheriff Arpaio, his office, deputies and the Cold Case Posse of Maricopa County).

52.     The Defendants also attacked Dennis Montgomery in other legal pleadings in the case of *Melendres v. Arpaio*, also in violation of the fiduciary and other duties of loyalty and confidentiality to a client.

53.     The ACLU and the other individual Defendants, acting in concert with each other, have turned on its own former client and intensified and spread the damage caused by the defamation, disparagement, false and misleading information and smears against this whistleblower.

54.     Prior to filing suit, the Plaintiff, by the undersigned counsel, sent letters to the ACLU and all of the Defendants at the ACLU demanding retraction of the defamation pursuant to § 770.02 Florida Statutes (2012) "Notice condition precedent to action or prosecution for libel or slander," as well as their withdrawal as counsel for the Plaintiffs in the *Melendres* litigation, given their professional misconduct and conflicts of interest.

55.     The Plaintiff incorporates by reference that demand letter sent to the ACLU and the other Defendants, which is attached as Exhibit D.

SER080

56.     In response to this demand letter under Florida Statutes § 770.02, the ACLU by Ms. Cecilia Wang, acting in concert with the other Defendants, responded with a dishonest rebuke, making it clear that she, the ACLU and the other Defendants, acting in concert, have no intention of stopping its attacks on and harm to Dennis Montgomery or withdrawing as counsel for the Plaintiffs in the *Melendres* case even in the face of their clear-cut professional misconduct and conflicts of interest.  *See* Exhibit E, attached.

57.     As a result, the harm is continuing and the Defendants, each and every one of them, acting in concert and jointly and severally, have refused to correct or stop their severe injury and damage to the Plaintiff, which damage is being compounded daily.

58.     Also, the Plaintiff alleges that the ACLU and the other individual Defendants acting in concert with each other, actually used some of the information the Plaintiff provided confidentially to them as a basis for the ACLU's lawsuit *Melendres v. Arpaio* and perhaps other cases. Defendants acting in concert therefore used confidential and other information he gathered and provided by the Plaintiff.

59.     Plaintiff Montgomery is not a public figure.

60.     Plaintiff Montgomery is a private citizen and at all material times acted individually and in business in these capacities.

61.     Nevertheless, Defendants' actions establish actual malice because the ACLU and the other individual Defendants, acting in concert with each other, have – intentionally and knowingly – harmed and are harming Dennis Montgomery for the purpose of advancing the ACLU's goals to further illegal immigration, and other related goals, as this suits its political interests by giving illegal immigrants voting and other rights to elect leftist candidates aligned with the Democratic Party and its other clients in the *Melendres* case and elsewhere.

13

SER081

62.     The Defendants' harm to Dennis Montgomery is not negligent or accidental but an intentional part of its campaign to harm its main target, Sheriff Arpaio, his office, his deputies, and the Cold Case Posse of Maricopa Country while illegally trampling upon and destroying Plaintiff Dennis Montgomery in the process.

## IV.     CAUSES OF ACTION

### FIRST CAUSE OF ACTION
*Breach of Fiduciary Duty*

63.     Plaintiff repeats and re-alleges each and every allegation of the foregoing paragraphs as if fully set forth herein.

64.     Florida has identified the elements for a breach of fiduciary duty specifically when involving an attorney's breach against a client:

> "As for a claim of breach of fiduciary duty, a plaintiff must allege three elements: the existence of a fiduciary duty, a breach of that duty, and plaintiff's damages proximately caused by the breach. *Gracey v. Eaker*, 837 So.2d 348, 353 (Fla.2002)." *Rocco v. Glenn, Rasmussen, Fogarty & Hooker, P.A.*, 32 So.3d at 116 n. 2.

*Moscowitz v. Oldham*, 48 So.3d 136 (Fla. App., 2010)

65.     Dennis Montgomery sought the legal assistance of the ACLU and the other Defendants with the legal issues he faces, including stopping prior defamation of him to silence and discredit him as a whistleblower attempting to reveal illegal and unconstitutional conduct by the U.S. Government, disclosing the information about misconduct as a whistleblower in a way to bring about change pursuant to the law, and repairing the damage to his reputation from the defamation and smears brought to silence and discredit him, as well as protecting his intellectual and other property rights, as well as other rights.

66.     When the Plaintiff sought the legal assistance of the ACLU and the other individual Defendants as not only professional experts as attorneys and otherwise but as experts

SER082

recognized worldwide as specialists in these areas, a fiduciary duty of trust owed by the ACLU

and the other Defendants to the Plaintiff was created.

67.     Instead of assisting the Plaintiff with those legal concerns, the Defendants, acting

in concert with each other, have turned around and attacked him publicly, further harming

Plaintiff's reputation and trade and profession, as well as damaging his intellectual and other

property rights, and other rights, including by stating to <u>The New York Times</u> on or about June

15, 2015, via Fernando Santos, as well as in court in the *Melendres* case:

> "***This guy [Sheriff Arpaio] hired a person [Dennis Montgomery]
> previously found to be a con man,***" said Dan Pochoda, senior
> counsel for the American Civil Liberties Union of Arizona, which
> represents the plaintiffs in the case against Sheriff Arpaio.

(Emphasis added.)

68.     As a direct conflict of interest between the Plaintiff and the *Melendres* Plaintiffs,

Defendants, acting in concert with each other, have harmed the Plaintiff in order to advance the

interests of the *Melendres* Plaintiffs who favor illegal immigration and have set out to destroy

Sheriff Arpaio, his deputies, and others who seek to enforce the laws of Arizona against them.

The Plaintiff and *Melendres* Plaintiffs are adverse in an actual conflict of interest.

69.     The conflict of interest of the Defendants between the Plaintiff and the *Melendres*

Plaintiffs accelerated into an increased conflict when the Defendants, acting in concert, and the

presiding Judge Snow injected Dennis Montgomery into the *Melendres v. Arpaio* case apparently

only in April 2015 and started to defame and attack him in court and publicly, as well as damage

his intellectual and other property interests and other rights.

70.     The Defendants, acting in concert, have also sought to induce criminal

prosecution against him, thereby not only failing entirely to fulfill its fiduciary duty but directly

opposing the goals for which the Plaintiff sought the ACLU's and the other individual

15

Defendants' legal assistance in an established attorney-client and professional relationship. *See* Exhibit C, attached.

71.    Furthermore, the Defendants failed to act diligently, promptly, or effectively for the Plaintiff, contrary to the standard of care owed by Plaintiff as a client, and thereby allowed rights to be compromised, opportunities for solutions to pass, and continued defamation against the Plaintiff to proliferate, as well as harm his intellectual and other property rights and other rights.

72.    While the Plaintiff sought the ACLU's and the other individual Defendants assistance to further his interests and those of the nation, as early as 2013, as a result of the Defendants actions and inactions, instead the Plaintiff has remained unemployable and destitute, leading to the foreclosure of his house, and the cumulative effect upon his finances, profession, career, employment, and occupation of these smears has grown worse both in direct damage but also in the steadily increasing difficulty of now trying to rebut the lies told against him, and other actionable acts as plead herein against the Defendants.

73.    Plaintiff has also been caused severe emotional distress, and given his fragile health that the ACLU and the other Defendants knew about at the time Plaintiff Montgomery first contacted the ACLU, has been placed in a condition of immediate bodily injury, incapacitation and potential death.

## SECOND CAUSE OF ACTION
### *Professional Malpractice*

74.    Plaintiff repeats and re-alleges each and every allegation of the foregoing paragraphs as if fully set forth herein.

75.    For a legal malpractice claim, Florida recognizes that the cause of action:

SER084

> "has three elements: (1) the attorney's employment, (2) the
> attorney's neglect of a reasonable duty, and (3) the attorney's
> negligence [as] the proximate cause of the client's loss." Cira v.
> Dillinger, 903 So.2d 367 (Fla. 2d DCA 2005).

*Rocco v. Glenn, Rasmussen, Fogarty & Hooker, P.A.*, 32 So.3d 111, 116 (Fla. 2d DCA 2009)
(cited and relied upon in *Moscowitz v. Oldham*, 48 So.3d 136 (Fla. App., 2010)).

76.     As pled in detail above and throughout this Complaint, the Plaintiff sought out the

ACLU's and the other individual Defendants' assistance with several related legal matters and

circumstances, and Mike German, acting in concert with the other Defendants, provided legal

advice including demanding documents to be used in the ACLU's future legal activities

defending and assisting Dennis Montgomery.

77.     As pled above, the ACLU and the other individual Defendants, acting in concert

with each other, violated the standard of care required of licensed attorneys, and failed to follow

through and assist the Plaintiff as required of attorneys and other related persons as the ACLU.

78.     Instead the Defendants then turned around and attacked the Plaintiff for the

benefit of the ACLU's other political goals and the *Melendres* Plaintiffs as well as the ACLU's

and other supporters.

79.     The Defendants have actively opposed the Plaintiff's interests and defamed and

harmed him as a result of an actual conflict of interest between the Plaintiff and the *Melendres*

Plaintiffs, as well as other professional misconduct as pled herein.

80.     That conflict of interest was heightened when the Defendants and Judge Snow

injected Dennis Montgomery into that lawsuit, without cause or rationale other than to harm him

and Sheriff Arpaio, his office, his deputies,  and the Cold Care Posse of Maricopa County

apparently as late as April 2015.

SER085

81.     The Defendant ACLU and the other individual Defendants, acting in concert with each other, failed to act diligently, promptly, or effectively for the Plaintiff and thereby allowed Plaintiff's rights to be lost, opportunities for solutions to pass, and continued defamation and loss of intellectual and other property rights against the Plaintiff to proliferate and be compounded.

82.     In violation of the duty of loyalty and confidentiality, the Defendants have spread defamation, disparagement and smears about the Plaintiff and have also worked aggressively to block the Plaintiff's attempts to rebut the lies and smears being spread against him, as well as to protect his intellectual and other property, advancing the goals of the *Melendres* Plaintiffs and their own at the expense of the Plaintiff Dennis Montgomery, including publishing to <u>The New York Times</u> on or about June 15, 2015, via Fernanda Santos:

> "*This guy [Sheriff Arpaio] hired a person [Dennis Montgomery] previously found to be a con man*," said Dan Pochoda, senior counsel for the American Civil Liberties Union of Arizona, which represents the plaintiffs in the case against Sheriff Arpaio.

(Emphasis added.)

83.     While the Plaintiff sought the ACLU's and the other individual Defendants' legal assistance to further his and the nation's interests as early as 2013, instead, due to the Defendants' actions and inactions, the Plaintiff has remained unemployable and destitute, leading to the foreclosure of his house, and the cumulative effect upon his finances, profession, career, employment, and occupation of this defamation, disparagement and smears have grown worse both in direct damage but also in the steadily increasing difficulty of now trying to rebut the lies told against him, as well as Defendants' other professional misconduct.

**THIRD CAUSE OF ACTION**
Common Law Defamation "Per Se"

SER086

84.   Plaintiff repeats and re-alleges each and every allegation of the foregoing paragraphs as if fully set forth herein.

85.   Defendants have also severely harmed Plaintiff's intellectual and rights property interests as well as other interests in the *Melendres* case, as set forth herein in this Complaint.

86.   As pled above in detail, the Defendants – acting on behalf of the ACLU and for the ACLU's clients, supporters and goals – publicly defamed the Plaintiff as having been previously found to be a "con man," including publishing to The New York Times on or about June 15, 2015, via The New York Times reporter Fernanda Santos, which was published in Florida, nationwide and internationally as a physical newspaper and also published on The New York Times' website on the internet:

> "*This guy [Sheriff Arpaio] hired a person [Dennis Montgomery] previously found to be a con man*," said Dan Pochoda, senior counsel for the American Civil Liberties Union of Arizona, which represents the plaintiffs in the case against Sheriff Arpaio.

(Emphasis added.)

87.   The underlying basis of this continuing course of misconduct and illegality makes it explicitly clear and overwhelmingly obvious that this false and misleading statement is about Dennis Montgomery. Not only does the description of who is being referred to apply to Dennis Montgomery and only Dennis Montgomery, but also he surrounding passages explicitly name Dennis Montgomery explicitly in reference to his connection to Sheriff Arpaio.

88.   Defendants' defamation of Plaintiff Montgomery was made and undertaken negligently and/or with actual malice.

89.   Defendants had knowledge of the falsity of the defamatory statements, or made the defamatory statements with reckless disregard for the truth.

SER087

90.     Defendants falsely accused Plaintiff of fraud, crime, scams, and being previously found to be a con artist.

91.     A statement is per se defamatory if it falsely imputes to another conduct, characteristics, or a condition incompatible with the proper exercise of his lawful business, trade, profession or office; in other words, or if it tended to injure Plaintiff in his trade or profession.

92.     A statement is also per se defamatory if "it imputes to another (a) a criminal offense amounting to a felony, or (b) a presently existing venereal or other loathsome and communicable disease, or (c) conduct, characteristics, or a condition incompatible with the proper exercise of his lawful business, trade, profession, or office, or (d) the other being a woman, acts of unchastity." *Campbell v. Jacksonville Kennel Club, Inc.*, 66 So. 2d 495, 497 (Fla. 1953) citing Restatement, Torts, Section 570.

93.     For Defamation Per Se, actual malice need not be shown because damages are presumed. *Campbell v. Jacksonville Kennel Club, Inc.*, 66 So. 2d 495, 497 (Fla. 1953); *Wolfson v. Kirk*, 273 So. 2d 774 (Fla. Dist. Ct. App. 4th Dist. 1973).

94.     Statements are "*defamatory per se,*" recognized under Florida law when statements are so powerful in their ability to hurt someone that Florida law presumes harmful as a matter of law. *Montgomery v. Knox,* 23 Fla. 595, 3 So. 211, 217 (1887), such that a court will allow damages to be awarded in these cases even if no evidence of harm has been presented. "[T]he law presumes malice in their utterance," *Abraham v. Baldwin*, 52 Fla. 151, 42 So. 591, 592 (1906), where the words are "... of such common notoriety established by the general consent of men, that the courts must of necessity take judicial notice of its harmful effect." *Layne v. Tribune Co.*, 108 Fla. 177, 146 So. 234, 236 (1933).

## FOURTH CAUSE OF ACTION
### *Common Law General Defamation*

SER088

95.     Plaintiff repeats and re-alleges each and every allegation of the foregoing
paragraphs as if fully set forth herein.

96.     To establish General Defamation, a plaintiff need only show: (1) publication; (2)
falsity; (3) that the defendant acted with knowledge or reckless disregard as to the falsity on a
matter concerning a public figure; (4) actual damages; and (5) the statement must be defamatory.

97.     Pleading cumulatively in the alternative to the Third Cause of Action, Plaintiff re-
alleges the allegations under the Third Cause of Action but also alleges that each of those
statements also qualify under the cumulative and alternative legal grounds of General
Defamation under Florida law.

## FIFTH CAUSE OF ACTION
### *Common Law Defamation By Implication*

98.     Plaintiff repeats and re-alleges each and every allegation of the foregoing
paragraphs as if fully set forth herein.

99.     For Defamation by Implication: " . . . [L]iterally true statements can be
defamatory where they create a false impression. This variation is known as Defamation by
Implication and has a longstanding history in defamation law." *See Jews for Jesus, Inc. v. Rapp*,
997 So.2d 1098, 1106 (Fla. 2008). Defamation by Implication occurs when a publication states
facts that are literally true, but produces a defamatory meaning apparent from a plain reading of
the publication in its entirety. *See Chapin v. Knight-Ridder, Inc.* 993 F.3d 1087 (4th Cir. 1993).

100.    Pleading cumulatively in the alternative to the Third Cause of Action, Plaintiff re-
alleges the allegations under the Third Cause of Action but also alleges that each of those
statements also qualify under the alternative and cumulative legal grounds of Defamation by
Implication under Florida law.

SER089

## SIXTH CAUSE OF ACTION
### *Common Law Intentional Infliction of Emotional Distress*

101.   Plaintiff repeats and re-alleges each and every allegation of the foregoing paragraphs as if fully set forth herein.

102.   The Defendants have actual knowledge that the Plaintiff is legally handicapped and medically ill, and knew this as a result of their communications with the Plaintiff in 2014, and have also learned of this repeatedly in April, May, and June of 2015.

103.   The Plaintiff suffered a brain aneurysm and a related multi-infarct stroke on May 12, 2014.  He suffered both a hemorrhagic stroke (caused by ruptured blood vessels that cause brain bleeding) and an ischemic stroke (loss of blood flow).  He was in the hospital for two months, through June 2014.  He has been left permanently disabled and partially paralyzed. Plaintiff could suffer a similar or repeated event causing him to die at any time.

104.   The Defendants knew about this – because the Plaintiff raised it repeatedly in his attempts to intervene in *Melendres v. Arpaio, supra* – before making and thus publishing the defamatory statements on or about June 15, 2015, to The New York Times and (on information and belief) to others.

105.   Defendants' knowing and intentional publication of the defamatory, disparaging and other harmful statements against the Plaintiff has foreseeably and proximately caused the Plaintiff emotional distress and thus personal injury.

106.   Under the law intention does not require the intention to cause a particular result but only that a defendant intended to take the action that causes the harm.

107.   Here, the Defendants acted intentionally to cause harm to Dennis Montgomery from which emotional distress was an overwhelmingly obvious and foreseeable result.

SER090

108.    Here, the Defendants acted with actual malice in wanting to harm Sheriff Arpaio by portraying Dennis Montgomery as previously found to be a con man engaged in a criminal conspiracy with Sheriff Arpaio, his office, his deputies, and the Cold Case Posse of Maricopa County as well as harming his property interests and other rights.

109.    Defendants' intentional actions were committed with the knowledge that they would cause extreme physical pain and suffering and cause severe emotional distress to the Plaintiff, including incapacitation and possible death.

110.    Defendants' actions, each and every one of them, jointly and severely, were willful malicious, deliberate, and were done with reckless or negligent indifference to the likelihood that such behavior would cause severe emotional distress, and thus personal injury, and with utter disregard for the consequences of such actions. They were intended to harm Sheriff Arpaio, his office and his deputies, and members of the Cold Case Posse in Maricopa County, by harming and destroying Plaintiff.

**PRAYER FOR RELIEF**

With regard to all counts, Plaintiff demands that judgment be entered against Defendants, each and every one of them, acting in concert, jointly and severally, for compensatory and actual damages in excess $20 million U.S. Dollars as a direct and proximate result of the intentional, willful, malicious or negligent actions of Defendants causing financial, reputational, emotional, physical and professional injury to Plaintiff, damage to his intellectual and other property rights, as well as for equitable relief as may be appropriate, reasonable attorneys fees, and such other relief the Court may deem just and proper.  Plaintiff further prays for an award of punitive damages in excess of $90 million U.S. Dollars to punish the Defendants for their outrageous and malicious conduct.

23

SER091

## JURY DEMAND

**Plaintiff respectfully demands a jury trial on all issues so triable.**

Dated: June 30, 2015

Respectfully submitted,

*/s/ Larry Klayman*
Larry Klayman, Esq.
FL Bar No. 246220
7050 W Palmetto Park Rd.
Suite 15-287
Boca Raton, FL 33433
(310) 595-0800
leklayman@gmail.com
Attorney for Plaintiff

24

SER092

# Exhibit A

SER093

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Manuel de Jesus Ortega Melendres, *et al.*, | CV-07-2513-PHX-GMS |
| Plaintiffs, | **DECLARATION OF CECILLIA WANG IN SUPPORT OF PLAINTIFFS' RESPONSE IN OPPOSITION TO SHERIFF ARPAIO AND CHIEF DEPUTY SHERIDAN'S MOTION FOR RECUSAL OR DISQUALIFICATION OF THE COURT** |
| v. | |
| Joseph M. Arpaio, *et al.*, | |
| Defendants. | |
| | **[UNDER SEAL]** |

I, Cecillia D. Wang, declare as follows:

1.    I am an attorney admitted to practice in California and New York and in numerous federal courts and have been admitted *pro hac vice* to represent the Plaintiffs in this matter.  I am the Director of the American Civil Liberties Union Foundation Immigrants' Rights Project.  I make the following declaration based on my personal knowledge, except where indicated.

2.    I make this declaration in support of the Plaintiffs' Response in Opposition to Sheriff Arpaio and Chief Deputy Sheridan's Motion for Recusal or Disqualification of the Court.

3.    Attached hereto as Exhibit A is a document that was introduced by the Court as Exhibit 522 during the evidentiary hearing in this matter, on April 23, 2015.  It is an article by Stephen Lemons published in the *Phoenix New Times* on June 4, 2014, entitled "Joe Arpaio's Investigating Federal Judge G. Murray Snow, DOJ, Sources Say, and Using a Seattle Scammer To Do It."  Exhibit A is a photocopy of the original document that was handed to me and to defense counsel by the courtroom deputy. It bears my

1

contemporaneous, handwritten notation of the announced exhibit number, 522.

4.      On May 6, 2015, Defendants produced documents to Plaintiffs on an attorneys'-eyes-only basis.  Exhibits B-F, attached hereto, were among those documents.  I am submitting Exhibits B-F under seal, with redacted copies in the publicly filed version of this Declaration.

a.      Attached hereto as Exhibit B is an email chain with the top-most email dated June 29, 2014, from "David Webb" to 1tick@earthlink.net, Bates-stamped MELC202132.

b.      Attached hereto as Exhibit C is an email chain with the top-most email dated November 7, 2014, from Brian Mackiewicz to Larry Klayman, Bates-stamped MELC202173-75.

c.      Attached hereto as Exhibit D is a December 9, 2014 email from "Mike" to detmack@gmail.com, Bates-stamped MELC202048.

d.      Attached hereto as Exhibit E is an email chain with the top-most email dated April 20, 2015, from Larry Klayman to Michael Zullo, Bates stamped MELC202142-45.

e.      Attached hereto as Exhibit F is a document entitled "Joe Arpaio Brief/Timeline," Bates stamped MELC199917-35.

5.      Attached hereto as Exhibit G is an email chain with the top-most email dated May 27, 2015, from the Court-appointed Monitor, Robert Warshaw, to me and to Defendants' counsel Michele Iafrate and Richard Walker.  Exhibit G also includes an attachment to Chief Warshaw's email, a

2

letter dated May 22, 2015 from Michelle Iafrate to Robert Warshaw.  In the letter and in the email exchange, Ms. Iafrate took the position that the entire litigation and all actions by the Monitor were stayed pending a decision on the instant Motion to Recuse.

6.     Attached hereto as Exhibit H is a true and correct copy of an article, Stephen Lemons, Arpaio's Desperation Move: Lawyers Move To Disqualify Judge Snow, *Phoenix New Times* May 22, 2015.  I obtained this copy from the *Phoenix New Times* website at http://www.phoenixnewtimes.com/news/arpaios-desperation-move-lawyers-move-to-disqualify-judge-snow-7352908.  The article quotes specially appearing counsel for the Sheriff in April 2015:

> I've heard comment or commentary from so-called lawyer experts, saying, "Gee, the judge should recuse himself," McDonald stated. That's ridiculous, of course he shouldn't!  People suggest we should now get rid of Judge Snow.  Why?  It was an inquiry.  It ended there.  It was not any kind of a witch hunt.  Case closed.

The online version of this article includes a link to an audio recording of counsel's statement.

I hereby declare that the foregoing is true and correct under penalty of perjury pursuant to 28 U.S.C. § 1746.

Executed at San Francisco, California this 12th day of June, 2015.


/s/ Cecilia D. Wang

3

# Exhibit A

SER097



# Joe Arpaio's Investigating Federal Judge G. Murray Snow, DOJ, Sources Say, and Using a Seattle Scammer To Do It

**By Stephen Lemons**
Published Wed., Jun. 4 2014 at 1:18 PM



AP Photo/Matt York

**Sheriff Joe Arpaio, during a 2012 press conference about his ludicrous birther investigation**

The most revealing part of Phoenix filmmaker Randy Murray's recent documentary *The Joe Show* was a strategy meeting during Sheriff Joe Arpaio's 2012 re-election campaign that included Arpaio, his top flack, Lisa Allen, Chief Deputy Jerry Sheridan, and campaign manager Chad Willems.

The group huddled in the back of a Fountain Hills restaurant to discuss how to spin Joe's negatives -- the misspending of more than $100 million, the deaths in the jails, the scores of millions in lawsuit payouts -- for the public.

At some point, Arpaio's "birther" investigation came up. You know, the one in which President Barack Obama's birth certificate gets investigated by both the Maricopa County Sheriff's Office's Cold Case Posse, a nonprofit organization, and MCSO Deputy Brian Mackiewicz, whom Arpaio flew to Hawaii as part of this snipe hunt, at a cost of nearly $10,000 to taxpayers.

Arpaio's March 2012 press conference -- in which the sheriff and the Cold Case Posse's "lead investigator," ex-used-car salesman Mike Zullo, declared Obama's birth certificate to be a forgery -- was in the planning stage when the scene was filmed.

At the mere mention of the birther investigation and the future press event, Allen and Willems practically rolled their eyes.

Willems called the birther probe "nuts."

Allen said the sheriff might as well go the press conference "in big ol' clown shoes."
Arpaio shrugged, literally.

"There ain't gonna be no damage control," Arpaio promised Willems. "You'll get more money [in campaign contributions] than you'll know what to do with."

Wilier than the cartoon coyote, Arpaio had tapped into a nationwide right-wing anti-government, anti-Obama feeding frenzy with his birther probe and with his tirades against the U.S. Department of Justice, which was investigating him for abuse of power and other issues and is now suing him in federal court.

"The DOJ is a hot item everywhere," Joe told his flunkies.

See, whenever Arpaio's never-ending political campaign sends out an e-mail blast begging for loot from Obama-haters, it reels in contributions from retired, far-right ofays all over the country.

Willems essentially admitted as much in another scene from the film.

"Now, with Arpaio going to battle with Barack Obama," Willems said, "it's meant literally millions of dollars for his campaign."

As everybody knows, Arpaio was re-elected in 2012, but the investigation into Obama's birth certificate continues apace, according to both Arpaio and Cold Case Posse "commander" Zullo.

At the beginning of May, Arpaio mentioned the birther probe during a speech before a group of Silicon Valley conservatives.

Around the same time, he appeared on _The Right Side, a conservative cable-access show in Mountain View, California_. He told host Chris Pareja that the inquiry into Obama's birth certificate was going strong.

"I'm not done with that yet," Arpaio insisted. "People think I surrendered. No . . . I'm trying to find out who's behind it now. That's the key. You can always have a crime to investigate, but I think you would like to know who did it."

The sheriff said he was after whoever created this "forged, fraudulent document," meaning a computer scan of the president's long-form birth certificate, released by the White House in April 2011.

Arpaio's statements have paralleled assurances from Zullo during periodic interviews with Florida pastor/radio host Carl Gallups that new revelations concerning the Obama birth certificate are on the way.

Critics of birthers regularly mock Zullo's vague pronouncements on Gallups' show as never resulting in any "new" finds.

Why, even the information disclosed during Arpaio's two birther-themed press conferences in 2012 were a rehash of debunked conspiracy theories.

But during a February interview with Gallups, Zullo caused an Internet kerfuffle when he told Gallups' audience that there were now two investigations: the original birther one and an offshoot of the birther probe, this one a criminal investigation.

Moreover, the second investigation was using two MCSO detectives and, presumably, county money.

"I don't know how this is all going to play out," Zullo said. "I know that [in] the criminal investigation that we're working on now, Sheriff Arpaio has dedicated resources and two full-time Maricopa County Sheriff's Office detectives."

He added, "These are seasoned pros [who] are working this. These are the guys that go hunt down the really bad guys."

Zullo promised to release "universe-shattering" results of these investigations in March, a deadline Zullo since has extended indefinitely.

Blogger Mitch Martinson of arizonaspolitics.com was the first to query the MCSO on Zullo's claim, and the first to report that Sheriff's Office spokesman Brandon Jones kinda-sorta had confirmed it.

"We have two sheriff's detectives assigned to look into other issues surrounding the birth certificate," Jones told Martinson, in a blog item posted February 10. "However, they are not investigating the birth certificate issue itself."

Later, Jones walked back his comments to Martinson, sending the blogger an e-mail, which Martinson used in a screen shot to a follow-up post.

"Mitch, I was misinformed," Jones stated. "The detectives are not working on anything regarding the birth certificate. Not even surrounding. Mr. Zullo was incorrect: They are working on other serious cases not even related."

Who were these two detectives, what were they up to, and why is Zullo, a mere posse member, privy to it?

Based on information given to me by longtime sources, the two detectives mentioned are Brian Mackiewicz, the same deputy who made a taxpayer-funded run to Hawaii in May 2012, and Sergeant Travis Anglin, once a lieutenant with the notorious Maricopa Anti-Corruption Effort who was demoted after an MCSO investigation into his private security company and its use of MCSO detectives.

Case 2:07-cv-02513-GMS   Document 1166   Filed 07/10/15   Page 8 of 61



Riverside County Sheriff's Department
**Dennis Montgomery, in a mugshot from a 2009 arrest**

My sources -- one of whom is a former detective with the MCSO's Special Investigations Division and is well-acquainted with SID and those in it -- say Anglin and Mackiewicz were involved in an odd investigation dating back to October 2013.

Moreover, they say, the deputies have used as a confidential informant a notorious scammer in the Seattle area.

What have they been investigating? According to my sources, Mackiewicz, Anglin, and the informant are focused on U.S. District Court Judge G. Murray Snow, the Justice Department, and a bizarre conspiracy theory that the DOJ and Snow have conspired to somehow "get" Joe Arpaio.

The person who purportedly convinced Arapio of this paranoid fantasy, the sources say, is computer fraudster Dennis L. Montgomery, the subject of a 2010 Playboy exposé titled "The Man Who Conned the Pentagon."

In that article, investigative reporter Aram Roston detailed how, in the wake of the 9/11 attacks, Montgomery snookered the CIA, the White House, the Department of Homeland Security, and the Air Force into believing he had software that could decode secret messages to terrorists, supposedly embedded in broadcasts of the Al Jazeera Media Network.

As crazy as this now sounds, Roston, using unsealed court documents, reported that eTreppid Technologies, the Nevada software company Montgomery co-owned, scored multimillion-dollar

contracts for computer software touted by Montgomery.

In fact, Roston wrote, the United States went to Code Orange, the DHS' second-highest terror alert, in 2003 based on data supplied to the CIA by Montgomery.

International flights were delayed, sometimes canceled, because of Montgomery's work. Based on Montgomery's "intelligence gathering," Homeland Security Secretary Tom Ridge told reporters at the time about the threat of "near-term attacks" that could "rival or exceed" those of 9/11.

"Montgomery calls the work he was doing noise filtering," Roston wrote. "He was churning out reams of data he called output. It consisted of latitudes and longitudes and flight numbers."

This data was given to then-CIA Director George Tenet, according to Roston, and "eventually ended up in the White House."

There was one big problem, Roston reported: "The communications Montgomery said he was decrypting apparently didn't exist."

Roston wrote that Montgomery's eTreppid colleagues questioned his computer skills. Company employees also claimed that Montgomery had faked demonstrations of weapons-recognition software for representatives of the U.S. military.

With the help of a "branch of the French intelligence services," the CIA finally got wise to Montgomery, realizing that there were no secret messages to bad guys in the Al Jazeera broadcasts.

Montgomery left eTreppid, wrote Roston, and went on to work for software companies backed by a wealthy heiress; to accuse Nevada Governor Jim Gibbons of taking a bribe (Gibbons later was cleared of wrongdoing); to lose big at a Rancho Mirage, California casino ($422,000 in one day); and to declare bankruptcy.

Now, Montgomery lives in Yarrow Point, Washington, a short drive from downtown Seattle. My sources report that MCSO detectives Anglin and Mackiewicz have spent a lot of time this year in Seattle with Montgomery, who, the sources say, has convinced the sheriff that he has information suggesting an anti-Arpaio conspiracy between Judge Snow and the DOJ.

These sources say there is no report number assigned to the case, that Arpaio himself is running it, and that the investigation has been financed with funds for confidential informants, RICO funds.

Montgomery has been assigned a "confidential informant number" or "control number," the identity of which is known only to Arpaio, a few MCSO brass, and those in Special Investigations, according to my sources, who claim Montgomery has been paid about $100,000 to date by the MCSO.

The situation gives Arpaio and the MCSO a degree of deniability because the department is allowed to keep the identities of confidential informants secret in most instances.
Though there should be MCSO paperwork associated with such payments, it would show a payment to a control number, not a name.

The MCSO's official policy on "informant management" states that control numbers must be maintained in a confidential-informant log "monitored by the [Special Investigations Division] commander or his designee."

It further states that all informant files be kept in a "secured area within the SID."
The policy notes that the MCSO "will protect these sources through all available and reasonable legal means."

Such "informant files" are retained as "permanent records" of SID, "unless the division commander determines that the records may be purged."

My sources say Mackiewicz has received, to date, $50,000 in overtime pay and Zullo has gotten about $5,000 in payments.

Zullo's role is unclear, though he currently is involved in the investigation, according to these sources, as well as the perpetual birther probe.

Additionally, they say the MCSO made about a $50,000 purchase of computer equipment for Montgomery sometime this year from a store in Washington state.

According to the MCSO's policy regarding "Undercover and Investigative Funds Accountability," an expenditure of up to $6,000 for undercover and investigative work can be approved by a division commander.

Anything over $6,000 must be approved by a bureau commander.

As for funds specifically paid to confidential informants, the reins are even tighter.

Payments to a CI of more than $300 must be approved by a division commander "prior to the expenditure of the funds," according to the MCSO's informant-management policy.
The amount of money involved in detectives Anglin and Mackeiwicz's Seattle quest has raised red flags with MCSO accountants, I've been told.

These same MCSO accountants reportedly have expressed concern internally about the procurement of the computer equipment, excessive CI payments, the amount of overtime involved, and the money spent on airfare and stays in Seattle.

In several broadly worded public-records requests sent to the MCSO in February, I asked for any and all e-mails traded among the players involved, as well as any and all records regarding MCSO employees' trips to Seattle, payments of informant funds to Dennis Montgomery, and Mackiewicz's overtime requests.

In each case, I was advised by MCSO spokesman Jones that "this is an ongoing investigation . . . no records can be released at this time."

In March, I called Zullo at his home phone number. I asked him about the work he was said to be doing with Montgomery.

He claimed not to know what I was talking about. When I pressed him, he said all such inquiries should go through the MCSO.

"I have no comment to make, especially to the *New Times*," he told me before hanging up.

The opportunity to question Arpaio about the Montgomery caper came as he munched on cheese <u>at a recent fundraiser for embattled Arizona Attorney General Tom Horne at the University Club in</u>

Phoenix.

I asked the sheriff about Montgomery and the work that my sources tell me he has done for the MCSO.

At first, he played dumb, asking if I meant County Attorney Bill Montgomery.

"No, *Dennis* Montgomery," I replied. "The computer guy in Seattle who is helping you investigate Judge Snow and the DOJ. You are investigating Snow and the DOJ, aren't you?"

As he hit the cheese platter again, Arpaio looked over his shoulder at me with a grin. But he said nothing.

I kept after him, asking why deputies Mackiewicz and Anglin had spent so much time in Seattle.

"I dunno, maybe they like the weather up there," he said over his shoulder, "or the snow crab."

True to form, the sheriff was cagey, but there was no denial.

The ex-Special Investigations source I know tells me that the joke around Arpaio's office is that Montgomery's referred to as "Snowden," after Edward Snowden, the American computer geek responsible for a massive 2013 leak of classified documents from the National Security Agency that exposed Orwellian surveillance programs run by the U.S. government.

"[Montgomery] says he worked for the CIA on a project called Hammer [and] collected data similar to Snowden's," the source says. "[Montgomery] claims he can prove there was a conspiracy between [U.S. Attorney General] Eric Holder and Judge Snow . . . a conspiracy against Arpaio."

Montgomery, who is middle-aged and stocky with a shock of white hair, is no Snowden. Whatever you think of Snowden, at least the information he released generally has been confirmed as legitimate.

As with the gibberish Montgomery reportedly gave the CIA in the early 2000s, he has, according to my sources, produced many printouts for the MCSO that seem off point, with dates going back to 1999 and earlier.

Obviously, that's long before Arpaio took up the cause of illegal immigration, long before he was investigated or sued by the DOJ, and long before he became the subject of the ACLU's big racial profiling lawsuit *Melendres v. Arpaio*.

One source informs me that at least one underling told Arpaio recently that what Montgomery provided the MCSO is worthless, that Joe is getting played -- which caused the sheriff to erupt into a fit of anger.

When Montgomery was approached by a freelance reporter on behalf of *New Times* in April, he was nonplussed.

Montgomery came to the door of his Yarrow Point home, a cell phone at his ear, talking to someone about computer equipment.

The reporter identified himself, and Montgomery asked for a card, which the reporter presented.

"I really don't wanna talk to you," Montgomery said, ending his call.

Case 2:07-cv-02513-GMS   Document 1166   Filed 07/10/15   Page 12 of 61

"Okay, about Phoenix . . .," the reporter began.

"No comment," Montgomery shot back.

"Arizona . . .," the reporter started again.

"No comment," Montgomery repeated. "Who sent you up here?"

"*Phoenix New Times*," the reporter explained.

"Yeah," growled Montgomery.

"Have you done any work for Joe Arpaio?" the reporter asked.

"I, I, I have no comment," Montgomery said, moving away. "I'll call you later. I'll think about it."

Montgomery went back into his house and shut the door, ending the conversation on a mysterious note.As with Arpaio, there was no denial.

Is Dennis Montgomery Joe Arpaio's Snowden? I cannot say absolutely.

But it's not far-fetched to think that Arpaio would investigate any powerful public official. He continues to investigate the president. He and now-disbarred former County Attorney Andrew Thomas investigated Superior Court judges perceived to be thwarting their anti-undocumented-immigrant policies.

That is, it fits a pattern cultivated over his reign of more than 20 years.

Among Arpaio's bogus investigations have been:

• One targeting former Arizona Attorney General Terry Goddard for alleged bribery. The probe began in 2007 and didn't seem to end until Goddard left office.

• One that brought the 2008 indictment of then-county Supervisor Don Stapley on 118 criminal counts related to his allegedly not properly disclosing sources of income. All counts were dismissed ultimately.

• An infamous December 2009 RICO suit brought by Arpaio and Thomas against the entire Board of Supervisors, various county employees and certain Superior Court judges. Supposedly, they all were part of a conspiracy involving the county's new court tower. The suit was a disaster that finally got dismissed by Thomas himself.

• A probe resulting in the filing of false bribery charges in 2009 against former Superior Court Judge Gary Donahoe. Arpaio and Thomas ginned up these charges as retaliation against Donahoe for adverse rulings and to make Donahoe vacate a hearing that Arpaio and Thomas didn't want to take place.

And now Judge Snow, who in 2013 found the MCSO guilty of racial profiling and assigned a monitor to make certain that Arpaio was obeying court orders on reforming and re-educating deputies so that the agency does not profile Latinos or any other minority again?

As for Holder, the DOJ remains engaged in a lawsuit accusing Arpaio of abuse of power and prejudiced policing.

SER105

At age 82, the sheriff faces the ignominy of ending his law enforcement career as a disgraced political colossus.

All -- in his mind -- because of Snow and the DOJ.

Why not attempt an investigation aimed at discrediting his perceived nemeses?

Though there never will be any pink handcuffs in Snow's or Holder's future, Arpaio's racist, wing-nut supporters would consider it an act of bravery that their hero is investigating federal officials getting in the way of keeping despised Latinos in their place.

Meaning more money in the sheriff's perpetual re-election kitty and proving that bogus investigations continue to pay off.

My dream, of course, is that Snow blows a gasket and perp-walks the aged autocrat. We'll see.

### *Rick Anderson in Seattle contributed to this story.*



# Exhibit B

**From:**     David Webb
**To:**       1tick@earthlink.net
**Subject:**  PROJECT
**Date:**     Sunday, June 29, 2014 12:11:26 PM

---

**From:** Dennis [mailto:dennis@ncoder.net]
**Sent:** Sunday, June 29, 2014 12:08 PM
**To:** dwebb605@gmail.com
**Subject:** PROJECT

It is obvious that Anglin and his superiors have been trying to shut this project down since its inception.  On one hand Anglin tells not to produce information on  Judge SNOW.  Then I am attacked for not producing information on Judge SNOW.  Too many mixed signals from Anglin.  This job is tough enough, but Anglin telling me not me not to share information with others until he gets the information was outrageous.  Who was I supposed to trust?

Brian has to take orders from his superiors.  Brian has never stop believing in me or the work.  I can assure you Brian was getting the same mixed messages I was. But he must follow the orders of his superiors to survive in MCSO. He has taken a lot of time from his family, and for that I am sorry.

Anglin told by me that Sheridan didn't want to go in front of Judge Snow and be accused of retaliating against the judge.

ANGLIN told me stop work on the BC day one, He told me never to trust Mike Zullo. I was told directly by Anglin not to pass information on to Mike Zullo.

I was not allowed to discuss with Mike zullo what I am being told to do or not to do.

I was setup to fail. To ensure I failed, Anglin or his superiors fed false information to the NEW PHOENIX TIMES.  When that failed, I was hit with the SEATTLE WEEKLY news article.  I had a stroke, and was in ICU when they article was released.

Anglin would not talk to Carl Cameron in front of me.  He knew that promising to deliver data to FOX, and then not do it, would hurt me with FOX.  He accomplished his goal. Anglin or his superiors then fed false information again to the New Phoenix Times to discredit the data, adding more doubt into Carl Cameron's mind.  Carl Cameron's recent email says it all.

I worked hard to gain credibility with FOXNEWS.  Anglin's plan to destroy my credibility with FOXNEWS succeeded.  Now there is doubt in FOXNEWS about the validity of my accusations I filed with the CIA and DOJ.  I now have a much higher hurdle to overcome with them to regain my redibility.

I will bet you the next article in the New Phoenix Times will be on Brian, to hurt him and kill this project.

I had no chance to succeed.  Obviously some people in MCSO wanted for political reasons to use my work to hurt the sheriff.

I can assure you that I have had only one goal since I began this work, and that was to get the work done!

MELC202132 SER108

Exhibit C

SER109

| | |
|---|---|
| **From:** | Brian Mackiewicz |
| **To:** | Larry Klayman |
| **Cc:** | Michael Zullo; David Webb; Dina James |
| **Subject:** | Re: DC |
| **Date:** | Friday, November 07, 2014 7:55:19 AM |

Gentleman,
Good morning. Wanted to update everyone on the progress of this investigation. Significant information was learned yesterday concerning the approximately 50 hard drives Dennis Montgomery provided as evidence to to the Maricopa County Sheriff's Office in April of 2014.

Dennis Montgomery represented the hard drives contained classified and sensitive information that he obtained while working at either eTreppid, or Blixware on behalf of federal government as a CIA contractor.

When our experts examined the information contained on the drives, not only did the numerous drives NOT contain any classified or sensitive information, they were instead contained data dumps of you relevant computer information hours off video feeds for Al Jazeera news feed.

After reviewing all the hard drives our experts concluded that Dennis Montgomery deliberately complied massive amounts of data  on to these drives for the purpose of obfuscating the fact the data itself contained no evidence to support Dennis Montgomery's  claims. There was no sensitive information contained on any of these 50 hard drives.

In addition, our experts brought question in
the validity concerning an number of emails Dennis Montgomery provided in the same hard drives.

Our experts also determined that much of the information that Dennis Montgomery has alleged that was harvested by the federal government in violation of the fourth amendment protections cannot be sourced for validity based on the information contained in the 50 hard drives Dennis Montgomery provided.

Two days worth of email correspondence and telephone calls to Dennis Montgomery advising him all is required of him is to cooperate and provide all source information supporting his allegations would remedy his situation immediately. He has refused. I should add he refuses while at the same time professing to want to cooperate.


At this juncture, after a 13 month investigation, Maricopa County Sheriffs office CANNOT validate the credibility of Dennis Montgomery and or his work without his full and candid cooperation in supplying the necessary evidence for our experts to substantiate his work and deem it authentic and creditable.

Dennis Montgomery is leaving us no other alternative but to take this investigation in a completely different course going forward.

It is extremely discouraging to learn most if not all the representations made by Dennis Montgomery to investigators, the State of Arizona Attorney General, and a Federal Judge have been less then truthful.

Mr. Klayman,  if you can represent to me Dennis Montgomery's intentions of cooperating fully, candidly, without obstruction or obfuscation,  perhaps we can bring this this investigation to a successful conclusion for all parties concerned.  Please advise me immediately.


Sent from my iPad

On Nov 3, 2014, at 1:20 PM, Larry Klayman <leklayman@gmail.com> wrote:

> I don't appreciate your games...there would be no judge if not for me. I suggest you do not mess with Lamberth. There is no reason to do so at this time and your games are just to squeeze Dennis through me. I don't appreciate being played.

> I am preparing for an oral argument for the NSA case and these tactics are offensive at this time in particular.

> On Nov 3, 2014 11:35 AM, "Brian Mackiewicz" <detmack@gmail.com> wrote:
>> Larry,
>> Pardon me I included you out of courtesy. No worries point taken and I will exclude you from all other communications, between our confidential informant and the judge going forward. That is to include what path this investigation takes going forward. Have a wonderful day. Good luck in your argument.

>> Sent from my iPhone

>> On Nov 3, 2014, at 10:25, Larry Klayman <leklayman@gmail.com> wrote:

>>> This is inappropriate! I asked Mike to have us talk after my oral argument in the NSA case. I do not appreciate this lack of respect! More later...

>>> On Mon, Nov 3, 2014 at 8:16 AM, Brian Mackiewicz <detmack@gmail.com> wrote:
>>>> Gentleman,

MELC202173 SER110

I guess I will take a minute and respond to some of the issues at hand. Dennis you have no problem defending the work because you truly believe your the only person on the face of the earth that knows what your talking about. It is easy to hide behind, "we have a lack of understanding of software development and programs" but do you really think we would ever take your word as gospel? I will admit we did take your word as gospel for some time time but that time ended when you grossly misrepresented the work that you said was completed.

It would have not been such a big deal Dennis but Mike and I represented the fact the work was complete and it wasn't. Look I am not stupid you have lied to me several times over the past 12 months. I have caught you in you lies and chosen to move forward and look past the fact you lied. I always kept hope and believed when it came to your work product and your "STORY" you were always being truthful. The problem now is were do the lies end and the truth start. I am not even sure you know the answer to that Dennis.

From day one I thought we all had a common goal in mind when it came to this investigation. If your "STORY" was based on facts and the information you provided was all truthful Mike, I, and the Office was dedicated do anything in our powers LEGALLY to help bring your story forward and expose the TRUTH. I truly believe Mike, I, and the Office have lived up to out part of the deal. We have given you approximately 120,000 dollars plus in exchange for information. We brought you before the Arizona State Attorney General, we found you two different Attorneys, and we opened the door to a Federal Judge to give you as much protection as possible. Mike and I went to the Administration several times and asked for extensions to continue this investigation because we believed your "STORY" and the information you provided. When you had a stroke and you had NO one to turn you I was on a plane to assist you and you family. Not to mention the personal sacrifices Mike and I have made over the past 12 months to make sure you and you family were taken care of. Dennis if you don't remember Mike and I even gave you 200.00 dollars a piece out of our own pockets so you could have a Thanksgiving with you family last year. Just to later find out you worked Tim for 500.00 dollars also.

And to address one other issue that has seemed to come up more then once. If I remember correctly it was you choice to get on a plane and fly to Washington DC. Mike, I, or the Office was not aware you were advised by your Doctor not to travel UNTIL after you flew back to Seattle.  I remember Mike and I specifically told when you after you informed us of that information you would have to provide a doctors letter before we would let you travel again. I also remember you getting so intoxicated at dinner while in Washington DC I had to tell the waiter to start serving you cocktails with no alcohol. Mike, I, or the Office would have never let you flight to Washington DC if we knew it was against your Doctors orders.

You also mention, "I was forced to sacrifice my recovery to adhere to your ridiculous timeframes to further are agenda".  Dennis I want to be clear last time I knew you were an adult. As adults sometimes we have to make certain choices in life that might effect our future. Mike, I, or the Office did not hold a gun to your head telling you had to do anything.

Dennis for some reason I think you believe it is Mike, I, and the Offices responsibility to support you and your family's lifestyle, and to fix all your problems. From the beginning we all agreed we had some obstacles to overcome based on what other people have said about you. I believe Mike, and I have and will continue to overcome those obstacles if you are truthful with us.

Dennis your not a stupid person. You know exactly what we need and want to be able to move forward. You know everything you provide us has to get verified by a third party. If I just believed everything people told me without verifying it by facts or evidence everyone would be locked up. If you CANT or WONT provide Mike, and I with what is necessary to prove and verify everything then be honest and tell us. There is more then one way to skin a cat.

As far is Larry Klayman is concerned his involvement in this investigation is non existent. we understand he is your attorney and he is representing you. BUT he has no bearing at all on how this case is investigated and what the outcome maybe. You might be able to play Larry for what you need for a little while but in the end you and Larry still need someone with CREDIBILITY to verify the information and your "STORY" .

And for my last and final point. Dennis I have been a Deputy Sheriff for almost 18 Years. When I graduated the Police Academy I took an Oath of Office which I still keep believe in. I know you have heard me say this more then once but this is one investigation of many in my Career. My job is to find the facts, verify the facts, and come to a logical conclusion that a reasonable person would believe based on those facts. I have no agenda is this investigation Dennis. When we decide this investigation is over I will look at all the facts, statements, and evidence that has been collected over the past year and ask myself what would a reasonable person would think. Remember that Oath I mention, it means no matter how I feel personally regarding the outcome of this investigation I am sworn to do the right thing Dennis. I truly hope in the end we all accomplish the same goal we all had in the beginning, but remember if not I am NOT AFRAID and I can promise you I will do the right thing.

Dennis it is a great possibility that your future depends on what you do from here. We have days not weeks, not months. Time is of the essence

Detective Brian Mackiewicz #1227

Sent from my iPad

MELC202174 SER111

On Nov 2, 2014, at 9:54 PM, David Webb <dwebb605@gmail.com> wrote:

I have no problem defending my work.  You have a lack of understanding of software development and programs.  This is what is hindering the work from moving forward.

If you look at the previous email I sent you, you will find all of the build numbers you have been looking for..  The website is also up and contains the latest information on the various adobe builds.

You can't expect the technology to find data that Adobe leaves out in some of their formats.

Regarding the issue of money, I will leave that to the sheriff and Brian Mackweitz to address.

Regarding my commitment,  at your and Brian Mickiewicz's request, I got on a plane 4 weeks after my stroke and brain coiling

against medical advice.  In addition, I was forced to sacrifice my recovery to adhere to you ridiculous timeframe and further your agenda.
,

Once again you are upset at me for not getting on a plane to meet your NSA advisors,  when my doctors have advised against it.

As you well know I have lost the use of my left arm and hand.  I made some progress in moving my arm, and hand, but it is impossible to program with it.

You told me in previous emails that you wanted this to get back on track.  You most recent email convinces me otherwise.

Go find someone else to do this work.

MELC202175 SER112

# Exhibit D

SER113

| | |
|---|---|
| **From:** | Mike |
| **To:** | detmack@gmail.com |
| **Subject:** | OZ |
| **Date:** | Tuesday, December 09, 2014 5:28:00 PM |

Dennis

To answer the question, where we go from here, really is dependent upon you. A year-long investigation and tens of thousands of dollars invested, we have absolutely nothing to show for it. The 50 some odd drives we had in our possession shockingly turned out to contain nothing of any significance on any level whether Federal or pertaining to the Sheriff's Office. There was absolutely nothing of use on those drives.

Overwhelming content of meaningless information does absolutely nothing to further your cause and obviously puts the Sheriff's office in a very precarious situation.

Dennis I think the bottom line is if you have the information this is the time to provide. We have an extremely short window of opportunity to work in and the choice is yours. All you have to do is produce what you said you were going to produce in exchange for the dollars you received.

But I have to stress to you the time is of the essence. We have been instructed to write up our final report and be ready to hand it over to a different agency. I really don't want to see it come to that but again the choice is yours.

MELC202048 SER114

# Exhibit E

| | |
|---|---|
| **From:** | Larry Klayman |
| **To:** | Michael Zullo |
| **Cc:** | David Webb; Dennis |
| **Subject:** | Re: 2nd Request |
| **Date:** | Monday, April 20, 2015 4:21:11 PM |

I'll call tomorrow  best

On Apr 20, 2015 7:10 PM, "Mike" <1tick@earthlink.net> wrote:

> Larry,
>
> This is now my second request asking for a date set for the completion of  the work Dennis Montgomery  has been promising for over 16 months..  Mr. Montgomery's behavior and lack of performance  flies  in the face of his numerous promises pledging to complete the work..  This is especially concerning given the face that Mr. Montgomery needs validation like a drowning man needs oxygen. His behavior simply erodes whatever thread  of credibility he may have left. In fact   as of this date, our experience  dealing with  Mr. Montgomery  mirrors what has been written  about him.. It is apparent to us that this is just a game of running the clock in the hope Montgomery can position himself as a "Whistle Blower"  with some jurisdiction  and with your help  get out from under his obligation to the us.  In our opinion   Montgomery does not qualify under Federal Whistle Blower protections. A risky game….
>
> I would like a response by close of business  on Wednesday  April 22nd, 2015. If we do not here from you or your client  we will complete final reports, close the matter and make the appropriate   notifications.
>
> Larry we have bent over backwards to help your client and you however, it appears that you have changed course and are no longer work to our  mutual benefit.
>
> Mike
>
> From: Mike [mailto:1tick@earthlink.net]
>
> Sent: Thursday, April 16, 2015 1:34 PM

MELC202142 SER116

To: Larry Klayman (leklayman@gmail.com); 'David webb'; 'Brian Mackiewicz'

Subject: FW: Home

Larry,

Per our phone conversation , I need to know Dennis's   intentions on moving forward on a
 timely basis and honor his  agreement with us and set a hard date  to complete the paid
 work on the BC  as he  agreed to perform..  This work has nothing to do with the other
 issues he is dealing with and as of last month he was one week away from completion.
 That week as others came and went.  Open ended e mails of promises  of continued efforts
 simple are no longer reliable  given the history.   Please let me know of his intentions to
 provide a completion date  in the very  near future.

Mike

From: Mike [mailto:1tick@earthlink.net]

Sent: Thursday, April 9, 2015 2:48 PM

To: 'Dennis '; Larry Klayman (leklayman@gmail.com)

Cc: 'Brian Mackiewicz'

Subject: RE: Home

Dennis

While I understand your situation to some degree, the truth here is you knew for months you
 would have to move out. You were in fact contractually obligated and paid a total of 15K
 weeks ago  just prior to vacating the residence as you formally agreed.  To portray this
 event  as if you were unceremoniously or undeservingly thrown out of that house really is a
 stretch.

Looking past that,  your condition of  not working  again until you have a residence is
 understandable to some extent however,  the idea that once again we are at the mercy of you
 or your circumstance is not going to be something we will be able to contend with much
 longer.  On my end of this you were compensated $10,000  from a charitable organization
 for a service and software that I have yet to receive in any worthwhile or usable
 configuration. I will not allow this organization to be victimized.   This matter is going to
 have to be resolved very soon. Additionally,  the agreement  between you and the Sheriff's

MELC202143 SER117

Office  to forgo official notification to our contact in DC is now very long in the tooth and unproductive for us, as you have again failed to deliver anything as agreed.

You also recall we have 60 hard drives that you created, now in our custody. The Sheriff's Office painfully drove them  back to AZ as purported evidence of classified information gathered  by you. You will recall we had those drives examined and discovered there was absolutely nothing of value on them. To be clear there was nothing of a classified nature contained on any of them and as matter of fact there was evidence of fabrication on numinous levels.  Dennis I don't have to tell you what this smells of do I?

With your pending litigation in FL. You are aware that both Brian and I had met with the defendant that last time we were in DC. He has our business cards. It will only be a matter of time before we are contacted by his attorney.  Also in light of your most recent attempt to offer testimony as a WB and the fact that we have a videotaped Free Talk agreement you made with the AZAG and  you have breached that agreements as well,  this is not something I am prepared to allow to move forward without the proper notifications made on our end under these agonizing  circumstances.

Sixteen  long months of ZERO s and just empty promises and lip service. Enough…

We are going to allow you one last attempt to honor your agreement with us and set a hard date in the very near future to complete the work as agreed. I will wait to hear from you or Larry . Remember this is going to be a make or break moment.

Time is of the essences Dennis…

Mike

From: Dennis [mailto:dennis@ncoder.net]

Sent: Thursday, April 9, 2015 4:24 PM

To: 1tick@earthlink.net

Subject: Home

MELC202144 SER118

I am still trying to find a place to live.  My life is in chaos since I have no home  As soon as I can get into a home and my needs are met, I will continue the work to the best of my ability.  You obviously know by now the sheriff enforced an eviction notice on us, and removed us from the Yarrow property.  Our situation is precarious at best.

MELC202145 SER119

# Exhibit F

JOE ARPAIO BRIEF
Timeline

| Date | Description | IP Address | Time Call | From Call | To Call | Duration in (Min) |
|------|-------------|-----------|-----------|-----------|---------|-------------------|
| 2001 - 2008 | Eric Holder Senior Partner Covington Burling Law Firm | | | | | |
| 2001 – 2009 | Lanny Breuer Senior Partner Covington Burling Law Firm | | | | | |
| 02/12/07 | ACLU Files Melendres Lawsuit Against Arpaio | | | | | |
| 06/15/08 | US Department of Justice (DOJ) announces investigation into Joe Arpaio | | | | | |
| 02/01/09 | US Department of Justice (DOJ) - Hires Eric Holder Attorney General US | | | | | |
| 03/15/09 | Arizona Attorney General (AG) Issues Search Warrant Deputy Joel Fox | | | | | |
| 04/20/09 | Lanny Breuer Hired As Assistant AG Criminal Div. - DOJ | | | | | |
| 07/07/09 | Joe Arpaio Announces he will not cooperate with DOJ Investigation | | | | | |
| 07/15/09 | US Federal Judge Mary Murguia recuses herself from the Arpaio case. | | | | | |
| 07/20/09 | US Department of Justice (DOJ) - Calls Federal Judge G. Murray Snow | | | 202.514.2000 | 602.322.7560 | 10 |
| 07/22/09 | Judge G. Murray Snow Assigned To Arpaio Federal Cases (Not Random) | | | | | |
| 07/23/09 | US Department of Justice (DOJ) - Calls Federal Judge G. Murray Snow | | | 202.514.2000 | 602.322.7560 | 32 |
| 09/01/09 | John Gray Starts Intern Clerk Job with Federal Judge G. Murray Snow | | | | | |
| 09/26/09 | US Department of Justice (DOJ) - Calls Federal Judge G. Murray Snow | | | 602.322.7650 | 202.514.2000 | 5 |
| 09/28/09 | US Department of Justice (DOJ) - Wire Tap #56990-34   REDACTED   ++ | | | | | |
| 10/15/09 | US Gov breached Maricopa all domains, and subdomains | 156.42.184.18 | | | | |
| | Maricopa Government - mcao.maricpoa.gov - mcso.maricopa gov | 156.42.184.65 | | | | |
| | Mail servers: extmail1.maricopa.gov extmail2.maricopa.gov | 156.42.103.166 | | | | |
| 03/25/10 | Federal Judge Mary Murguia nominated to the 9th Circuit Court Appeals. | | | | | |
| 05/24/10 | US Department of Justice (DOJ) Calls Federal Judge G. Murray Snow | | | 202.514.2000 | 602.322.7560 | 14 |
| 05/28/10 | DOJ Criminal Division Wire Tap #64402-03      REDACTED | | | | | |
| 08/15/10 | US Gov breached Maricopa all domains, and subdomains | 156.42.184.18 | | | | |
| | Maricopa Government - mcao.maricpoa.gov - mcso.maricopa.gov | 156.42.184.65 | | | | |
| | Mail servers: extmail1.maricopa.gov extmail2.maricopa.gov | 156.42.103.166 | | | | |
| 07/10/10 | Covington Burling Law Firm Take Over Melendres Lawsuit Against Arpaio. | | | | | |
| 09/02/10 | US Department of Justice (DOJ) files suit against Arpaio | | | | | |
| 09/15/10 | John Gray Ends Intern Clerk with Federal Judge G. Murray Snow | | | | | |
| 10/01/10 | John Gray Joins Perkins Coie Law Firm | | | | | |
| 10/23/10 | US Government Breached - www.jshfirm.com  mail.jshfirm.com | 216.119.127.142 | | | | |
| | Service25-us.mimecast.com ; service26-us.mimecast.com | | | | | |

Rev 1.3a

MELC199917 SER121

JOE ARPAIO BRIEF

<u>Timeline</u>

| Date | Description | IP Address | Time Call | From Call | To Call | Duration in (Min) |
|------|-------------|------------|-----------|-----------|---------|-------------------|
| 10/25/10 | US Department of Justice (DOJ) Calls Perkins Coie (John Gray) | | 16:30 | 202.514.2000 | 602.351.8092 | 8 |
| 10/25/10 | Perkins Coie Associate  (John Gray) makes call to Federal Judge Snow Chambers | | 16:42 | 602.351.8092 | 602.322.7560 | 10 |
| 10/25/10 | Perkins Coie Associate  (John Gray) makes call to Maricopa County Cell Phone ++ | | 16:55 | 602.351.8092 | 602.+++ | 10 |
| 01/04/11 | US Federal Judge Mary Murguia approved as 9th Circuit Court of Appeals Judge | | | | | |
| 04/23/11 | Sheriff Arpaio Fires Chief Deputy David Hendershott and Deputy Larry Black | | | | | |
| 10/21/11 | Sheriff Arpaio Fires MSCO Captain Joel Fox | | | | | |
| 09/01/11 | US Department of Justice (DOJ) files complaint against Sheriff Arpaio | | | | | |
| 07/19/12 | Melendres vs. Sheriff Arpaio Trial Heard by Federal Judge G. Murray Snow | | | | | |
| 03/01/13 | Lanny Breuer Resigns from DOJ and rejoins Covington Burling Law Firm | | | | | |
| 06/13/13 | US Department of Justice (DOJ) Joins Melendres Lawsuit with Covington Law Firm | | | | | |
| 10/02/13 | Judge G. Murray Snow Rules in Class Action Lawsuit Against Joe Arpaio | | | | | |

Red - Phone Calls made to or from the Department of Justice
Green - John Gray Interns for Federal Judge G. Murray Snow (2009 - 2  10)
Blue - Judge G. Murray Snow Assigned To Arpaio Federal Case

MELC199918 SER122

JOE ARPAIO BRIEF
<u>Timeline</u>



Confidential Information Not to Be Disclosed

Rev 1.3a

MELC199919 SER123

JOE ARPAIO BRIEF
<u>Timeline</u>



MELC199920 SER124

JOE ARPAIO BRIEF
<u>Timeline</u>

| <u>Date</u> | <u>Description</u> | Breach<br><u>IP Address</u> | Time<br><u>Call</u> | From<br><u>Call</u> | To<br><u>Call</u> | Duration<br><u>in (Min)</u> |
|---|---|---|---|---|---|---|
| 2001 - 2008 | Eric Holder Senior Partner Covington Burling Law Firm | | | | | |
| 2001 – 2009 | Lanny Breuer Senior Partner Covington Burling Law Firm | | | | | |
| 02/12/07 | ACLU Files Melendres Lawsuit Against Arpaio | | | | | |
| 06/15/08 | US Department of Justice (DOJ) announces investigation into Joe Arpaio | | | | | |
| 02/01/09 | US Department of Justice (DOJ) - Hires Eric Holder Attorney General US | | | | | |
| 03/15/09 | Arizona Attorney General (AG) Issues Search Warrant Deputy Joel Fox | | | | | |
| 04/20/09 | Lanny Breuer Hired As Assistant AG Criminal Div. - DOJ | | | | | |
| 07/07/09 | Joe Arpaio Announces he will not cooperate with DOJ Investigation | | | | | |
| 07/15/09 | US Federal Judge Mary Murguia recuses herself from the Arpaio case. | | | | | |
| 07/20/09 | US Department of Justice (DOJ) - Calls Federal Judge G. Murray Snow | | | 202.514.2000 | 602.322.7560 | 10 |
| 07/22/09 | Judge G. Murray Snow Assigned To Arpaio Federal Cases (Not Random) | | | | | |
| 07/23/09 | US Department of Justice (DOJ) - Calls Federal Judge G. Murray Snow | | | 202.514.2000 | 602.322.7560 | 32 |
| 09/01/09 | John Gray Starts Intern Clerk Job with Federal Judge G. Murray Snow | | | | | |
| 09/16/09 | Dennis Burke Becomes US Attorney General Arizona | | | | | |
| 09/25/09 | US Department of Justice (DOJ) - Calls Dennis Burke US Attorney Arizona | | 10:43 | 202.514.2000 | 602.514.7500 | 9 |
| 09/26/09 | Judge G. Murray Snow Calls US Department of Justice (DOJ) | | 11:04 | 602.322.7560 | 202.514.2000 | 16 |
| 09/28/09 | Dennis Burke US Attorney - Calls Judge G. Murray Snow | | 11:44 | 602.514.7500 | 602.322.7560 | 6 |
| 09/28/09 | US Department of Justice (DOJ) - Wire Tap #56990-34   Block REDACTED ,++ | | | | | |
| 10/15/09 | US Gov breached Maricopa all domains, and subdomains | 156.42.184.18 | | | | |
| | Maricopa Government - mcao.maricpoa.gov - mcso.maricopa.gov | 156.42.184.65 | | | | |
| | Mail servers: extmail1.maricopa.gov extmail2.maricopa.gov | 156.42.103.166 | | | | |
| 03/25/10 | Federal Judge Mary Murguia nominated to the 9th Circuit Court Appeals. | | | | | |
| 05/24/10 | US Department of Justice (DOJ) - Civil Rights Calls Federal Judge G. Murray Snow | | | 202.514.6225 | 602.322.7560 | 14 |
| 05/28/10 | DOJ Criminal Division Wire Tap #64402-03     REDACTED | | | | | |
| 08/15/10 | US Gov breached Maricopa all domains, and subdomains | 156.42.184.18 | | | | |
| | Maricopa Government - mcao.maricpoa.gov - mcso.maricopa.gov | 156.42.184.65 | | | | |
| | Mail servers: extmail1.maricopa.gov extmail2.maricopa.gov | 156.42.103.166 | | | | |
| 07/10/10 | Covington Burling Law Firm Take Over Melendres Lawsuit Against Arpaio. | | | | | |
| 09/02/10 | US Department of Justice (DOJ) files suit against Arpaio | | | | | |
| 09/15/10 | US Department of Justice (DOJ) Call Federal Judge G. Murray Snow | | | 202.307.0652 | 602.322.7560 | 5 |

<span style="color:red">MELC199921</span> SER125

JOE ARPAIO BRIEF
<u>Timeline</u>

| Date | Description | Breach IP Address | Time Call | From Call | To Call | Duration in (Min) |
|---|---|---|---|---|---|---|
| 09/15/10 | John Gray Ends Intern Clerk with Federal Judge G. Murray Snow | | | | | |
| 10/01/10 | John Gray Joins Perkins Coie Law Firm | | | | | |
| 10/23/10 | US Government Breached - www.jshfirm.com  mail.jshfirm.com | 216.119.127.142 | | | | |
| | Service25-us.mimecast.com ; service26-us.mimecast.com | | | | | |
| 10/25/10 | US Department of Justice (DOJ) Calls Perkins Coie (John Gray) | | 16:30 | 202.514.2000 | 602.351.8092 | 8 |
| 10/25/10 | Perkins Coie Associate  (John Gray) makes call to Federal Judge Snow Chambers | | 16:42 | 602.351.8092 | 602.322.7560 | 10 |
| 10/25/10 | Perkins Coie Associate  (John Gray) makes call to Maricopa County Cell Phone ++ | | 16:55 | 602.351.8092 | 602.+++ | 4 |
| 01/04/11 | US Federal Judge Mary Murguia approved as 9th Circuit Court of Appeals Judge | | | | | |
| 04/23/11 | Sheriff Arpaio Fires Chief Deputy David Hendershott and Deputy Larry Black | | | | | |
| 08/30/11 | Dennis Burke Resigns As Us Attorney Arizona - Fast and Furious Scandal | | | | | |
| 10/21/11 | Sheriff Arpaio Fires MSCO Captain Joel Fox | | | | | |
| 09/01/11 | US Department of Justice (DOJ) files complaint against Sheriff Arpaio | | | | | |
| 07/19/12 | Melendres vs. Sheriff Arpaio Trial Heard by Federal Judge G. Murray Snow | | | | | |
| 03/01/13 | Lanny Breuer Resigns from DOJ and rejoins Covington Burling Law Firm | | | | | |
| 06/13/13 | US Department of Justice (DOJ) Joins Melendres Lawsuit with Covington Law Firm | | | | | |
| 10/02/13 | Judge G. Murray Snow Rules in Class Action Lawsuit Against Joe Arpaio | | | | | |

Red - Phone Calls made to or from the Department of Justice
Green - John Gray Interns for Federal Judge G. Murray Snow (2009 - 2010)
Blue - Judge G. Murray Snow Assigned To Arpaio Federal Case

MELC199922 SER126

JOE ARPAIO BRIEF
<u>Timeline</u>

MELC199923 SER127

JOE ARPAIO BRIEF

Timeline

Rev 1.4c

MELC199924 SER128

JOE ARPAIO BRIEF

<u>Timeline</u>

| Date | Description | Breach IP Address | Time Call | From Call | To Call | Duration in (Min) |
|------|-------------|-------------------|-----------|-----------|---------|-------------------|
| 2001 - 2008 | Eric Holder Senior Partner Covington Burling Law Firm | | | | | |
| 2001 – 2009 | Lanny Breuer Senior Partner Covington Burling Law Firm | | | | | |
| 02/12/07 | ACLU Files Melendres Lawsuit Against Arpaio | | | | | |
| 06/15/08 | US Department of Justice (DOJ) announces investigation into Joe Arpaio | | | | | |
| 02/01/09 | US Department of Justice (DOJ) - Hires Eric Holder Attorney General US | | | | | |
| 03/15/09 | Arizona Attorney General (AG) Issues Search Warrant Deputy Joel Fox | | | | | |
| 04/20/09 | Lanny Breuer Hired As Assistant AG Criminal Div. - DOJ | | | | | |
| 07/07/09 | Joe Arpaio Announces he will not cooperate with DOJ Investigation | | | | | |
| 07/15/09 | US Federal Judge Mary Murguia recuses herself from the Arpaio case. | | | | | |
| 07/20/09 | US Department of Justice (DOJ) - Calls Federal Judge G. Murray Snow | | | 202.514.2000 | 602.322.7560 | 10 |
| 07/22/09 | Judge G. Murray Snow Assigned To Arpaio Federal Cases (Not Random) | | | | | |
| 07/23/09 | US Department of Justice (DOJ) - Calls Federal Judge G. Murray Snow | | | 202.514.2000 | 602.322.7560 | 32 |
| 09/01/09 | John Gray Starts Intern Clerk Job with Federal Judge G. Murray Snow | | | | | |
| 09/16/09 | Dennis Burke Becomes US Attorney General Arizona | | | | | |
| 09/25/09 | US Department of Justice (DOJ) - Calls Dennis Burke US Attorney Arizona | | 10:43 | 202.514.2000 | 602.514.7500 | 9 |
| 09/26/09 | Judge G. Murray Snow Calls US Department of Justice (DOJ) | | 11:04 | 602.322.7560 | 202.514.2000 | 16 |
| 09/28/09 | Dennis Burke US Attorney - Calls Judge G. Murray Snow | | 11:44 | 602.514.7500 | 602.322.7560 | 6 |
| 09/28/09 | US Department of Justice (DOJ) - Wire Tap #56990-34   Block REDACTED ,++ | | | | | |
| 10/15/09 | US Gov breached Maricopa all domains, and subdomains | 156.42.184.18 | | | | |
| | Maricopa Government - mcao.maricpoa.gov – mcso.maricopa.gov | 156.42.184.65 | | | | |
| | Mail servers: extmail1.maricopa.gov extmail2.maricopa.gov | 156.42.103.166 | | | | |
| 03/25/10 | Federal Judge Mary Murguia nominated to the 9th Circuit Court Appeals. | | | | | |
| 05/24/10 | US Department of Justice (DOJ) - Civil Rights Calls Federal Judge G. Murray Snow | | | 202.514.6225 | 602.322.7560 | 14 |
| 05/28/10 | DOJ Criminal Division Wire Tap #64402-03         REDACTED | | | | | |
| 08/15/10 | US Gov breached Maricopa all domains, and subdomains | 156.42.184.18 | | | | |
| | Maricopa Government - mcao.maricpoa.gov – mcso.maricopa.gov | 156.42.184.65 | | | | |
| | Mail servers: extmail1.maricopa.gov extmail2.maricopa.gov | 156.42.103.166 | | | | |
| 07/10/10 | Covington Burling Law Firm Take Over Melendres Lawsuit Against Arpaio. | | | | | |
| 09/02/10 | US Department of Justice (DOJ) files suit against Arpaio | | | | | |
| 09/15/10 | US Department of Justice (DOJ) Call Federal Judge G. Murray Snow | | | 202.307.0652 | 602.322.7560 | 5 |

MELC199925 SER129

JOE ARPAIO BRIEF

<u>Timeline</u>

| Date | Description | Breach IP Address | Time Call | From Call | To Call | Duration in (Min) |
|------|-------------|-------------------|-----------|-----------|---------|-------------------|
| 09/15/10 | John Gray Ends Intern Clerk with Federal Judge G. Murray Snow | | | | | |
| 10/01/10 | John Gray Joins Perkins Coie | | | | | |
| 10/18/10 | Covington Burling Law Firm Call Department of Justice (DOJ) - Not In This Case | | 14:55 | 650.632.4704 | 202.514.6225 | 10 |
| 10/22/10 | Covington Burling Law Firm Call Perkins Coie (John Gray) | | 14:21 | 650.632.4704 | 602.351.8092 | 19 |
| 10/23/10 | US Government Breached - www.jshfirm.com  mail.jshfirm.com Service25-us.mimecast.com ; service26-us.mimecast.com | 216.119.127.142 | | | | |
| 10/25/10 | US Department of Justice (DOJ) Calls Perkins Coie (John Gray) | | 16:30 | 202.514.2000 | 602.351.8092 | 8 |
| 10/25/10 | Perkins Coie Associate  (John Gray) makes call to Federal Judge Snow Chambers | | 16:42 | 602.351.8092 | 602.322.7560 | 10 |
| 10/25/10 | Perkins Coie Associate  (John Gray) makes call to Maricopa County Cell Phone ++ | | 16:55 | 602.351.8092 | 602.+++ | 4 |
| | | | | | | |
| 01/04/11 | US Federal Judge Mary Murguia approved as 9th Circuit Court of Appeals Judge | | | | | |
| 04/23/11 | Sheriff Arpaio Fires Chief Deputy David Hendershott and Deputy Larry Black | | | | | |
| 08/30/11 | Dennis Burke Resigns As Us Attorney Arizona - Fast and Furious Scandal | | | | | |
| 10/21/11 | Sheriff Arpaio Fires MSCO Captain Joel Fox | | | | | |
| 09/01/11 | US Department of Justice (DOJ) files complaint against Sheriff Arpaio | | | | | |
| | | | | | | |
| 07/19/12 | Melendres vs. Sheriff Arpaio Trial Heard by Federal Judge G. Murray Snow | | | | | |
| | | | | | | |
| 03/01/13 | Lanny Breuer Resigns from DOJ and rejoins Covington Burling Law Firm | | | | | |
| 06/13/13 | US Department of Justice (DOJ) Joins Melendres Lawsuit with Covington Law Firm | | | | | |
| 10/02/13 | Judge G. Murray Snow Rules in Class Action Lawsuit Against Joe Arpaio | | | | | |

Red - Phone Calls made to or from the Department of Justice

Green - John Gray Interns for Federal Judge G. Murray Snow (2009 - 2010)

Blue - Judge G. Murray Snow Assigned To Arpaio Federal Case

MELC199926 SER130

JOE ARPAIO BRIEF
<u>Timeline</u>

MELC199927

JOE ARPAIO BRIEF
<u>Timeline</u>

Confidential Information Not to Be Disclosed

MELC199928 SER132

JOE ARPAIO BRIEF

<u>Timeline</u>

| Date | Description | Breach IP Address | Time Call | From Call | To Call | Duration in (Min) |
|------|-------------|-------------------|-----------|-----------|---------|-------------------|
| 2001 - 2008 | Eric Holder Senior Partner Covington Burling Law Firm | | | | | |
| 2001 – 2009 | Lanny Breuer Senior Partner Covington Burling Law Firm | | | | | |
| 02/12/07 | ACLU Files Melendres Lawsuit Against Arpaio | | | | | |
| 06/15/08 | US Department of Justice (DOJ) announces investigation into Joe Arpaio | | | | | |
| 02/01/09 | US Department of Justice (DOJ) - Hires Eric Holder Attorney General US | | | | | |
| 03/15/09 | Arizona Attorney General (AG) Issues Search Warrant Deputy Joel Fox | | | | | |
| 04/20/09 | Lanny Breuer Hired As Assistant AG Criminal Div. - DOJ | | | | | |
| 07/07/09 | Joe Arpaio Announces he will not cooperate with DOJ Investigation | | | | | |
| 07/15/09 | US Federal Judge Mary Murguia recuses herself from the Arpaio case. | | | | | |
| 07/20/09 | US Department of Justice (DOJ) - Calls Federal Judge G. Murray Snow | | | 202.514.2000 | 602.322.7560 | 10 |
| 07/22/09 | Judge G. Murray Snow Assigned To Arpaio Federal Cases (Not Random) | | | | | |
| 07/23/09 | US Department of Justice (DOJ) - Calls Federal Judge G. Murray Snow | | | 202.514.2000 | 602.322.7560 | 32 |
| 09/01/09 | John Gray Starts Intern Clerk Job with Federal Judge G. Murray Snow | | | | | |
| 09/16/09 | Dennis Burke Becomes US Attorney General Arizona | | | | | |
| 09/25/09 | US Department of Justice (DOJ) - Calls Dennis Burke US Attorney Arizona | | 10:43 | 202.514.2000 | 602.514.7500 | 9 |
| 09/26/09 | Judge G. Murray Snow Calls US Department of Justice (DOJ) | | 11:04 | 602.322.7560 | 202.514.2000 | 16 |
| 09/28/09 | Dennis Burke US Attorney - Calls Judge G. Murray Snow | | 11:44 | 602.514.7500 | 602.322.7560 | 6 |
| 09/28/09 | US Department of Justice (DOJ) - Wire Tap #56990-34   Block REDACTED ,++ | | | | | |
| 10/15/09 | US Gov breached Maricopa all domains, and subdomains | 156.42.184.18 | | | | |
| 10/15/09 | Maricopa Government - mcao.maricpoa.gov - mcso.maricopa.gov | 156.42.184.65 | | | | |
| 10/15/09 | Mail servers: extmail1.maricopa.gov extmail2.maricopa.gov | 156.42.103.166 | | | | |
| 03/25/10 | Federal Judge Mary Murguia nominated to the 9th Circuit Court Appeals. | | | | | |
| 05/24/10 | US Department of Justice (DOJ) - Civil Rights Calls Federal Judge G. Murray Snow | | | 202.514.6225 | 602.322.7560 | 14 |
| 05/28/10 | DOJ Criminal Division Wire Tap #64402-03      REDACTED | | | | | |
| 08/15/10 | US Gov breached Maricopa all domains, and subdomains | 156.42.184.18 | | | | |
| 08/15/10 | Maricopa Government - mcao.maricpoa.gov - mcso.maricopa.gov | 156.42.184.65 | | | | |
| 08/15/10 | Mail servers: extmail1.maricopa.gov extmail2.maricopa.gov | 156.42.103.166 | | | | |
| 07/10/10 | Covington Burling Law Firm Take Over Melendres Lawsuit Against Arpaio. | | | | | |
| 09/02/10 | US Department of Justice (DOJ) files suit against Arpaio | | | | | |

<span style="color:red">MELC199929</span> SER133

JOE ARPAIO BRIEF

<u>Timeline</u>

| Date | Description | Breach IP Address | Time Call | From Call | To Call | Duration in (Min) |
|---|---|---|---|---|---|---|
| 09/15/10 | US Department of Justice (DOJ) Call Federal Judge G. Murray Snow | | | 202.307.0652 | 602.322.7560 | 5 |
| 09/15/10 | John Gray Ends Intern Clerk with Federal Judge G. Murray Snow | | | | | |
| 10/01/10 | John Gray Joins Perkins Coie Law Firm | | | | | |
| 10/18/10 | Covington Burling Law Firm Call Department of Justice (DOJ) - Not In This Case | | 14:55 | 650.632.4704 | 202.514.6225 | 10 |
| 10/22/10 | Covington Burling Law Firm Call Perkins Coie (John Gray) | | 14:21 | 650.632.4704 | 602.351.8092 | 19 |
| 10/23/10 | US Government Breached - www.jshfirm.com  mail.jshfirm.com | 216.119.127.142 | | | | |
| 10/23/10 | Service25-us.mimecast.com ; service26-us.mimecast.com | | | | | |
| 10/25/10 | US Department of Justice (DOJ) Calls Perkins Coie (John Gray) | | 16:30 | 202.514.2000 | 602.351.8092 | 8 |
| 10/25/10 | Perkins Coie Associate  (John Gray) makes call to Federal Judge Snow Chambers | | 16:42 | 602.351.8092 | 602.322.7560 | 10 |
| 10/25/10 | Perkins Coie Associate  (John Gray) makes call to Maricopa County Cell Phone ++ | | 16:55 | 602.351.8092 | 602.+++ | 4 |
| 01/04/11 | US Federal Judge Mary Murguia approved as 9th Circuit Court of Appeals Judge | | | | | |
| 04/23/11 | Sheriff Arpaio Fires Chief Deputy David Hendershott and Deputy Larry Black | | | | | |
| 08/30/11 | Dennis Burke Resigns As Us Attorney Arizona - Fast and Furious Scandal | | | | | |
| 10/21/11 | Sheriff Arpaio Fires MSCO Captain Joel Fox | | | | | |
| 09/01/11 | US Department of Justice (DOJ) files complaint against Sheriff Arpaio | | | | | |
| 07/18/12 | US Rep Jon Kyl office call Department of Justice Office Attorney - Amin Aminfar | | 11:14 | 202.224.4521 | 202-307-0652 | 26 |
| 07/19/12 | Melendres vs. Sheriff Arpaio Trial Heard by Federal Judge G. Murray Snow | | | | | |
| 07/24/12 | Covington Burling Law Fim Call to US Rep Jon Kyl office | | 11:58 | 202.662.6000 | 202.224.4521 | 38 |
| 06/13/13 | US Department of Justice (DOJ) Joins Melendres Lawsuit with Covington Law Firm | | | | | |
| 10/02/13 | Judge G. Murray Snow Rules in Class Action Lawsuit Against Joe Arpaio | | | | | |

Red - Phone Calls made to or from the Department of Justice

Green - John Gray Interns for Federal Judge G. Murray Snow (2009 - 2010)

Blue - Judge G. Murray Snow Assigned To Arpaio Federal Case

MELC199930 SER134

JOE ARPAIO BRIEF

<u>Timeline</u>

Rev 2.0

MELC199931 SER135

JOE ARPAIO BRIEF
<u>Timeline</u>

Confidential Information Not to Be Disclosed

Rev 2.0

MELC199932 SER136

# ARPAIO BRIEF



*This Page is Still Under Construction*   *rev (1.4c)*

MELC199933 SER137

# ARPAIO BRIEF



_This Page is Still Under Construction_   _rev (1.5a)_

MELC199934 SER138

# ARPAIO BRIEF



_This Page is Still Under Construction_   _rev (2.0)_

MELC199935 SER139

1   Cecilia D. Wang (*Pro Hac Vice*)
2   cwang@aclu.org
    ACLU Foundation
3   Immigrants' Rights Project
    39 Drumm Street
4   San Francisco, California 94111
5   Telephone: (415) 343-0775
    Facsimile: (415) 395-0950
6
7   Daniel J. Pochoda
    dpochoda@acluaz.org
8   Joshua D. Bendor
    jbendor@acluaz.org
9   ACLU Foundation of Arizona
    3707 N. 7th St., Ste. 235
10  Phoenix, AZ 85014
    Telephone: (602) 650-1854
11  Facsimile: (602) 650-1376
12
13  *Attorneys for Plaintiffs (Additional attorneys*
    *for Plaintiffs listed on next page)*
14

15              **IN THE UNITED STATES DISTRICT COURT**
16               **FOR THE DISTRICT OF ARIZONA**

17  Manuel de Jesus Ortega Melendres,    )    CV-07-2513-PHX-GMS
18  et al.,                             )
                                        )    **PLAINTIFFS' OPPOSITION TO**
19            Plaintiff(s),             )    **MOTION TO STAY**
                                        )
20       v.                             )
                                        )
21                                      )
    Joseph M. Arpaio, et al.,           )
22                                      )
                                        )
23            Defendant(s).             )
                                        )
24  _____    )
25
26
27
28

SER140

Additional Attorneys for Plaintiffs:

Andre I. Segura (*Pro Hac Vice*)
asegura@aclu.org
ACLU Foundation
Immigrants' Rights Project
125 Broad Street, 17th Floor
New York, NY 10004
Telephone: (212) 549-2676
Facsimile: (212) 549-2654

Anne Lai (*Pro Hac Vice*)
alai@law.uci.edu
401 E. Peltason, Suite 3500
Irvine, CA 92697-8000
Telephone: (949) 824-9894
Facsimile: (949) 824-0066

Stanley Young (*Pro Hac Vice*)
syoung@cov.com
Hyun S. Byun (*Pro Hac Vice*)
hbyun@cov.com
Covington & Burling LLP
333 Twin Dolphin Drive
Suite 700
Redwood Shores, CA 94065-1418
Telephone: (650) 632-4700
Facsimile: (650) 632-4800

Tammy Albarran
talbarran@cov.com
Covington & Burling LLP
One Front Street
San Francisco, CA 94111
Telephone: (415) 591-7066
Facsimile: (415) 955-6566

Priscilla G. Dodson (*Pro Hac Vice*)
pdodson@cov.com
Covington & Burling LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
Telephone: (202) 662-5996
Facsimile: (202) 778-5996

Jorge M. Castillo (*Pro Hac Vice*)
jcastillo@maldef.org
Mexican American Legal Defense and
Educational Fund
634 South Spring Street, 11th Floor
Los Angeles, California 90014
Telephone: (213) 629-2512
Facsimile: (213) 629-0266

1    The Movants'[1] meritless motion to stay, Doc. 1171, seeks to delay these

2 proceedings once again, without providing one scintilla of legal argument or relevant

3 authority.  Movants' only argument is that they "sincerely believe the Court has erred in

4 its recusal decision."  Doc. 1171 at 2.  That is not the legal standard.

5    "The factors considered in determining whether a stay pending petition for writ of

6 mandamus is warranted are the same as a stay pending appeal."  *Powertech Tech. Inc. v.*

7 *Tessera*, Inc., No. C 11-6121 CW, 2013 WL 1164966, at *1 (N.D. Cal. Mar. 20, 2013)

8 (internal citations and quotations omitted); *accord Morgan Tire of Sacramento, Inc. v.*

9 *Goodyear Tire & Rubber Co.*, No. 2:15-CV-00133-KJM-AC, 2015 WL 3623369, at *1

10 (E.D. Cal. June 9, 2015).  Those factors are: "'(1) whether the stay applicant has made a

11 strong showing that he is likely to succeed on the merits; (2) whether the applicant will be

12 irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure

13 the other parties interested in the proceeding; and (4) where the public interest lies.'"[2]

14 *Nken v. Holder*, 556 U.S. 418, 434 (2009) (quoting *Hilton v. Braunskill*, 481 U.S. 770,

15 776 (1987)).  "The party requesting a stay bears the burden of showing that the

16 circumstances justify an exercise of that discretion."  *Id.* at 433-34.

17    Movants have not even tried to carry their burden.  Their motion does not bother

18 to argue that they are likely to succeed on the merits of the mandamus petition, that they

19 will be irreparably injured absent a stay, that a stay will not substantially injure Plaintiffs,

20 or that the public interest would be benefited by a stay.

21    In fact, Movants cannot meet a single part of their four-part burden.  For the

22 reasons stated in the Court's July 10, 2015 Order Denying Motion For Recusal Or

23

24
---
25 [1] The Movants are Defendant Joseph M. Arpaio and non-party contemnor Gerard Sheridan.

26 [2] As *Nken* noted, "[t]here is substantial overlap between these and the factors governing
27 preliminary injunctions, not because the two are one and the same, but because similar concerns arise whenever a court order may allow or disallow anticipated action before the legality of that action has been conclusively determined."  *Nken*, 556 U.S. at 434 (internal
28 citation omitted).

1

Disqualification, Doc. 1164, they are not likely to succeed on their petition for a writ of mandamus. *See Solis v. Washington*, No. C08-5479BHS, 2010 WL 1708831, at *3 (W.D. Wash. Apr. 27, 2010) ("The likelihood of success in this case [of a motion to stay] is the likelihood of Plaintiff succeeding in having the Court's order to compel (Dkt. 60) reversed by the Ninth Circuit."). The Ninth Circuit has "repeatedly emphasized that the writ of mandamus is an extraordinary remedy limited to extraordinary causes." *In re Anonymous Online Speakers*, 661 F.3d 1168, 1173 (9th Cir. 2011) (internal citations and quotations omitted). The Ninth Circuit uses the *Bauman* factors to evaluate mandamus petitions:

> (1) whether the petitioner has no other means, such as a direct appeal, to obtain the desired relief; (2) whether the petitioner will be damaged or prejudiced in any way not correctable on appeal; (3) whether the district court's order is clearly erroneous as a matter of law; (4) whether the district court's order is an oft repeated error or manifests a persistent disregard of the federal rules; and (5) whether the district court's order raises new and important problems or issues of first impression.

*Id.* at 1174 (quoting *Perry v. Schwarzenegger*, 591 F.3d 1147, 1156 (9th Cir. 2010) and citing *Bauman v. U.S. Dist. Court*, 557 F.2d 650, 654–55 (9th Cir. 1977)). "'[T]he absence of the third factor, clear error, is dispositive.'" *Id.* (quoting *Burlington N. & Santa Fe Ry. Co. v. U.S. Dist. Court*, 408 F.3d 1142, 1146 (9th Cir. 2005)). "The clear error standard is highly deferential and is only met when 'the reviewing court is left with a definite and firm conviction that a mistake has been committed.'" *Id.* at 1177 (quoting *Cohen v. U.S. Dist. Court*, 586 F.3d 703, 708 (9th Cir. 2009)). "If the district court's findings are plausible in light of the entire record, we may not reverse, even if we would have weighed the evidence differently." *Lewis v. Ayers*, 681 F.3d 992, 998 (9th Cir. 2012).

Movants have not explained how this Court committed clear error in its thorough order denying the motion for recusal or the manner in which the Court's findings were implausible in light of the entire record. Rather, as this Court noted, Movants' recusal motion "ignore[d] the long-settled principle that, to trigger recusal, any alleged bias must

2

spring from an extrajudicial source, not from information or beliefs the judge gained over the course of litigation, or else the bias must be particularly excessive in degree." Doc. 1164 at 16 (citing *Liteky v. United States*, 510 U.S. 540, 550-51 (1994)). The Court also righty held that the recusal motion was devoid of merit because, among other things, its reliance on the Montgomery and Grissom investigations was untimely, belied by the Movants' own testimony and their counsel's public statements, and risked strategic manipulation. *Id.* at 26-27, 29, 31-32. Movants have not explained how these or any other of the Court's bases for denying the recusal motion were clearly erroneous. They have therefore failed to show that they are likely to succeed on their petition for a writ of mandamus, and their motion to stay must be denied.

As to the second stay factor, Movants have not shown how they would be irreparably injured by the continuation of these proceedings, or even which portion of these proceedings they seek to stay. See Doc. 1171 at 1 (requesting only that the Court "stay the district court proceedings"). The Ninth Circuit has already upheld the vast majority of the Supplemental Permanent Injunction, *Melendres v. Arpaio*, 784 F.3d 1254 (9th Cir. 2015), and Movants have twice admitted that they committed contempt of court, Doc. 948, 1003, so it is not clear how the continuation of these proceedings would irreparably injure them.

Meanwhile, a stay of these proceedings would substantially injure the Plaintiff class by further delaying the additional injunctive relief necessary to protect them. The contempt proceedings have revealed that Sheriff Arpaio and his subordinates paid no heed to numerous orders of this Court; that MCSO has shown little interest in administering discipline to the persons responsible; and that Defendants violated Plaintiffs' constitutional rights in ways beyond those shown at trial. Such disregard for the law by an agency charged with its enforcement poses a continued danger to the residents of Maricopa County and especially to the Plaintiff class. Allowing the Movants to further delay the imposition of injunctive relief would endanger the Plaintiff class. Additionally, delay will injure Plaintiffs by making it harder to compensate the victims of

3

1   Defendants' contempt.  As this Court has repeatedly noted, and in part because of

2   Defendants' inadequate recordkeeping and document production, it will be difficult to

3   locate the numerous contempt victims, and the more time that passes, the fewer victims

4   are likely to be identified.  With the passage of time, people move, addresses and phone

5   numbers on record become stale, and memories fade.  The request for a stay should be

6   denied on these bases alone.  *See* Order Denying Motion to Stay, Doc. 154 at 4 ("'[I]f

7   there is even a fair possibility that the stay for which [a party] prays will work damage to

8   some one else,' then 'the suppliant for a stay must make out a clear case of hardship or

9   inequity' to justify staying the case") (quoting *Landis v. N. Am. Co.*, 299 U.S. 248, 255

10  (1936)).

11        Finally, as to the public interest, as this Court noted in denying Maricopa County's

12  motion to stay in 2009, "the public has a strong interest not only in the resolution of

13  litigation, but also in making sure that such resolution is expeditious.  A stay of the kind

14  proposed here would compromise these interests.  Thus, this factor weighs against the

15  granting of a stay."  *Id.* at 8; *see also Nken*, 556 U.S. at 427 ("A stay is an intrusion into

16  the ordinary processes of administration and judicial review, and accordingly is not a

17  matter of right, even if irreparable injury might otherwise result to the appellant.")

18  (internal citations and quotations omitted).

19        Movants have not and cannot carry their burden to merit a stay of these

20  proceedings.  Their motion should be denied.

21

22  RESPECTFULLY SUBMITTED this 16th day of July, 2015.

23                                      By: /s/ Joshua D. Bendor

24                                      Cecillia D. Wang (*Pro Hac Vice*)
25                                      Andre I. Segura (*Pro Hac Vice*)
                                        ACLU Foundation
26                                      Immigrants' Rights Project

27                                      Daniel J. Pochoda
28                                      Joshua D. Bendor

                                        4

ACLU Foundation of Arizona

Anne Lai (*Pro Hac Vice*)

Stanley Young (*Pro Hac Vice*)
Tammy Albarran (*Pro Hac Vice*)
Hyun S. Byun (*Pro Hac Vice*)
Priscilla G. Dodson (*Pro Hac Vice*)
Covington & Burling, LLP

Jorge M. Castillo (*Pro Hac Vice*)
Mexican American Legal Defense and
Educational Fund
*Attorneys for Plaintiffs*

5

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 16, 2015, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail as indicated on the Notice of Electronic Filing.

Dated this 16th day of July, 2015.

/s/ *Joshua D. Bendor*

6

1    Michele M. Iafrate (#015115)
     miafrate@iafratelaw.com
2    IAFRATE & ASSOCIATES
     649 North Second Avenue
3    Phoenix, Arizona 85003
     Telephone: (602) 234-9775
4
     A. Melvin McDonald (#002298)
5    Melmcdonald2@gmail.com
     Joseph J. Popolizio (#017434)
6    jpopolizio@jshfirm.com
     John T. Masterson (#007447)
7    jmasterson@jshfirm.com
     JONES, SKELTON & HOCHULI, P.L.C.
8    2901 North Central Avenue, Suite 800
     Phoenix, Arizona  85012
9    Telephone:  (602) 263-1700

10   Attorneys for Defendant Joseph M. Arpaio

11   Lee Stein (#12368)
     lee@mitchellsteincarey.com
12   Barry Mitchell (#13975)
     barry@mitchellsteincarey.com
13   MITCHELL | STEIN | CAREY, PC
     One Renaissance Square
14   2 North Central Avenue, Suite 1900
     Phoenix, AZ 85004
15   Telephone:  (602) 358-0293
     Facsimile:   (602) 358-0291
16   Attorneys for Chief Deputy Gerard Sheridan

17

18                        UNITED STATES DISTRICT COURT

19                             DISTRICT OF ARIZONA

20

21   Manual de Jesus Ortega Melendres, on behalf          NO. CV-07-02513-PHX-GMS
     of himself and all others similarly situated; et
22   al.,

23                                        Plaintiffs,     **Sheriff Joseph Arpaio and Chief
                                                          Deputy Gerard Sheridan's Response
24              v.                                        to Putative Intervenor Dennis
                                                          Montgomery's Supplement to Motion
25   Joseph M. Arpaio, in his individual and official    for Reconsideration**
     capacity as Sheriff of Maricopa County, AZ; et
26   al.,

27                                       Defendants.

28

     4294822.1

                                                                                    SER148

1       Putative intervenor's attorneys Klayman and Mosley neither represent

2   Sheriff Arpaio and Chief Deputy Sheridan, nor speak for the interests of MCSO in this

3   action or in any proceeding related to this action.

4       Sheriff Arpaio and Chief Deputy Sheridan reject the vitriol and

5   inflammatory attacks set forth in the putative intervenor's supplement.  Sheriff Arpaio and

6   Chief Deputy Sheridan respect the Court and believe such ad hominem attacks have no

7   place in this litigation.

8       RESPECTFULLY SUBMITTED this 3rd day of June, 2015.

9       IAFRATE & ASSOCIATES

10

11      By:   _s:/  Michele M. Iafrate_____

12          Michele M. Iafrate
        Attorneys for Sheriff Joseph M. Arpaio
        and Maricopa County Sheriff's Office

13      JONES, SKELTON, & HOCHULI, P.L.C.

14

15      By:   _s:/  A. Melvin McDonald_____
        A. Melvin McDonald

16      By:   _s:/  Joseph P. Popolizio_____

17          Joseph J. Popolizio

18      By:   _s:/  John T. Masterson_____

19          John T. Masterson

20          Attorneys for Sheriff Joseph M. Arpaio

    MITCHELL | STEIN | CAREY, PC

21

22      By:   _s:/ Lee Stein_____
        Lee Stein

23      By:   _s:/ Barry Mitchell_____

24          Barry Mitchell

25          Attorneys for Chief Deputy Gerard
        Sheridan

26

27

28

SER149

1

## CERTIFICATE OF SERVICE

2

3   I hereby certify that on June 3, 2015, I electronically transmitted the attached document
using the CM/ECF system for filing, and which will be sent electronically to all registered
participants as identified on the Notice of Electronic Filing, and paper copies will be sent
to those indicated as non-registered participants.

4

5

6   *s:/  D. Weeks*

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SER150

CASE NO. 15-17269

IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

---

MANUEL de JESUS ORTEGA MELENDRES, *et al.*,
Plaintiffs - Appellees

v.

MICHAEL ZULLO, Movant - Appellant

v.

MARICOPA COUNTY; JOSEPH M. ARPAIO,
Sheriff of Maricopa County, Arizona; *et al.*,
Defendants – Appellees

---

From the United States District Court
For the District of Arizona
The Honorable G. Murray Snow, Presiding
Case No. CV-07-2513

---

## NOTICE OF APPEARANCE OF COUNSEL FOR MOVANT-APPELLANT MICHAEL ZULLO

---

Larry Klayman, Esq.
Klayman Law Firm
2020 Pennsylvania Ave. NW, Suite 800
Washington, DC 20006
Tel: (310) 595-0800
Email: leklayman@gmail.com

Attorney for Appellant – Movant Michael Zullo

i

Notice is hereby given that Larry Klayman, Klayman Law Firm, enters his

appearance in the above-captioned case as counsel for the Movant-Appellant

Michael Zullo, in the above-captioned matter.

Dated:  December 2, 2015                    Respectfully submitted,

                                             /s/ *Larry Klayman*
                                            Larry Klayman, Esq.
                                            Klayman Law Firm
                                            D.C. Bar No. 334581
                                            2020 Pennsylvania Avenue N.W., Suite 800
                                            Washington, DC 20006
                                            Telephone: (310) 595-0800
                                            Email: leklayman@gmail.com

## CERTIFICATE OF SERVICE

I hereby certify that on December 2, 2015, I electronically filed the
foregoing Notice of Appearance with the Clerk of the Court for the U.S. Court of
Appeals for the Ninth Circuit by using the Ninth Circuit's CM/ECF system,
causing it to be served upon the following counsel of record in the case through
CM/ECF:

               Stanley Young, Esq.
               Andrew Carl Byrnes, Esq.
               333 Twin Dolphin Road
               Redwood Shores, CA 94065
               syoung@cov.com
               650-632-4700
               Attorneys for Plaintiffs
               (Service via Email)

               Daniel Pochoda, Esq.
               ACLU FOUNDATION OF ARIZONA
               3707 N.  7th Street, Suite 235
               Phoenix, AZ 85014
               dpochoda@acluaz.org

1

602-650-1854
Attorney for Plaintiffs
(Service via Email)

Cecilia D.  Wang
ACLU FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
cwang@aclu.org
415-343-0775
Attorney for Plaintiff Melendres
(Service via Email)

Thomas P.  Liddy, Esq.
CIVIL SERVICES DIVISION
MARICOPA COUNTY ATTORNEY'S OFFICE
222 North Central Avenue, Suite 1100
Phoenix, AZ 85005
liddyt@mcao.maricopa.gov
602-506-8541
Attorney for Defendant Joseph Arpaio and Maricopa County
Sheriff's Office
(Service via Email)

Michele M.  Iafrate, Esq.
IAFRATE & ASSOCIATES
649 North Second Avenue
Phoenix, AZ 85003
miafrate@iafratelaw.com
602-234-9775
Attorney for Defendant Joseph Arpaio and Maricopa County
Sheriff's Office
(Service via Email)

Deborah L.  Garner, Esq.
IAFRATE & ASSOCIATES
649 North Second Avenue
Phoenix, AZ 85003

SER153

dgarner@iafratelaw.com
602-234-9775
Attorney for Defendant Joseph Arpaio and Maricopa County
Sheriff's Office
(Service via Email)

Mr. John Masterson
Mr. Justin M. Ackerman
Mr. Joseph J. Popolizio
JONES SKELTON & HOCHULI, PLC
2901 N. Central Avenue, Suite 800
Phoenix, Arizona 85012-2728
Telephone: 602-263-1700
jmasterson@jshfirm.com
jpopolizio@jshfirm.com
jackerman@jshfirm.com
Attorney for Defendant Sheriff Joseph Arpaio
(Service via Email)

Andre Segura, Esq.
ACLU FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad Street, 18th Fl.
New York, NY 10004
asegura@aclu.org
212-549-2676
Attorney for Plaintiffs
(Service via Email)

Anne Lai
UCI School of Law
401 E. Peltason Drive. Suite 3500
Irvine, CA 92616
alai@law.uci.edu
949-824-9894
(Service via Email)

Jorge M. Castillo
MALDEF

3

634 S. Spring Street, 11th Fl.
Los Angeles, CA 90014
jcastillo@maldef.org
213-629-2512
Attorney for Plaintiffs
(Service via Email)

Richard K. Walker
WALKER & PESKIND, PLLC
16100 N. 71st Street, Suite 140
Scottsdale, AZ 85254-2236
rkw@azlawpartner.com
480-483-6336
Attorney for Defendant Maricopa County
(Service via Email)

/s/ *Larry Klayman*
Larry Klayman, Esq.
Klayman Law Firm
D.C. Bar No. 334581
2020 Pennsylvania Avenue N.W., Suite 800
Washington, DC 20006
Telephone: (310) 595-0800
Email: leklayman@gmail.com

4



Office of the Clerk
**United States Court of Appeals for the Ninth Circuit**
Post Office Box 193939
San Francisco, California 94119-3939
415-355-8000

Molly C. Dwyer
Clerk of Court

May 11, 2015

| | |
|---|---|
| No.: | 15-71433 |
| D.C. No.: | 2:07-cv-02513-GMS |
| Short Title: | Dennis Montgomery v. USDC-AZP |

Dear Petitioner/Counsel

A petition for writ of mandamus and/or prohibition has been received in the Clerk's Office of the United States Court of Appeals for the Ninth Circuit. The U.S. Court of Appeals docket number shown above has been assigned to this case. Always indicate this docket number when corresponding with this office about your case.

If the U.S. Court of Appeals docket fee has not yet been paid, please make immediate arrangements to do so. If you wish to apply for in forma pauperis status, you must file a motion for permission to proceed in forma pauperis with this court.

Pursuant to FRAP Rule 21(b), no answer to a petition for writ of mandamus and/or prohibition may be filed unless ordered by the Court. If such an order is issued, the answer shall be filed by the respondents within the time fixed by the Court.

Pursuant to Circuit Rule 21-2, an application for writ of mandamus and/or prohibition shall not bear the name of the district court judge concerned. Rather, the appropriate district court shall be named as respondent.

# EMERGENCY PETITION UNDER CIRCUIT RULE 27-3

## CASE NO. _____

## IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

---

### IN RE: DENNIS L. MONTGOMERY

---

DENNIS L. MONTGOMERY, Intervenor-Petitioner,
v.
UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF ARIZONA, Respondent.

---

From the United States District Court
For the District of Arizona
The Honorable G. Murray Snow, Presiding
Case No. CV-07-2513

---

## EMERGENCY PETITION FOR WRIT OF MANDAMUS FOR RECUSAL PURSUANT TO 28 US.C. § 455 AND/OR 28 US.C. § 144

### [Ruling And Relief Requested Prior TO 9:30 A.M. May 14, 2015]

---

Larry Klayman, Esq.
FREEDOM WATCH, INC.
2020 Pennsylvania Ave. NW, Suite 345
Washington, DC 20006
Tel: (310) 595-0800
Email: leklayman@gmail.com

Jonathon Moseley, Esq.
FREEDOM WATCH, INC.
2020 Pennsylvania Ave. NW, Suite 345
Washington, DC 20006
Of Counsel (Not Admitted to Ninth Circuit)

Attorneys for Intervenor Dennis L. Montgomery

## **CIRCUIT RULE 27-3 CERTIFICATE**

**(i)**   The telephone numbers, e-mail addresses, and office addresses of the attorneys for the parties;

Stanley Young, Esq.
Andrew Carl Byrnes, Esq.
333 Twin Dolphin Road
Redwood Shores, CA 94065
syoung@cov.com
650-632-4700
Attorneys for Plaintiffs

Daniel Pochoda, Esq.
ACLU FOUNDATION OF ARIZONA
3707 N. 7th Street, Suite 235
Phoenix, AZ 85014
dpochoda@acluaz.org
602-650-1854
Attorney for Plaintiffs

Cecilia D. Wang
ACLU FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
cwang@aclu.org
415-343-0775
Attorney for Plaintiff Melendres

Thomas P. Liddy, Esq.
CIVIL SERVICES DIVISION
MARICOPA COUNTY ATTORNEY'S OFFICE
222 North Central Avenue, Suite 1100
Phoenix, AZ 85005
liddyt@mcao.maricopa.gov
602-506-8541
Attorney for Defendant Joseph Arpaio and Maricopa County Sheriff's Office

Michele M. Iafrate, Esq.
IAFRATE & ASSOCIATES
649 North Second Avenue
Phoenix, AZ 85003
miafrate@iafratelaw.com
602-234-9775
Attorney for Defendant Joseph Arpaio and Maricopa County Sheriff's Office

Deborah L. Garner, Esq.
IAFRATE & ASSOCIATES
649 North Second Avenue
Phoenix, AZ 85003
dgarner@iafratelaw.com
602-234-9775
Attorney for Defendant Joseph Arpaio and Maricopa County Sheriff's Office

Melvin McDonald
JONES SKELTON & HOCHULI, PLC
2901 N. Central Avenue, Suite 800
Phoenix, AZ 85012-2728
mmcdonald@jshfirm.com
602-263-1700
Attorney for Defendant Sheriff Joseph Arpaio

Andre Segura, Esq.
ACLU FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad Street, 18th Fl.
New York, NY 10004
asegura@aclu.org
212-549-2676
Attorney for Plaintiffs

Anne Lai
UCI School of Law
401 E. Peltason Drive. Suite 3500
Irvine, CA 92616
alai@law.uci.edu
949-824-9894

Jorge M. Castillo
MALDEF
634 S. Spring Street, 11th Fl.
Los Angeles, CA 90014
jcastillo@maldef.org
213-629-2512
Attorney for Plaintiffs

Richard K. Walker
WALKER & PESKIND, PLLC
16100 N. 71st Street, Suite 140
Scottsdale, AZ 85254-2236
rkw@azlawpartner.com
480-483-6336
Attorney for Defendant Maricopa County

**(ii)** Facts showing the existence and nature of the claimed emergency; and

A decision by the U.S. Court of Appeals for the Ninth Circuit is requested on May 12, 2015 or May 13, 2015, as the lower Court, as explained below, has set a hearing for 9:30 am on May 14, 2015, during which time it will likely issue further orders irreparably harming Petitioner. Due to unethical misconduct and a conflict of interest by the lower court judge, Petitioner files this petition for writ of mandamus to have him removed immediately from the subject case and his prior order vacated.

**(iii)** When and how counsel for the other parties were notified and whether they have been served with the motion; or, if not notified and served, why that was not done.

iv

Counsel for the other parties were notified via email on May 11, 2015 of

Intervenor Dennis L. Montgomery's intention to file this petition for writ of

mandamus.  Counsel will be served via email as soon as the petition has been filed

with this Court.

**EMERGENCY PETITION FOR WRIT OF MANDAMUS FOR RECUSAL
PURSUANT TO 28 U.S.C. § 455 et seq. AND/OR 28 U.S.C. § 144 et seq.**

## I.  INTRODUCTION

A decision by the U.S. Court of Appeals for the Ninth Circuit is requested on May 12, 2015 or May 13, 2015, as the lower Court, as explained below, has set a hearing for 9:30 am on May 14, 2015, during which time it will likely issue further orders irreparably harming Petitioner. This Emergency Petition needs to be considered and ruled upon prior to that date since Judge G. Murray Snow has refused to recuse himself from the subject case. Pursuant to 28 U.S.C. § 1651, Federal Rules of Appellate Procedure ("FRAP") Rule 21, and Local Circuit Rules 21-1, 21-2, 21-3, 21-4, and 27-3, Petitioner Dennis L. Montgomery ("Petitioner") respectfully petitions for a writ of mandamus to compel the Respondent, the Honorable G. Murray Snow, to recuse himself or be disqualified from the case of *Melendres, et. al. v. Arpaio, et. al.* (CV-07-2513-PHX-GMS) in the U.S. District Court for the District of Arizona pursuant to 28 U.S.C. § 455 and/or 28 U.S.C. §144, and to vacate his prior orders and actions at a minimum, relating to Dennis Montgomery, which Petitioner believes, began on April 21, 2015. Petitioner Montgomery is a whistleblower who worked for the National Security Agency ("NSA") and Central Intelligence Agency ("CIA").

The Petitioner, who is an intervenor as a matter of right pursuant to Rule 24 of the Federal Rules of Civil Procedure ("FRCP"), also filed an affidavit, motion,

1

and certificate of counsel requiring the disqualification of Judge Snow in the District Court. *See* Exhibit 1.

Judge Snow was obligated under the statutory command of 28 U.S.C. § 144 to immediately stop actions in the case and recuse and/or disqualify himself. Alternatively, even apart from the motion and affidavit under 28 U.S.C. § 144, Judge Snow is obligated to immediately recuse himself under the Code of Conduct for United States Judges and also under 28 U.S.C. § 455. Distinguished ethics expert Professor Ronald Rotunda explains the requirement for disqualification and/or recusal in his declaration. *See* Exhibit 2.

Nevertheless, Judge Snow has continued to act despite being informed of his ethical violations and conflict of interests. Judge Snow issued *three* orders on May 8, 2015, presenting a number of substantive, administrative and scheduling matters and set a status hearing for May 14, 2015. Judge Snow also ordered "[t]he Court will hold weekly status conferences" beginning May 14, 2015, May 22, 2015, May 29, 2015 June 5, 2015, and June 12, 2015. *See* Exhibit 3. It is Judge Snow's practice to issue substantive orders at these conferences. Judge Snow has already ordered that "[c]ounsel for Defendants will contact the chief legal counsel at the CIA, inform such legal counsel of MCSO's receipt of the alleged CIA documents, this proceeding, the Court's subsequent discovery orders and the CIA's need to seek relief, if any, with respect to such documents within 14 days of today's date."

*Id*. Judge Snow continues, "[w]ith respect to the CIA documents, the Defendants will cooperate with the Monitor in identifying which documents are those provided by Dennis L. Montgomery to the MCSO, and, with respect to those documents, indicating to the parties their contents, the files they contain if any, the file's general contents and organization, and the general content of the file." *Id*.

Even after the Motion to Disqualify was filed, Judge Snow set even more hearings for June 23, June 24, June 25, and June 26. After Petitioner moved to intervene as a matter of right and to disqualify Judge snow, he issued orders about documents pertaining to "workplace operations" responsive memoranda, motions to compel, materials and transcripts, motions under seal, objections, supplements, Notice of Completions, independent accountants, monitors, and other requirements from parties that Judge Snow should not have been authorized to order as here he has a clear conflict of interest and should be ordered to recuse himself or be disqualified, as discussed fully below. Attached are the orders issued after Petitioner filed his motions to intervene as a matter of right to disqualify Judge Snow. They show a flagrant disregard for 28 U.S.C. § 144 and 28 U.S.C. § 455.[1]

Judge Snow cannot be the judge to run an investigation in the context of on-going litigation into matters concerning Judge Snow's own family, wife, or

---

[1] On May 11, 2015, Petitioner was also forced to file an ethics complaint before this Court because of Judge Snow's continued abuse of process and defiant violations of judicial ethics as set forth herein.

3

himself. Judge Snow has an incurable conflict of interest by pursuing personal interests. It is admitted and undisputed, spread upon the transcript in open court, that Judge Snow has launched his own personal inquiry – and thus an unethical abuse of judicial and court process – into whether there was an investigation of his wife and/or himself.

It is also undisputed that Judge Snow has personal knowledge of disputed facts outside of the presentation of witnesses and evidence in the courtroom. Judge Snow has undoubtedly already learned from his wife whether she made the statement.

Judge Snow's wife announced to the Grissom family, as acquaintances, in a Someburros restaurant in Arizona that his husband – Judge Snow – was determined to conduct the litigation in *Melendres, et. al. v. Arpaio, et. al.* in such a way as to ensure that Sheriff Joe Arpaio would not be re-elected as Sheriff of Maricopa County, Arizona in 2016. Several witnesses confirmed this conversation. *See* "How Mexican Food Drew Couple into Heart of Arpaio Case," by Yvonne Wingett Sanchez, Arizona Republic, May 8, 2015, attached as Exhibit 4. *See also* Transcript, April 24, 2015, pgs. 901-906, Exhibit 5.

To the best of Petitioner's knowledge after reviewing the records and public news reports, neither Judge Snow nor Judge Snow's wife have denied that Judge Snow's wife made the (voluntary) statement, nor sought to explain.

Instead, during the evidentiary hearing which began April 21, 2015, Judge Snow began on April 23, 2015, to conduct an inquiry into whether Sheriff Arpaio and the Maricopa County Sheriff's Office ("MCSO") hired Petitioner Dennis L. Montgomery to investigate Judge Snow's wife. That is, instead of addressing his own bias appearing from his wife's statements, Judge Snow sought to cover-up, intimidate, threaten, and silence any inquiry into Judge Snow's own bias. In doing so, he embroiled Montgomery in false allegations that Petitioner was investigating Judge Snow's family.

Judge Snow's questioning thus becomes exactly what Judge Snow's wife predicted it would be: Judge Snow is using the litigation to make sure that Sheriff Arpaio is not re-elected. It is also undisputed on the transcript that Judge Snow has undertaken his own factual investigation outside of court proceedings and apart from the witnesses or the parties. After the lunch break on April 23, 2015, Judge Snow returned to the bench and announced that he had spoken to someone and learned additional facts outside of the courtroom (which are in fact inaccurate) about alleged payments from the Maricopa County Sheriff's Office ("MCSO") to Dennis Montgomery. *See* Exhibit 5.

Thereupon, Judge Snow by order – not requested in discovery by any party – seized all documents relating to Dennis Montgomery, trampling upon Montgomery's proprietary interests, attorney work productive privilege, and even

5

more sensitive information.

## II.    RELIEF SOUGHT

Petitioner seeks a writ of mandamus compelling the Honorable G. Murray Snow to recuse himself immediately or be disqualified from any further proceedings in the case of *Melendres, et. al. v. Arpaio, et. al.* in the U.S. District Court for the District of Arizona.

Petitioner further seeks in the writ of mandamus that any orders or actions by Judge Snow, including orders for production of documents, relating at least to Petitioner Dennis Montgomery be vacated and his documents, information, and intellectual property returned to him.

## III.   STATEMENT OF FACTS NECESSARY TO UNDERSTAND THE ISSUES PRESENTED BY THE PETITION

### A. Standing of Petitioner for Writ of Mandamus

Petitioner Dennis L. Montgomery has a personal stake in this matter to bring this Petition now, including because his intellectual property, records, documents, and work have been seized by order of Judge Snow.  Petitioner provided his work and intellectual property to the MCSO under contract that preserved his ownership of the proprietary information, trade secrets, data, and work belonging to him.  By order in open court on April 23 and April 24, 2015, and by a sealed order on April 27, 2015, ECF # 1033.  Petitioner's intangible personal property has been taken and his constitutional rights, including the work product privilege with his attorney

6

have been trampled.  Petitioner has an interest in bringing this Petition regardless of whether any observer believes the Court's taking was lawful or unlawful.

Petitioner advises that the ownership of this intellectual property has already been litigated.  The U.S. District Court for the District of Nevada has already ruled that (1) the data and intellectual property belongs to Dennis Montgomery, (2) none of the data or information is classified, (3) the U.S. Government was required to return all of the data and information to Dennis Montgomery, and (4) the U.S. Government deceived the Court in falsely claiming that the data, information, and/or intellectual property did not belong to Dennis Montgomery. *See Dennis Montgomery and the Montgomery Family Trust v. eTreppid Technologies, LLC, Warren Trepp and the U.S. Department of Defense*, Case Nos. 3:06-CV-00056-PMP-VPC and  3:06-CV-00145-PMP-VPC, Order, Judge Philip M. Pro, March 19,2007, and *In the Mater of the Search of:  The Residence Located at 12720 Buckthorne Lane, Reno, Nevada, and Storage Units 136, 140, 141, 142 and 143, Double R Storage, 888 Madestro Drive, Reno, Nevada,* Case Nos. 3:06-CV-0263-PMP-VPC and 3:06-MJ-00023-VPC, Order, Magistrate Judge Valerie P. Cooke, November 28, 2006.  These Orders are *res judicata* and are now final. Furthermore, that previous litigation also indirectly refutes the libel and slander about Dennis Montgomery.

Petitioner Dennis Montgomery is alleged to have performed confidential

7

work for the MCSO but it had nothing to do with Judge Snow's attempts to cover up Judge Snow's wife's public statements about Judge Snow's bias in the case and determination to use the case to throw an election campaign for Sheriff of Maricopa County.

Because Judge Snow's own family is now involved, his objectivity is compromised. Yet while harming Sheriff Arpaio in his re-election campaign in 2016, Judge Snow is publicly slandering Montgomery in open court, before many local and national news reporters keenly interested in the court proceedings, portraying Montgomery as a con-artist and a "known scammer." Thus, Petitioner is caught in a battle not of his own choosing and being used as a pawn in harming Arpaio.

**B. Case Has been Dramatically Transformed Into New Matters**

The original case of *Melendres v. Arpaio* in the U.S. District Court for the District of Arizona from which these matters arise ended with a final order on October 2, 2013. On that date, Judge Snow entered a "Supplemental Permanent Injunction / Judgment Order." Sheriff Joe Arpaio and the Maricopa County Sheriff's Office filed a Notice of Appeal from the October 2, 2013, final order to the U.S. Court of Appeals for the Ninth Circuit, which appeal was heard. This confirms that that October 2, 2013, Order was a final order.

Now 19 months after the final order, post-judgment proceedings are focused

on allegations that the Court's permanent injunction was not complied with.

But then, on April 23, 2015, Judge Snow launched an entirely different and irrelevant inquiry concerning Dennis L. Montgomery during the testimony of Sheriff Joe Arpaio. The case fundamentally changed once more on April 23, 2015.

It will be nearly impossible to understand these matters without recognizing that the case of *Melendres, et. al. v. Arpaio, et. al.* has taken several dramatic turns and that now current developments bear no relationship to the original litigation. Plaintiffs brought proceedings to enforce the Permanent Injunction. However, on or about April 21-24, 2015, the case entered a new, irrelevant and improper phase focusing on Petitioner Dennis Montgomery for the first time.

### C. Mandamus Required for Recusal of Judge Snow

In the hearing in this case on April 23, 2015, Judge G. Murray Snow was conducting the questioning of Sheriff Joe Arpaio. At Page 646, lines 4-6, Judge Snow asked Sheriff Arpaio: "**Q. Did you ever -- you see that the article says that what Montgomery was actually doing was investigating me. You see that that's what the article says?**"

Sheriff Arpaio answered, "**It's not true.**"

Yet Judge Snow nevertheless completely believes hearsay by reporter Stephen Lemons at an unreliable, disreputable, partisan blog known as The

<u>Phoenix New Times</u>.[2]  Lemons, whose blog hates Sheriff Arpaio and has done everything possible to have his reputation tarnished and removed from office, is pulling the strings and writing the script.  Being emotionally compromised concerning his own wife and family, Judge Snow seized on it for his and his wife's own personal interests.

During the evidentiary hearing, Judge Snow embarked on an unethical detour to personally engage in extensive questioning focused on himself and his wife and allegations about Dennis Montgomery. The detour in the case began when reports were published that Judge Snow's wife stated to several witnesses at a restaurant that her husband, Judge Snow, wanted to do everything possible in his conduct of this case to make sure that Sheriff Arpaio is not re-elected as Sheriff in the upcoming 2016 elections.

But instead of Judge Snow recusing himself because of the appearance of bias from his wife's public comments, Judge Snow has confused Dennis Montgomery's alleged other, unrelated work for MCSO as being about Judge Snow.  This shows the effects of a lack of objectivity that results from personal interests.  A different judge must hear these matters.

Neither Judge Snow nor Judge Snow's wife have even denied that Judge Snow's wife made the (voluntary) statement that Judge Snow was determined to

---

[2] The Phoenix New Times, owned by Voice Media Group, hires pornographers, convicted felons and drug addicts as bloggers.

use the case to ensure that Sheriff Arpaio would lose re-election in the 2016 campaign, denied that Judge Snow is actually conducting the case so as to cause Sheriff Arpaio to lose re-election, nor sought to explain or place in context his wife's comments. To the contrary, it has been confirmed by Sheriff Arpaio's office that the statements were made. *See* Exhibit 5, 654:6 – 656:6, 961:15 – 967:19, 656:3 – 660:16.

### D. Petitioner Has No Adequate Remedy at Law

Petitioner Dennis Montgomery has no adequate remedy at law, as he is being dragged into a case and publicly defamed, with continuing and incalculable further damage to his reputation, because of the lack of objectivity of Judge Snow about personal interests of the judge. Importantly, Judge Snow refuses to remove himself on the case and instead continues to flagrantly and defiantly violate 28 U.S.C. § 144 and 28 U.S.C. § 455 and the Code of Conduct for United States Judges.

Petitioner followed the procedure for recusal and/or disqualification prescribed under 28 U.S.C. § 144. Yet Respondent Judge Snow refused to recuse himself from the proceedings and has instead continued to act and issue orders in the case. Petitioner has sought all available means to redress this blatant refusal to follow the law, including today having been forced to file a judicial complaint with the U.S. Court of Appeals for the Ninth Circuit given Judge Snow's defiant refusal

to recuse himself and the continuing violations of the judicial canons, rules of ethics and 28 U.S.C. § 144 and 28 U.S.C. § 455.

Petitioner is thus left with no other remedy available to him to compel Respondent Judge Snow to follow the law other than to file this petition.

### E. No Prejudice or Delay to a Pending Jury Trial

Because this case was decided on the merits 19 months ago, transferring any remaining post-judgment proceedings to a different judge will not prejudice or disrupt a pending trial, which finished long ago. Furthermore, the post-judgment actions do not require any special knowledge of the prior proceedings, but only concern the Plaintiffs' allegations that the injunction has not been followed. A different judge is fully capable of understanding and applying the Court's Permanent Injunction. No particular institutional memory is required at this phase of the case.

## IV. GOVERNING LAW: MANDAMUS ON FAILURE TO RECUSE FOR DISQUALIFICATION

Pursuant to 28 U.S.C. § 144:

Whenever a party to any proceeding in a district court makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party, such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding.

The affidavit shall state the facts and the reasons for the belief that bias or prejudice exists, and shall be filed not less than ten

SER173

days before the beginning of the term at which the proceeding is to be heard, or good cause shall be shown for failure to file it within such time. A party may file only one such affidavit in any case. It shall be accompanied by a certificate of counsel of record stating that it is made in good faith.

Mandamus is a proper remedy for the refusal of a judge to recuse himself, although some Circuits hold that mandamus applies pursuant to 28 U.S.C. § 455 rather than 28 U.S.C. § 144. *In re: School Asbestos Litigation*, 977 F.2d 764 (C.A.3 (Pa.), 1992); *In re: International Business Machines Corp.*, 687 F.2d 591 (C.A.2, 1982). *See, also,* Cynthia Gray, "The Line Between Legal Error and Judicial Misconduct: Balancing Judicial Independence and Accountability," 32 Hofstra L. Rev. 1245 (2004).

The U.S. Courts of Appeals for the First, Fifth, Sixth, Tenth, and Eleventh Circuits have said that close questions should be decided in favor of recusal. *See Republic of Pan. v. American Tobacco Co.*, 217 F.3d 343, 347 (5th Cir. 2000) (citing *In re Chevron*, 121 F.3d 163, 165 (5th Cir. 1997)); *In re United States*, 158 F.3d 26, 30 (1st Cir. 1998); *Nichols v. Alley*, 71 F.3d 347, 352 (10th Cir. 1995); *United States v. Dandy*, 998 F.2d 1344, 1349 (6th Cir. 1993); *United States v. Kelly*, 888 F.2d 732, 744 (11th Cir. 1989).

In *SCA Servs. v. Morgan*, 557 F.2d 110 (7th Cir. 1977), mandamus was ordered for disqualification because of the personal interests of the judge. There, the judge's brother was an attorney in the firm appearing before the judge. Similar

13

to the relationship between Judge Snow and his wife in the case at bar: "This appearance of partiality begins with the natural assumption that brothers enjoy a close personal and family relationship and, consequently, would be inclined to support each other's interests. When one's brother is a lawyer in the firm representing a party before his brother who is the judge in the case, the belief may arise in the public's mind that the brother's firm and its clients will receive favored treatment, even if the brother does not personally appear in the case." *Id.* at 116. The U.S. Court of Appeals for the Seventh Circuit also found that "the judge's 'Memorandum of Decision' suggests that he made a confidential inquiry, presumably to his brother, to determine in what capacity Donald A. Morgan was involved in this case (Petitioner's App. D-3). Counsel were not present and were unaware of the inquiry at the time it was made. While it is understandable why the judge may have felt his brother could present the most accurate evidence as to his role in the pending litigation, the judge's inquiry creates an impression of private consultation and appearance of partiality which does not reassure a public already skeptical of lawyers and the legal system." *Id.* The Seventh Circuit granted a petition for writ of mandamus requiring the trial court to abstain from presiding over further proceedings.

The same situation appears here. Judge Snow will have access to his wife's explanation outside of court as to whether she did or did not make the statement at

issue and has a personal interest regarding his wife. He also admits on the record to having conducted his own factual investigation outside of the courtroom.

In *In re Faulkner*, 856 F.2d 716 (5th Cir. 1988), the U.S. Court of Appeals for the Fifth Circuit reversed a refusal to recuse where a relative of the judge was a major participant in transactions relating to the defendant's indictment and "that relative had communicated to the judge . . . material facts and her opinions and attitudes regarding those facts." *Id.* at 721.

Also on point is *In re Aetna Casualty & Surety Co.*, 919 F.2d 1136 (6th Cir. 1990), where the U.S. Court of Appeals for the Sixth Circuit, sitting en banc, required recusal. The trial judge initially recused himself because his daughter's law firm represented four of the claimants. The judge later separated the cases and planned to try the three claims in which his daughter's firm was not involved. On mandamus petition the court reversed: A "decision on the merits of any important issue in any of the seven cases . . . could constitute the law of the case in all of them, or involve collateral estoppel, or might be highly persuasive as precedent." *Id*. at 1143. The court did not specify whether it based its decision on section 455(a) or section 455(b)(5)(ii), but a concurring opinion, joined by seven judges, emphasized that there was an actual conflict of interest under section 455(b)(5) as well as an appearance of partiality.

Moreover, the Code of Conduct for United States Judges governs:

**CANON 2** requires:

\* \* \*

(B) Outside Influence. A judge should not allow family, social, political, financial, or other relationships to influence judicial conduct or judgment. A judge should neither lend the prestige of the judicial office to advance the private interests of the judge or others nor convey or permit others to convey the impression that they are in a special position to influence the judge. A judge should not testify voluntarily as a character witness.

**CANON 3** requires:

\* \* \*

(C) Disqualification.

(1) A judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to instances in which:

(a) the judge has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding;

\* \* \*

(c) the judge knows that the judge, individually or as a fiduciary, or the judge's spouse or minor child residing in the judge's household, has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be affected substantially by the outcome of the proceeding;

(d) the judge or the judge's spouse, or a person related to either within the third degree of relationship, or the spouse of such a person is:

\* \* \*

(iii) known by the judge to have an interest that could be substantially affected by the outcome of the proceeding; or

(iv) to the judge's knowledge likely to be a material witness in the proceeding;

Also pursuant to 28 U.S.C. § 455:

(a) Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

(b) He shall also disqualify himself in the following circumstances:

(1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding;

\* \* \*

(4) He knows that he, individually or as a fiduciary, or his spouse or minor child residing in his household, has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding;

(5) He or his spouse, or a person within the third degree of relationship to either of them, or the spouse of such a person:

(i) Is a party to the proceeding, or an officer, director, or trustee of a party;

(ii) Is acting as a lawyer in the proceeding;

(iii) Is known by the judge to have an interest that could be substantially affected by the outcome of the proceeding;

(iv) Is to the judge's knowledge likely to be a material witness in the proceeding.

\* \* \*

Recusal or disqualification is required when judicial conflicts create the appearance that the court's impartiality may be called into question, and "could suggest, to an outside observer, such a 'high degree of favoritism or antagonism' to defendants' position that 'fair judgment is impossible.' *Liteky v. United States*, 510 U.S. 540, 555, 127 L. Ed. 2d 474, 114 S. Ct. 1147 (1994). The courts strive to eliminate even the appearance of bias. "Thus even if there is no bias in fact, an appearance of bias or prejudice requires recusal if it is sufficient to raise a question

17

in the mind of 'the average citizen' about a judge's impartiality." *York v. United States,* 785 A.2d 651, 655 (D.C. 2001).

## V. ARGUMENT: STATEMENT OF REASONS WHY THE WRIT SHOULD ISSUE

### A. Jurisdiction is Proper Under the All Writs Act., 28 U.S.C. § 1651.

This Court has jurisdiction under the All Writs Act, 28 U.S.C. § 1651. The All Writs Act is invoked by federal courts of appeals to a district judge, or by the Supreme Court to issue a writ to a lower court judge. *Allied Chemical Corp. v. Daiflon, Inc.*, 449 U.S. 33 (1980).

The All Writs Act states:

> The Supreme Court and all courts established by Act of Congress may issue all writs necessary and appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law.

28 U.S.C. § 1651. "The authority of federal courts to issue writs of mandamus is derived from the All Writs Act, 28 U.S.C. § 1651.*" United States v. Bell*, 2008 U.S. Dist. LEXIS 91803, 7-8 (E.D. Tenn. Sept. 29, 2008) *citing In re Parker*, 49 F.3d 204, 206 (6th Cir. 1995). Mandamus is defined as "[a] writ issued by a superior court to compel a lower court or a government officer to perform mandatory or purely ministerial duties correctly." *Coles v. Granville*, 448 F.3d 853, 861 n. 2 (6th Cir. 2006) (citing Black's Law Dictionary p. 973 (7th ed. 1999). Mandamus is a remedy to be invoked in extraordinary situations where the petitioner can show a clear and indisputable right to the relief sought. *Will v.*

18

*Calvert Fire Ins. Co.*, 437 U.S. 655, 661-62, 98 S. Ct. 2552, 57 L. Ed. 2d 504 (1978); *Kerr v. United States District Court*, 426 U.S. 394, 402-03, 96 S. Ct. 2119, 48 L. Ed. 2d 725 (1976).

The case at hand is precisely one of those "extraordinary situations" that the court in *Will* described. Petitioner has been subject to repeated violations of his constitutional rights and the ethics complaint Petitioner filed has fallen on deaf ears. It is mandatory that Respondent Judge Snow remove himself from the proceedings, yet he defiantly refuses to do so and continues to issue orders that have caused and will cause more irreparable damage to Petitioner.

**B. Case Must Be Transferred to Another Judge**

For a United States judge, recusal and/or disqualification are mandated by statute under 28 U.S.C. § 144. The language of the statute does not leave any room for discretion. The judge "*shall* proceed no further therein." If an affidavit meets the rule's standards, the judge *has a duty* to recuse himself. *Morse v. Lewis*, 54 F.2d 1027, 1031 (4th Cir.), cert. denied, 286 U.S. 557, 76 L. Ed. 1291, 52 S. Ct. 640 (1932) (emphasis added).

Petitioner, with well-documented showings of extra-judicial bias and conflicts of interest by Judge Snow, filed a timely affidavit and that of ethics expert Professor Ronald Rotunda in an attempt to have Judge Snow remove himself from the proceedings, as provided by 28 U.S.C. § 144. *See* Exhibits 1, 2.

19

Recusal is a mandatory act, and therefore "ministerial" within the law of a writ of mandamus. There is no requirement for any subjective decision.

> The disqualification statute, 28 U.S.C. §144, is **mandatory and automatic**, requiring only a timely and sufficient affidavit alleging personal bias or prejudice of the judge. The judge is a silent defendant, unable to make findings on the truth or falsity of the affiant's allegations, and truth must be presumed. *United States v. Hanrahan*, 248 F. Supp. 471, 474 (D.D.C. 1965)(Emphasis added); and the allegations may be based upon information and belief, *Berger v. United States*, 255 U.S. 22, 34, 65 L. Ed. 481, 41 S. Ct. 230 (1920).

*Brotherhood of Locomotive Firemen & Enginemen v. Bangor & Aroostook Railroad Co.*, 380 F.2d 570, 576 (D.C. 1967).

Nothing can create more of the appearance of a conflict of interest than when a presiding judge has a personal interest in the litigation or matters related to it. The applicable standard for recsual is whether a judge's participation in a lawsuit will create the *appearance* of bias and prejudice. *See Liteky v. United States*, 510 U.S. 540, 555, 127 L. Ed. 2d 474, 114 S. Ct. 1147 (1994)); *Jackson v. Microsoft Corp.*, 135 F. Supp. 2d 38, 40 (D.D.C. 2001), *supra*.

Recusal is required when there is even the appearance that the court's impartiality may be called into question, and "could suggest, to an outside observer, such a 'high degree of favoritism or antagonism' to defendants' position that 'fair judgment is impossible.'" And, indeed much more than an appearance of extra-judicial bias and conflicts of interest are at issue here. *Liteky v. United States*, 510 U.S. 540, 555, 127 L. Ed. 2d 474, 114 S. Ct. 1147 (1994)); *See also*

*Jackson v. Microsoft Corp.*, 135 F. Supp. 2d 38, 40 (D.D.C. 2001) (recusal was proper because the judge "ha[d] created an appearance of personal bias or prejudice").

As explained in the legal opinion of Professor Ronald Rotunda, an expert on Professional Responsibility and Constitutional Law, Judge Snow now has – by his own admission – an incurable personal interest in the case. At this stage, there is no jury and Judge Snow is the sole decision-maker in the case in this phase.

Judge Snow admits that the investigation now concerns – at least as the Judge believes – his own wife and family, including himself. As explained by Professor Ronald Rotunda, Judge Snow should recuse himself including for the following reasons, including with additional elucidation from the Code of Conduct and 28 U.S.C. § 455.

Pursuant to Code of Conduct Canon 2(B) and Canon 3(C)(1)(d)(iii) and 28 U.S.C. § 455(a), Judge Snow's impartiality may reasonably be questioned, because the Judge has a personal interest running an inquiry concerning possible investigations of himself and his family, and also, according to Professor Rotunda, because the transcript indicates Judge Snow investigating matters on his own outside of the evidentiary hearing.

Pursuant to Code of Conduct Canon 3(C)(1)(a) and 28 U.S.C. § 455(b)(1), Judge Snow has personal knowledge of disputed evidentiary facts concerning the

proceeding. The Court determined that an inquiry about investigations in the context of on-going litigation into his wife's statement should come within the current case. Yet, undoubtedly, Judge Snow has or will find out from his wife if she made the statement or not. Therefore, Judge Snow has personal knowledge of disputed facts which the Court has determined to be relevant.

To the extent that the Court determines the topic to be relevant at all, pursuant to Code of Conduct Canon 3(C)(1)(d)(iv) and 28 U.S.C. § 455(b)(5)(iv), Judge Snow's wife would be a likely witness as to whether she made the statement or not and/or what she meant and the context, etc.

Sheriff Arpaio testified that Dennis Montgomery had nothing to do with any investigation of Judge Snow or his wife. Yet when Court resumed after lunch on April 23, 2015, at page 657-660 of the transcript, Judge Snow immediately started up again with further inquiries about Dennis Montgomery's alleged funding and records. Judge Snow's orders after the lunch recess indicated a determination to undertake a major examination of Dennis Montgomery.

In addition and separately, the language of the Judicial Code leaves no doubt that that recusal process is to be self-executing, as the judge should not unethically wait for a recusal motion to be filed.

> It [the Code of Conduct] is intended to be used by a judge at the start of each case as a checklist to assist in deciding whether at that point he should disqualify himself from any participation in the proceedings . . . [E]ven before appraising participation in the case under the

22

[Judicial Code], the judge should first consult his own emotions and conscience, and pass an 'internal test of freedom' from disabling conflicts.

Leslie W. Abramson, Judicial Disqualification Under Canon 3 of the Code of Judicial Conduct 10 (2d ed. 1992).

An impartial judiciary is a fundamental component of the system of justice in the United States. The right to a "neutral and detached judge" in any proceeding is protected by the Constitution and is an integral part of maintaining the public's confidence in the judicial system. *Ward v. City of Monroeville*, 409 U.S. 57, 61-62 (1972). *See also Marshall v. Jerrico, Inc.*, 446 U.S. 238, 243 (1980) ("powerful" constitutional interest in fair adjudicative procedure). Congress has sought to secure the impartiality of judges by requiring them to step aside, or in some instances, disqualify themselves, in various circumstances.

"In order to preserve the integrity of the judiciary, and to ensure that justice is carried out in each individual case, judges must adhere to high standards of conduct." *York v. United States*, 785 A.2d 651, 655 (D.C. 2001). "A judge should disqualify himself in a proceeding in which his impartiality might reasonably be questioned . . ." ABA Code Of Judicial Conduct Canon 3(C)(1) *see also Scott v. United States,* 559 A.2d 745, 750 (D.C. 1989) (en banc).

## VI.   CONCLUSION

Pursuant to 28 U.S.C. § 144 and 28 U.S.C. § 455, this Court must

respectfully disqualify Judge Snow, order that this case be assigned to another judge, and order that any orders, at least with regard to Petitioner Dennis Montgomery, be vacated forthwith. Petitioner Dennis Montgomery notified each of parties and counsel that this Emergency Petition is being filed.

Dated:  May 11, 2015                    Respectfully submitted,

                                          /s/ *Larry Klayman*
                                        Larry Klayman, Esq.
                                        General Counsel
                                        Freedom Watch, Inc.
                                        D.C. Bar No. 334581
                                        2020 Pennsylvania Avenue NW, Suite 345
                                        Washington, DC 20006
                                        Telephone: (310) 595-0800
                                        Email: leklayman@gmail.com

                                        Jonathon Moseley
                                        Virginia State Bar No. 41058
                                        Freedom Watch, Inc.
                                        2020 Pennsylvania Avenue N.W., Suite 345
                                        Washington, D.C. 20006
                                        (310) 595-0800
                                        leklayman@gmail.com
                                        Attorney for Plaintiff

                                        Of Counsel

## STATEMENT OF RELATED CASES

Pursuant to Circuit Rule 28-2.6, Petitioner Dennis Montgomery states that this case is related to the case of *Melendres v. Arpaio*, Case No. CV-07-2513-PHX-GMS, that is currently pending before the U.S. District Court for the District of Arizona.

## __CERTIFICATE OF COMPLIANCE__

I certify that this petition complies with the page limitations of Fed. R. App.

21(d), and that this petition complies with the typeface requirements of Fed. R. App. P.

32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been

prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times

New Roman style.

# <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 11, 2015, I electronically filed the foregoing document with the Clerk of the Court by using the CM/ECF system, I hereby certify that I have served the following in the manner indicated:

Honorable G. Murray Snow
United States District Courthouse
Sandra Day O'Connor U.S. Courthouse, Suite 322
401 West Washington Street, SPC 75
Phoenix, AZ 85003-2160
(Service via Federal Express Priority Overnight Delivery)

Stanley Young, Esq.
Andrew Carl Byrnes, Esq.
333 Twin Dolphin Road
Redwood Shores, CA 94065
syoung@cov.com
650-632-4700
Attorneys for Plaintiffs
(Service via Email)

Daniel Pochoda, Esq.
ACLU FOUNDATION OF ARIZONA
3707 N. 7th Street, Suite 235
Phoenix, AZ 85014
dpochoda@acluaz.org
602-650-1854
Attorney for Plaintiffs
(Service via Email)

Cecilia D. Wang
ACLU FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
cwang@aclu.org
415-343-0775

SER188

Attorney for Plaintiff Melendres
(Service via Email)

Thomas P. Liddy, Esq.
CIVIL SERVICES DIVISION
MARICOPA COUNTY ATTORNEY'S OFFICE
222 North Central Avenue, Suite 1100
Phoenix, AZ 85005
liddyt@mcao.maricopa.gov
602-506-8541
Attorney for Defendant Joseph Arpaio and Maricopa County Sheriff's Office
(Service via Email)

Michele M. Iafrate, Esq.
IAFRATE & ASSOCIATES
649 North Second Avenue
Phoenix, AZ 85003
miafrate@iafratelaw.com
602-234-9775
Attorney for Defendant Joseph Arpaio and Maricopa County Sheriff's Office
(Service via Email)

Deborah L. Garner, Esq.
IAFRATE & ASSOCIATES
649 North Second Avenue
Phoenix, AZ 85003
dgarner@iafratelaw.com
602-234-9775
Attorney for Defendant Joseph Arpaio and Maricopa County Sheriff's Office
(Service via Email)

Melvin McDonald
JONES SKELTON & HOCHULI, PLC
2901 N. Central Avenue, Suite 800
Phoenix, AZ 85012-2728
mmcdonald@jshfirm.com
602-263-1700
Attorney for Defendant Sheriff Joseph Arpaio
(Service via Email)

Andre Segura, Esq.
ACLU FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad Street, 18th Fl.
New York, NY 10004
asegura@aclu.org
212-549-2676
Attorney for Plaintiffs
(Service via Email)

Anne Lai
UCI School of Law
401 E. Peltason Drive. Suite 3500
Irvine, CA 92616
alai@law.uci.edu
949-824-9894
(Service via Email)

Jorge M. Castillo
MALDEF
634 S. Spring Street, 11th Fl.
Los Angeles, CA 90014
jcastillo@maldef.org
213-629-2512
Attorney for Plaintiffs
(Service via Email)

Richard K. Walker
WALKER & PESKIND, PLLC
16100 N. 71st Street, Suite 140
Scottsdale, AZ 85254-2236
rkw@azlawpartner.com
480-483-6336
Attorney for Defendant Maricopa County
(Service via Email)

/s/ *Larry Klayman*
Larry Klayman, Esq.
General Counsel
Freedom Watch, Inc.

29

D.C. Bar No. 334581
2020 Pennsylvania Avenue N.W., Suite 345
Washington, DC 20006
Telephone: (310) 595-0800
Email: leklayman@gmail.com

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | |
|---|---|
| STATE OF TEXAS; | ) |
| | ) |
| STATE OF ALABAMA; | ) |
| | ) |
| STATE OF ARIZONA; | ) |
| | ) |
| STATE OF ARKANSAS; | ) |
| | ) |
| STATE OF FLORIDA; | ) |
| | ) |
| STATE OF GEORGIA; | ) |
| | ) |
| STATE OF IDAHO; | ) |
| | ) |
| STATE OF INDIANA; | ) |
| | ) |
| STATE OF KANSAS; | ) |
| | ) |
| STATE OF LOUISIANA; | )   Case No. 1:14-cv-254 |
| | ) |
| STATE OF MONTANA; | ) |
| | ) |
| STATE OF NEBRASKA; | ) |
| | ) |
| STATE OF NORTH DAKOTA; | ) |
| | ) |
| STATE OF OHIO; | ) |
| | ) |
| STATE OF OKLAHOMA; | ) |
| | ) |
| STATE OF SOUTH CAROLINA; | ) |
| | ) |
| STATE OF SOUTH DAKOTA; | ) |
| | ) |
| STATE OF UTAH; | ) |
| | ) |
| STATE OF WEST VIRGINIA; | ) |
| | ) |
| STATE OF WISCONSIN; | ) |

ATTORNEY GENERAL BILL SCHUETTE, People of  )
   Michigan;  )
     )
GOVERNOR PHIL BRYANT, State of Mississippi;  )
     )
GOVERNOR PAUL R. LEPAGE, State of Maine;  )
     )
GOVERNOR PATRICK L. MCCRORY, State of North  )
   Carolina; and  )
     )
GOVERNOR C.L. "BUTCH" OTTER, State of Idaho,  )
     )
                              *Plaintiffs*,  )
     )
vs.  )
     )
UNITED STATES OF AMERICA;  )
     )
JEH JOHNSON, Secretary of the Department of  )
   Homeland Security;  )
     )
R. GIL KERLIKOWSKE, Commissioner of U.S. Customs  )
   and Border Protection;  )
     )
RONALD D. VITIELLO, Deputy Chief of U.S. Border  )
   Patrol, U.S. Customs and Border Protection;  )
     )
THOMAS S. WINKOWSKI, Acting Director of U.S.  )
   Immigration and Customs Enforcement; and  )
     )
LEÓN RODRÍGUEZ, Director of U.S. Citizenship and  )
   Immigration Services,  )
     )
                           *Defendants*.  )
     )

## AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.    The State of Texas, the State of Alabama, the State of Arizona, the State of Arkansas, the State of Florida, the State of Georgia, the State of Idaho, the State of Indiana, the State of Kansas, the State of Louisiana, the State of Montana, the State of Nebraska, the State of North Dakota, the State of Ohio, the State of

SER193

Oklahoma, the State of South Carolina, the State of South Dakota, the State of Utah, the State of West Virginia, the State of Wisconsin, and Attorney General Bill Schuette of Michigan, Governor Phil Bryant of Mississippi, Governor Paul R. LePage of Maine, Governor Patrick L. McCrory of North Carolina, and Governor C.L. "Butch" Otter of Idaho (collectively, "Plaintiffs" or "Plaintiff States") seek declaratory and injunctive relief against the United States and the above-named federal officials (collectively, "the Defendants") for their violations of the Take Care Clause, U.S. CONST. art. II, § 3, cl. 5, and the Administrative Procedure Act, 5 U.S.C. §§ 551 *et seq.*

2.     This lawsuit is not about immigration.  It is about the rule of law, presidential power, and the structural limits of the U.S. Constitution.

3.     On November 20, 2014, the President of the United States announced that he would unilaterally suspend the immigration laws as applied to 4 million of the 11 million undocumented immigrants in the United States.

4.     The President candidly admitted that, in so doing, he unilaterally rewrote the law:  "What you're not paying attention to is, *I just took an action to change the law.*"

5.     In accordance with the President's unilateral exercise of lawmaking, his Secretary of the Department of Homeland Security ("DHS") issued a directive that purports to legalize the presence of approximately 40% of the known undocumented-immigrant population, and affords them legal rights and benefits. *See* Memorandum from Jeh Charles Johnson, *Exercising Prosecutorial Discretion*

3

Respectfully submitted.

LUTHER STRANGE
*Attorney General of Alabama*

THOMAS C. HORNE
*Attorney General of Arizona*

DUSTIN MCDANIEL
*Attorney General of Arkansas*

PAMELA JO BONDI
*Attorney General of Florida*

SAMUEL S. OLENS
*Attorney General of Georgia*

LAWRENCE G. WASDEN
*Attorney General of Idaho*

JOSEPH C. CHAPELLE
PETER J. RUSTHOVEN
*Counsel for the State of Indiana*

DEREK SCHMIDT
*Attorney General of Kansas*

JAMES D. "BUDDY" CALDWELL
*Attorney General of Louisiana*

TIMOTHY C. FOX
*Attorney General of Montana*

JON C. BRUNING
*Attorney General of Nebraska*

WAYNE STENEHJEM
*Attorney General of North Dakota*

MICHAEL DEWINE
*Attorney General of Ohio*
ERIC E. MURPHY
*Co-counsel for the State of Ohio*

GREG ABBOTT
*Attorney General of Texas*

DANIEL T. HODGE
*First Assistant Attorney General*

JAMES D. BLACKLOCK
*Deputy Attorney General for Legal Counsel*

ANDREW S. OLDHAM
*Deputy Solicitor General*
    Attorney-in-Charge
    State Bar No. 24081616

Office of the Attorney General of Texas
P.O. Box 78711
Austin, Texas 78711-2548
512-936-1700

31

SER195

E. SCOTT PRUITT
*Attorney General of Oklahoma*

ALAN WILSON
*Attorney General of South Carolina*

MARTY J. JACKLEY
*Attorney General of South Dakota*

SEAN D. REYES
*Attorney General of Utah*

PATRICK MORRISEY
*Attorney General of West Virginia*

J.B. VAN HOLLEN
*Attorney General of Wisconsin*

BILL SCHUETTE
*Attorney General for the People of
    Michigan*

DREW SNYDER
*Counsel for the Governor of Mississippi*

PAUL R. LEPAGE
*Governor of Maine*

ROBERT C. STEPHENS
*Counsel for the Governor of North
    Carolina*

TOM C. PERRY
CALLY YOUNGER
*Counsel for the Governor of Idaho*

Dated:  December 9, 2014

SER196

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| Mr. JOE ARPAIO, Elected SHERIFF of<br>Maricopa County, State of Arizona<br>550 West Jackson Street<br>Phoenix, AZ 85003<br><br>                     Plaintiff,<br><br>     v.<br><br>The Honorable BARACK OBAMA, individually and<br>in his professional capacity as President of the<br>United States of America<br>1600 Pennsylvania Avenue<br>Washington, D.C. 20500<br><br>             and<br><br>The Honorable JEH JOHNSON, individually and in<br>his professional capacity as Secretary of the<br>U.S. Department of Homeland Security<br>12th & C Street SW<br>Washington, D.C. 20024<br><br>             and<br><br>The Honorable LEON RODRIQUEZ, individually<br>and in his professional capacity as Director of U.S.<br>Citizenship and Immigration Services<br>12th & C Street SW<br>Washington, D.C. 20024<br><br>             and<br><br>The Honorable ERIC HOLDER, JR., individually and<br>in his professional capacity as U.S. Attorney General<br>555 Fourth St. NW<br>Washington, D.C. 20530<br><br>                  Defendants. | **CIVIL COMPLAINT**<br><br>   Civil Action No.  _____ |

SER197

26. In fact, Defendant Obama's amnesty programs merely shift the burden to the States and local governments, creating severe burdens and a crime wave in States along the border.

27. Plaintiff Joe Arpaio is adversely affected and harmed in his office's finances, workload, and interference with the conduct of his duties, by the failure of the executive branch to enforce existing immigration laws, but has been severely affected by increases in the influx of illegal aliens motivated by Defendant Obama's policies of offering amnesty. In this regard, as detailed in Exhibits 1, 2 and 3 to this Complaint which is incorporated herein for reference, Plaintiff Arpaio has been severely affected and damaged by Defendant Obama's release of criminal aliens onto the streets of Maricopa County, Arizona. This prior damage will be severely increased by virtue of Defendant Obama's Executive Order of November 20, 2014, which is at issue.

28. Thus, the Office of the Sheriff has been directly harmed and impacted adversely by Obama's DACA program and will be similarly harmed by his new Executive Order effectively granting amnesty to illegal aliens.

29. Defendant Obama's past promises of amnesty and his DACA amnesty have directly burdened and interfered with the operations of the Sheriff's Office, and Defendant Obama's new amnesty program will greatly increase the burden and disruption of the Sheriff's duties.

30. First, experience has proven as an empirical fact that millions more illegal aliens will be attracted into the border states of the United States, regardless of the specific details.

31. Second, the experiences and records of the Sheriff's office show that many illegal aliens – as distinct from law-abiding Hispanic Americans – are repeat offenders, such that

SER198

programs to be unlawful, as well award such other forms of equitable relief as may be appropriate, and such other relief the Court may deem just and proper.

**This prayer for relief does not request legal authority for Plaintiff Arpaio to enforce the immigration laws of the United States, as current legal precedent has found that he and other similarly situated state law enforcement and other officials have no authority to do so.**


Dated: November 20, 2014                    Respectfully submitted,

                                            */s/ Larry Klayman*
                                            Larry Klayman, Esq.
                                            Washington, D.C. Bar No. 334581
                                            Freedom Watch, Inc.
                                            2020 Pennsylvania Avenue N.W. , Suite 345
                                            Washington, D.C. 20006
                                            (310) 595-0800
                                            leklayman@gmail.com
                                            Attorney for Plaintiff

SER199

# Exhibit 1

SER200

*Maricopa County Sheriff's Office*
*Joe Arpaio, Sheriff*

# NEWSRelease

**For Release:** November 5, 2014          **CONTACT:** Sheriff Joe Arpaio

## SHERIFF ARPAIO MEETS WITH U.S. REPRESENTATIVE SALMON ON POSSIBLE CONGRESSIONAL HEARING ON FEDERAL GOVERNMENT RELEASE OF CRIMINAL ALIENS ONTO AMERICAN STREETS

*SHERIFF COMPILES FIGURES TENTH MONTH IN A ROW DOCUMENTING RELEASE OF CRIMINAL ALIENS BACK INTO MARICOPA COUNTY BY IMMIGRATION AND CUSTOMS ENFORCEMENT (ICE)*

(Maricopa County, AZ, November 4, 2014): Sheriff Joe Arpaio of Maricopa County, AZ met with Congressman Matt Salmon (AZ-05) on Monday, November 3, to discuss the possibility of launching a congressional hearing into why Immigration and Customs Enforcement (ICE) keeps releasing illegal aliens charged of crimes back onto the streets of our communities. The Sheriff had previously called for a congressional hearing into this matter.

For the tenth month in a row, Maricopa County Sheriff Joe Arpaio has compiled the disturbing figures that reveal the number of criminal aliens taken by ICE who are arrested again and return to the Maricopa County jail system.

In October 2014, 307 illegal immigrants were arrested by Sheriff's deputies and police officers in Maricopa County and given detainers, or holds by ICE. Of that number, 96 are repeat offenders, having had prior bookings with detainers placed on them, or 31.2% of the total. Among those are two illegal aliens who have been booked into the Sheriff's jails 19 times each, one of which had 11 prior detainers, and, extraordinarily, 4 within the last year. These statistics mirror with rather remarkable consistency what has happened every month of 2014.

550 West Jackson Street, Phoenix, Arizona 85003 | Phone (602)876-1801 | Fax: (602)258-2081 | Media Contact: mediarequest@mcso.maricopa.gov

SER201

During that same month, two California deputy sheriffs were shot and killed by an illegal alien who had previously been incarcerated in Maricopa County jails four times, going back a number of years, and had been deported by ICE twice.

"An individual with this history," Arpaio says, "convicted and deported more than once, should not have been able to get back into this country to commit these murders."

Adding the figures from October onto the numbers already accumulated means that of the 4,172 ICE detainers placed on incoming criminal offenders, 1478, or 35.4%, are repeat offenders.

"We have been compiling and presenting these figures over and over, month after month," says Sheriff Arpaio, "and it seems that no one is paying attention, because of the underlying issues. These policies are contentious and difficult, and it's easier to bury your head in the sand and ignore them. But that's not good enough, not good enough for the public and the public safety, not good enough for national policy.

"Politicians and other officials have to stand up," states Arpaio, "and do their duty, popular or not. The situation is untenable and unacceptable, and that's why, after trying to get a real response from Homeland Security and ICE for months, I contacted Representative Salmon to see what he can do. We met and I will say, without going into specifics at this time, that his response was most encouraging, and I am confident we will be working together to resolve this serious problem before long."

### 

550 West Jackson St., Phoenix, Arizona 85003 | Phone (602)876-1801 | Fax: (602)258-2081 | Media Contact: mediarequest@mcso.maricopa.gov

2

SER202

*Maricopa County Sheriff's Office*
*Joe Arpaio, Sheriff*

# NEWSRelease

**For Release:** October 27, 2014 **CONTACT:** Sheriff Joe Arpaio

## ARPAIO CONCERNED WITH FEDS AFTER TWICE DEPORTED ILLEGAL ALIEN KILLS TWO CALIFORNIA SHERIFF'S DEPUTIES

### Suspect Arrested in Maricopa County Four Times

(Maricopa County, AZ) The controversy surrounding an illegal alien who has been charged with killing two California sheriff's deputies and wounding another has taken on fresh urgency as Sheriff Joe Arpaio reveals the details of his prior four arrests by Maricopa County local law enforcement.

Moreover, says the Sheriff, the history surrounding this one illegal alien exposes the inherent dishonesty and ineptitude surrounding the federal government approach to illegal immigration.

For the past 9 months, Sheriff Arpaio, whose jails constitute the third largest system in the country, has been demanding that Immigration and Customs Enforcement (ICE) explain why the agency keeps releasing illegal aliens convicted of crimes back onto the streets of Maricopa County, located just 30 miles from the border. In pursuit of answers, the Sheriff has written to DHS Secretary Jeh Johnson, the head of ICE, and the DHS Inspector General, never receiving an adequate response.

"I am calling for a congressional hearing," states Arpaio, "to find out why illegal aliens arrested by my deputies and other police officers for often serious crimes are handed over to ICE, only to end up back in my jail, arrested again on more charges. Either ICE is letting these individuals go out the back door, free to commit more crimes, or is the border so open that even though they're being deported they turn around and immediately return?"

The statistics are daunting: For the past 9 months, back to the beginning of 2014, of the approximately 4,000 ICE detainers placing on incoming criminal offenders arrested by local police and Sheriff's deputies in Maricopa County, a stunning 1,382, translating to 38% of the total, were repeat offenders. Nor were these necessarily minor crimes, but encompass the full range of criminal offenses, including kidnapping, aggravated assault with a deadly weapon, armed robbery, child molestation, sexual abuse, conspiracy, dangerous drugs, and more.

Now we have the case Marcelo Marquez, known by his alias Luis Bracamonte to the Maricopa County Sheriff's Office (MCSO), which has had him in custody 4 times. Incarcerated for the first time in the county in 1996 for the sale of narcotic drugs and other felonies, he spent 4 months in Arpaio's Tent-City Jail before being released to ICE in 1997. His fate from that point on, whether he was deported or released, is unknown.

550 West Jackson Street, Phoenix, Arizona 85003 | Phone (602)876-1801 | Fax: (602)258-2081 | Media Contact: mediarequest@mcso.maricopa.gov

SER203

In the very next year, 1998, Marquez/Bracamonte was arrested for possession of narcotic drugs and misconduct involving weapons and possession of marijuana. For reasons unknown, he was not held buy ICE but instead released from jail to the streets.

Marquez/Bracamonte was arrested yet again on May 4, 2001 for the sale of narcotic drugs and possession of marijuana for sale. He was released to ICE 3 days later.

What ICE did with him is unknown, but what is certain is that not even 3 months later, on July 26, 2001, he was arrested for failure to appear on drug charges. Marquez/Bracamonte posted bond and was released.

At that point, it appears that Marquez/Bracamonte left Arizona for California or another state, for that is where his history with MCSO ends.

"Now this situation," Arpaio states, "which has always been intolerable, has resulted in tragedy, with 2 sheriff's deputies dead and a third wounded. Now, maybe, I will get the answers I have been calling for month after month. Now, maybe, ICE and the federal government will be called to account for their actions."

## MUG SHOTS



| Polaroid Picture not Available | | | |
|---|---|---|---|
| 09/27/1996 | 01/05/1998 | 05/04/2001 | 07/26/2001 |

550 West Jackson St., Phoenix, Arizona 85003 | Phone (602)876-1801 | Fax: (602)258-2081 | Media Contact: mediarequest@mcso.maricopa.gov

2
SER204

*Maricopa County Sheriff's Office*

*Joe Arpaio, Sheriff*

# NEWSRelease

**For Release:** October 6, 2014                    **CONTACT:** Sheriff Joe Arpaio

## SHERIFF JOE ARPAIO DEMANDS FEDERAL GOVERNMENT STOP RELEASING CRIMINAL ALIENS IN MARICOPA COUNTY

*THE SHERIFF STATES THIS IS A FORM OF "BACKDOOR AMNESTY" BY THE ADMINISTRATION, TO BE FOLLOWED BY OBAMA'S ISSUING BROADER AMNESTY AFTER ELECTION*

*ARPAIO STANCE IN STARK CONTRAST TO HUNDREDS OF JAILS NATIONWIDE REFUSING TO HOLD ILLEGAL ALIENS FOR ICE*

(Maricopa County, AZ) For the ninth month in a row, Maricopa County Sheriff Joe Arpaio is demanding that Immigration and Customs Enforcement (ICE) explain why the agency keeps releasing illegal aliens convicted of crimes back onto the streets of Maricopa County, located just thirty miles from the border.

The Sheriff's call comes in the face of a growing national refusal by local law enforcement agencies to hold illegal aliens in jail after disposition of their crimes for 48 hours on behalf of ICE. According to published reports, two hundred twenty-five jails from coast to coast have so far adopted this posture.

Sheriff Arpaio could not help but note the irony that as increasing numbers of local law enforcement agencies refuse to work with the federal government, his attempts to do exactly that, including his offer to assist ICE in halting the release of criminal aliens and, beyond that, construct a workable, smart policy to deal with this issue, are ignored. Having served in the Drug Enforcement Administration for over twenty-five years, including stints as the regional director and diplomatic attaché in Mexico, Central and South America, and then as the director in Texas and then Arizona, Arpaio contends he is uniquely qualified to help in this effort.

"The law is being flouted by both the federal government and local law enforcement," states the Sheriff, "for different reasons, to suit their own purposes. That is simply not right. The law needs to be enforced because it is the law and because it is the right thing to do. Deport illegal aliens, and especially criminal aliens, and secure the border so we make sure they don't come

SER205

back. Until this is accomplished, I repeat my demand, as I have repeatedly done in letters to the Secretary of Homeland Security Johnson, the DHS Inspector General, and the head of Immigration Control and Enforcement, for an investigation as to how and why these criminal aliens are neither kept in jail nor deported.

Meanwhile, criminal aliens continue to plague the streets of Maricopa County, as demonstrated by the Maricopa County Sheriff's Office, which has compiled figures that show that of the 318 illegal immigrants arrested by local law enforcement in Maricopa County in September 2014, 105, or 33% of the total group, are repeat offenders. This mirrors what has happened every month of this year, when at least one-third of all illegal immigrants arrested by Sheriff's deputies and police officers are repeat offenders. In fact, adding the totals for 2014 together, of the 3,865 ICE detainers placed on incoming criminal offenders, a stunning 1,382, translating to 36% of the whole, were repeat offenders.

The release of criminal aliens back in the community is a form of "backdoor amnesty," says the Sheriff, "to be followed after the November elections by President Obama issuing an executive order granting widespread amnesty to millions of illegal aliens."

Nor are the crimes committed by criminal aliens insignificant. One such individual arrested in September, a verified Mexican Mafia prison gang member with seven prior arrests including aggravated assault with a weapon, arson, riot, and five INS detainers, had also been charged with six counts of murder in 2004. He received a seventeen-year sentence. Now somehow out of prison, he has been arrested again.

That individual is hardly alone in his multiple arrests. This month alone, two different criminal aliens have each had fifteen prior arrests, while two others account for eleven each. Another has fifteen and one more has sixteen, a total topped last month by one individual who had been arrested twenty-five times. Furthermore, as has been noted month after month, the offenses committed by criminal aliens have run the gamut of serious crimes, including kidnapping, aggravated assault with a deadly weapon, armed robbery, child molestation, sexual abuse, conspiracy, dangerous drugs, and more.

"The situation is not only intolerable," says Sheriff Arpaio, "but it is also getting worse. The growing conflict between the federal government and local law enforcement over what to do about illegal aliens and criminal aliens is endangering the citizens of the United States. Combine that with the ongoing threat of an open border, through which not only criminals but also terrorists can enter this country, and we have a major problem that demands immediate attention. My office and I stand ready, as always, to help in any way possible to protect the American people and the integrity of our nation."

550 West Jackson St., Phoenix, Arizona 85003 | Phone (602)876-1801 | Fax: (602)258-2081 | Media Contact: mediarequest@mcso.maricopa.gov

2

SER206



**Maricopa County Sheriff's Office Headquarters**

*Joe Arpaio*
*Sheriff*

Ph: 602-876-1801
Switchboard: 602-876-1000
www.mcso.org

550 West Jackson Street
Phoenix, AZ 85003

September 23, 2014

The Honorable Jeh Johnson
Secretary of Homeland Security
Washington, DC 20258

Dear Secretary Johnson:

Thank you for your response dated September 3, 2014.

I appreciate your offer to meet in Washington, DC. Prior to that meeting I would like to stress, once again, that what I primarily seek is not a procedural review by DHS, but a thorough investigation into a very serious and pressing problem. The situation to which I have referred several times in my letters, to not only you, but also to ICE Principal Deputy Assistant Secretary Winkowski and DHS Inspector General John Roth, in which Immigration and Customs Enforcement keeps releasing illegal aliens who have already been convicted of crimes and then arrested, yet again, by local law enforcement back on the streets of Maricopa County. This policy endangers both law enforcement officers and the public by not keeping such criminal offenders in jail or deporting them and making sure they cannot so readily cross the border again.

As I have previously written, I am ready to deploy the considerable resources of my agency to help in this investigation. I have ICE officers in my jails and ICE agents are cross-certified by me to function as deputy sheriffs in order to enforce the laws of Maricopa County. It should be noted that, in the past, your organization trained and certified 150 of my deputies, giving them the authority to enforce our illegal immigration laws; a partnership that highlighted my commitment to assist the federal government in taking on this most serious issue.

As for me, after serving as the regional director for the U.S. Drug Enforcement Administration (DEA) in Mexico, Central and South America, as well as, in Texas and Arizona, and 22 years as the elected sheriff of the third largest Sheriff's Office in the country – located only thirty miles from the border, I understand the difficulties in securing that border, as well as, dealing with the complex issue of illegal immigration. I agree to assist in any way possible in order to resolve these problems.

Sincerely,

Joseph M. Arpaio
Sheriff

SER207

*Maricopa County Sheriff's Office*

*Joe Arpaio, Sheriff*

# NEWSRelease

**For Release: September 4, 2014**                    **CONTACT:** Sheriff Joe Arpaio

## SHERIFF ARPAIO PETITIONS THE FEDERAL GOVERNMENT TO STOP RELEASING ILLEGAL ALIENS CHARGED WITH CRIMINAL OFFENSES

(Phoenix, AZ,)For the eighth time in as many months, Maricopa County Sheriff Joe Arpaio is pressing his demand in a letter expedited to the Inspector General of Homeland Security that Immigration and Customs Enforcement (ICE) explain why the agency continually releases illegal aliens convicted of crimes back onto the streets of Maricopa County, the most populated Arizona county located just thirty miles from the border. In addition, Arpaio's letter reiterates his intention to renew his call for a congressional investigation if answers and action are not forthcoming.

The Maricopa County Sheriff's Office, headed by Arpaio, has compiled figures showing that of the 379 illegal immigrants arrested by local law enforcement in Maricopa County in August 2014, 128, or 33.7% of the total group, are repeat offenders. This mirrors what has happened every month of this year, when at least one-third of all illegal immigrants arrested by Sheriff's deputies and police officers are repeat offenders. In fact, adding the totals for 2014 together, of the 3,547 ICE detainers placed on incoming criminal offenders, a stunning 1,277, translating to 36% of the whole, were repeat offenders.

These crimes are not insignificant.

In August alone, one illegal alien with 12 prior arrests, including four ICE detainers, was arrested yet again, and this time on attempted murder charges. That crime was hardly unique in its violence or seriousness, for many illegal aliens have been charged with committing every variety of crime including kidnapping, aggravated assault with a deadly weapon, armed robbery, child molestation, sexual abuse, conspiracy, dangerous drugs, and more.

And it is not just the severity of the offense but also the number of times many offenders have been arrested.

550 West Jackson Street, Phoenix, Arizona 85003 | Phone (602)876-1801 | Fax: (602)258-2081 | Media Contact: mediarequest@mcso.maricopa.gov

SER208

Again this August, one illegal alien had 25 prior arrests, with nine prior ICE detainers, before being arrested this time. He is hardly alone: Some illegal immigrants have been arrested, not once, not twice, but multiple times, some more than a dozen. In point of fact, the 128 repeat offenders in July account for 214 separate charges.

Arpaio notes that he has no doubt the Department of Homeland Security Secretary Johnson, the head of ICE and the DHS Inspector General, are tired to receiving his letters. Nevertheless, the Sheriff has pledged to not give up and to make certain that appropriate action is taken.

Arpaio, who has worked in Mexico and on the US border for twelve years as the top US Drug Enforcement Administration official, and for the past twenty-two years as the Sheriff of Maricopa County, vows to continue fighting international crime – and that includes keeping the people of Maricopa County safe from the serious criminals that ICE keeps releasing on our streets.

The answer is not complicated, says Arpaio: "Do what the law says by deporting these criminals, and then make sure they don't come back."

Now, notes Arpaio, we face another issue on our border - the potential that terrorists will enter America to attack us.

"Everyone in the world knows the border is open," says Arpaio. "Don't you think the terrorists know it, too?"

In his letter to the Inspector General, the Sheriff offered to help the federal government in any way possible to get these criminals put away or deported, and beyond that, to construct a workable, smart policy to deal with these issues. The Sheriff's Office already has ICE officers working in his jail system, and other ICE agents cross-certified by the Sheriff to act as deputy sheriffs in order to enforce the laws of Maricopa County.
###

100 West Washington, Suite 1900, Phoenix, Arizona 85003 | Phone (602)876-1801 | Fax: (602)258-2081 | Media Contact: mediarequest@mcso.maricopa.gov

2    SER209



*Secretary*

**U.S. Department of Homeland Security**
Washington, DC 20528

## Homeland Security

September 3, 2014

Joseph M. Arpaio
Sheriff, Maricopa County
550 West Jackson Street
Phoenix, Arizona  85003

Dear Sheriff Arpaio:

Thank you for your June 30 and August 4, 2014 letters.

You are correct that on June 25 I visited the U.S. Customs and Border Protection's Processing Center in Nogales, Arizona.  While there I met with Governor Jan Brewer and Nogales Mayor Arturo Garino.

Since taking office, I have been reviewing our existing immigration and border enforcement practices and procedures in order to assess how the Department of Homeland Security can conduct its important enforcement mission more humanely within the confines of the law.  As part of that effort, we have been meeting with a range of external stakeholders including Members of Congress, law enforcement, and non-governmental organizations.  If you visit Washington, I would be pleased to meet with you to discuss the issues you raise.

Sincerely,



Jeh Charles Johnson

September 3, 2014

Inspector General John Roth
Office of Inspector General/Mail Stop 0305
Department of Homeland Security
245 Murray Lane SW
Washington, DC 20528-0305


Dear Inspector General Roth:

I am writing to you once again in the matter of illegal aliens being summarily released back by Immigration Control and Enforcement (ICE) into my jurisdiction of Maricopa County, Arizona, without undergoing the due process of law, despite so many having had prior criminal records, despite being in this country illegally.

For the eighth month in a row, the facts reveal that of the 379 illegal immigrants arrested by local law enforcement in Maricopa County in August 2014 and given detainers by ICE, no fewer than 128, or 33.7% of the total, are repeat offenders. Furthermore, those 128 repeat offenders account for a total of 214 prior bookings. Over the months their crimes span the range of serious offenses, including aggravated assault with a deadly weapon, armed robbery, kidnapping, molestation of a child, sexual abuse, dangerous drugs, conspiracy and even attempted murder.

In fact, August saw one illegal alien with 12 prior arrests, including 4 ICE detainers, arrested once more on a charge of attempted murder. Another illegal alien, also arrested in August, had already totaled 25 prior arrests, including 9 detainers.

After eight months of looking into this issue and adding up the numbers, the Maricopa County Sheriff's Office has found 2014 that of 3,547 ICE detainers placed on individuals arrested by local law enforcement in Maricopa County and booked into my jails on criminal charges, a stunning 1,277, or 36%, more than one-third, were repeat offenders.

These statistics point to only two contingencies: First, ICE is quietly releasing them rather than detain and either charge them and try them here or deport them to their own countries, and second, that the border is so porous that even for those deported, they quickly return to this country to break more laws. The truth is that both of these situations are happening: ICE is releasing illegal aliens back onto the streets, and the border is open for easy passage.

Putting aside the outrageous flaunting of both the law and ICE's own protocols, I am personally concerned because ICE's actions endanger both my deputy sheriffs and the county's other law enforcement officers who are keeping our streets safe and the public they protect. This situation is hardly a new development, extending far beyond the 8 months covered in this study. My office's investigation shows that

many of these individuals were released, sometimes many times, some more than a dozen, some more than twenty times, going back years. Thus, the problem and the awareness of the problem is not a recent matter, but a long-term issue.

In the course of 2014, I have written to you, to ICE Principal Deputy Assistant Secretary Winkowski and to Homeland Security Secretary Jeh Johnson. Replies, on the rare occasions when they have been forthcoming, are limited to benign, bureaucratic statements, designed to lead nowhere. I want real responses to a very serious problem, and I once more ask that your office conduct an investigation.

As I written over and over, I am ready to deploy the considerable resources of my organization to help in this investigation. I will state once again that I have ICE officers in my jails, and ICE agents are cross-certified by me to function as deputy sheriffs in order to enforce the laws of Maricopa County. As for me, after serving as the regional director for the US Drug Enforcement Administration (DEA) in Mexico, Central and South America, as well as in Texas and Arizona, I understand very well both the difficulties in securing the border as well as dealing with the complex issue of illegal immigration, and am always ready to work to resolve these problems.

I look forward to hearing from you.

Thank you.

Exhibit 2

SER213

*Maricopa County Sheriff's Office*

*Joe Arpaio, Sheriff*

# NEWSRelease

**For Release:** August 14, 2014                    **CONTACT: Sheriff Joe Arpaio**

### SHERIFF JOE ARPAIO DEMANDS DHS INSPECTOR GENERAL INVESTIGATE FEDERAL GOVERNMENT'S ONGOING RELEASE OF ALIEN CRIMINALS IN MARICOPA COUNTY

(Phoenix, AZ) After monthly studies going back seven months, and sending the statistics showing how Immigration and Customs Enforcement (ICE) is releasing illegal aliens convicted of crimes back onto the streets of Maricopa County to DHS Secretary Jeh Johnson in an attempt to get answers, Sheriff Joe Arpaio is now demanding an investigation by the DHS Inspector General.

The seven-month total compiled by the Maricopa County Sheriff's Office reveals that for 2014 thus far, of the 3,168 ICE detainers placed on incoming criminal offenders arrested by local law enforcement, incarcerated in the county jail, and passed to ICE, a stunning 1,149, or 36.3%, were repeat offenders. The crimes committed by these individuals included the range of serious and dangerous crimes, including though not limited to kidnapping, aggravated assault with a deadly weapon, armed robbery, child molestation, sexual abuse, conspiracy, various drug felonies, and more. Some of the immigrants have been arrested multiple times, some more than a dozen.

As Sheriff Arpaio has pointed out to Secretary Johnson in his four letters accompanying the figures, this dismal situation can only exist if ICE is not deporting criminals, as required by law, or if the borders are so open that the deported criminals easily return to the U.S.

Of course, the answer is some combination of the two factors.

"I've been writing to Secretary Johnson, offering my help and asking for answers and receiving nothing but bureaucratic form letters in return," says the Sheriff. "This is more than a serious situation, this is dangerous and intolerable, and I have no choice but to request that the Inspector General for Homeland Security look into the matter. And if I receive the same sort of useless response from the Inspector General as I have received the past seven months," states the Sheriff, "then I will no option but to call for a congressional investigation."

The Department of Homeland Security just admitted that it did wrongly release hundreds of criminal aliens in 2013, blaming congressional budgetary constraints for the reason. In the wake of that admission, politicians have called for changes to ICE's actions.

SER214

Regardless, as the Sheriff points out, DHS's explanation does not account as to why the releases persist, what criteria is used to determine which criminals are released, how far back these practices can be traced, and more – and the Sheriff is not satisfied.

The Sheriff's letter sent today to DHS Inspector General John Roth is attached.

550 West Jackson St., Phoenix, Arizona 85003 | Phone (602)876-1801 | Fax: (602)258-2081 | Media Contact: mediarequest@mcso.maricopa.gov

2    SER215



**Maricopa County Sheriff's Office Headquarters**

*Joe Arpaio*
*Sheriff*

Ph: 602-876-1801
Switchboard: 602-876-1000
www.mcso.org

550 West Jackson Street
Phoenix, AZ 85003

August 13, 2014

Inspector General John Roth
Office of Inspector General/Mail Stop 0305
Department of Homeland Security
245 Murray Lane SW
Washington, DC 20528-0305

Dear Inspector General Roth:

Despite the report released today by your office – or, more accurately because of it – I am writing you to insist that your office conduct a more thorough and broad-reaching investigation.

Your report covers the actions of Immigration Customs and Enforcement (ICE) for one year, 2013, and the agency's release of thousands of illegal aliens, including hundreds with criminal records, instead of pursuing prosecution or deportation.  The reason given for these transgressions, to cut to the chase, is budgetary.

The Maricopa County Sheriff's Office has conducted our own investigation into the matter for the past seven months, from the beginning of 2014, and has recorded that of 3,168 ICE detainers placed on individuals arrested by local law enforcement in Maricopa County and booked into my jails on criminal charges, a stunning 1,149, or 36.3%, more than one-third, were repeat offenders.

The significance of this cannot be overstated, as ICE has released these people who end up back on the streets of my county, endangering both my deputy sheriffs and police officers who keep those streets safe and the public they protect.  And we are not talking about 2013 and those budget constraints, for our seven-month investigation covers 2014.  Furthermore, our study shows that these individuals were released, sometimes many times, some more than a dozen, some more than twenty times, going back years.  Thus, the problem and the awareness of the problem is not a recent matter, but a long-term issue.

SER216

This is far from my first attempt to ask the Department of Homeland Security to take notice. As you will see by the accompanying letters, I have written to Secretary Jeh Johnson four times, (the most recent having been dispatched August 4) each letter accompanied by a new set of statistics that bolster our case. Though ICE Principal Deputy Assistant Secretary Winkowski has sent replies, they have been general, bureaucratic statements and thus nonresponsive in any meaningful way. I want real answers to a very serious issue, and so I request that your office conduct an investigation, in the hope that answers will be forthcoming and I will not have to demand a congressional inquiry.

As I wrote Secretary Johnson, I am prepared to deploy the considerable resources of my organization to help in this investigation. As you might know, I have ICE officers in my jails, and ICE agents are cross-certified by me to function as deputy sheriffs in order to enforce the laws of Maricopa County. As for me, after serving as the regional director for the US Drug Enforcement Administration (DEA) in Mexico, Central and South America, as well as in Texas and Arizona, I understand very well both the difficulties in securing the border as well as dealing with the complex issue of illegal immigration, and am always ready to work to resolve these problems.

I look forward to hearing from you.

Sincerely,

Joseph M. Arpaio
Sheriff

*Maricopa County Sheriff's Office*

*Joe Arpaio, Sheriff*

# NEWSRelease

**For Release:** August 5, 2014

**CONTACT:** Sheriff Joe Arpaio

## FOR 7TH MONTH IN ROW, SHERIFF JOE ARPAIO DEMANDS FEDS EXPLAIN WHY THEY CONTINUE TO RELEASE ALIEN CRIMINALS IN MARICOPA COUNTY

### SHERIFF MAY CALL FOR CONGRESSIONAL INVESTIGATION IF DHS KEEPS STALLING

(Phoenix, AZ, August 5, 2014): For the seventh time in seven months, Maricopa County Sheriff Joe Arpaio is pressing his demand in letters sent to Secretary of Homeland Security Jeh Johnson that Immigration and Customs Enforcement (ICE) explain why the federal government keeps releasing illegal aliens convicted of crimes back onto the streets of Maricopa County. This time, however, the Sheriff may insist on a congressional investigation if answers and action are not forthcoming.

Figures compiled by the Maricopa County Sheriff's Office show that in July 2014 of the 393 illegal immigrants arrested by local law enforcement in Maricopa County, 139, or 35.3% of the total group, are repeat offenders. This continues the unbroken pattern recorded by the Sheriff's Office since the start of the year. In fact, adding the totals for 2014 together, of the 3,168 ICE detainers placed on incoming criminal offenders, a stunning 1,149, translating to 36.3% of the whole, were repeat offenders.

Furthermore, the crimes committed by these individuals spanned the range of serious and dangerous offenses, including though not limited to kidnapping, aggravated assault with a deadly weapon, armed robbery, child molestation, sexual abuse, conspiracy, various drug felonies, and more. Some illegal immigrants have been arrested multiple times, some more than a dozen. In point of fact, the 139 repeat offenders in July account for an astonishing 500 separate charges.

As the Sheriff has written to Secretary Johnson month after month, the only way this situation can exist is if ICE is not deporting criminals, as the law requires, or if the borders are so porous that the deported criminals virtually immediately return to the U.S. Of course, the answer is some combination of those two factors.

"I have said it before and I will say it again," states Sheriff Arpaio, "this situation is intolerable. It violates federal policy. It knowingly, needlessly places the citizens of Maricopa County in danger. I have written Secretary of Homeland Secretary Jeh Johnson several times always sending him the facts and figures that we have assembled, asking for an explanation. While I have received perfunctory responses from a deputy official, we have not received anything resembling a satisfactory answer.

"The Obama Administration is going to great lengths to ensure the well-being of the young illegal immigrants crossing our borders, and a reasonable case can be made for that on humanitarian grounds. The people of Maricopa County should be worthy of the same concern. Don't we deserve real answers? Don't we deserve real action?"

In addition to asking for a meeting with Secretary Johnson, Sheriff Arpaio has also offered to assist ICE, which has officers working in his jail system and whose agents are cross-certified by the Sheriff to act as deputy sheriffs in order to enforce the laws of Maricopa County, in investigating and resolving these issues.

"I previously served as the regional director for the US Drug Enforcement Administration (DEA), which was part of the U.S. Department of Justice. I served in Mexico, Central and South America, as well as in Texas and Arizona," says the Sheriff. "I know the border, I know the issues, I know the people on both sides of the border. I am ready to help solve the problems this country faces."

In his letter to the Secretary, Arpaio relates the story of one illegal immigrant to personify the horrific reality behind these statistics. Armando Rodriguez was arrested on February 13, 2014 and charged with theft and giving false information to a law enforcement officer. This was not Mr. Rodriguez's first arrest; indeed, he had been previously arrested on two separate occasions, beginning some thirteen years ago – a long time, not incidentally, to be living illegally in this country. In those instances, the charges included a variety of drug and burglary offenses. Thus, by the time of his February 13, 2014 arrest, Mr. Rodriguez, in addition to his

550 West Jackson St., Phoenix, Arizona 85003 | Phone (602)876-1801 | Fax: (602)258-2081 | Media Contact: mediarequest@mcso.maricopa.gov

2   SER219

current charges, had already compiled a record worthy of deportation under ICE guidelines. Nonetheless, he was released, for whatever reason, despite being given an ICE detainer. The result was that just five months later, on July 29, 2014, Mr. Rodriguez was arrested yet again and this time his charges were two counts of sexual conduct with a minor, three counts of attempted sexual conduct with a minor, kidnapping, aggravated assault, sexual abuse, molestation of a child, and furnishing obscene material to a child. It is hard to think of more terrible crimes, crimes that in this instance, assuming the charges are proved true, could not have been committed if the federal government had done what it should have done - deported Armando Rodriguez.

Once again, Sheriff Arpaio vows to maintain the pressure on the federal government to not only get answers but also force changes in policy and procedure to protect the people of Maricopa County and the entire United States.

"We're done just sending letters and waiting for a satisfactory response," Arpaio says. "If we don't get real action, not just the usual Washington bureaucratic refrain, may insist that Congress step up and look into the matter. We must solve this problem." (see attached for previous letters sent to Homeland Security Secretary Johnson) ###

550 West Jackson St., Phoenix, Arizona 85003 | Phone (602)876-1801 | Fax: (602)258-2081 | Media Contact: mediarequest@mcso.maricopa.gov

3     SER220



**Maricopa County Sheriff's Office Headquarters**

*Joe Arpaio*
*Sheriff*

Ph: 602-876-1801
Switchboard: 602-876-1000
www.mcso.org

550 West Jackson Street
Phoenix, AZ 85003

August 4, 2014

The Honorable Jeh Johnson
Secretary of Homeland Security
Washington, D.C. 20258

Dear Secretary Johnson:

Thank you for your organization's recent response, received July 10, 2014, to my letter. While I appreciate the detailing of ICE's enforcement priorities, it would seem that the issues I have raised, and continue to raise, directly impact, to quote your letter "the promotion of national security, border security, public safety, and the integrity of the immigration system." Yet Homeland Security and ICE have consistently pursued policies that contravene those goals. I am speaking in particular of the fact that some one-third of the illegal immigrants arrested by law enforcement in Maricopa County and booked into my jails have already been arrested on a wide range of serious criminal charges – and many of them multiple times.

For the seventh month in a row, the facts show that of the 393 illegal immigrants arrested by local law enforcement in Maricopa County in July 2014, no fewer than 139, or 35.3% of the total, are repeat offenders. Their crimes include a full range of serious offenses – aggravated assault with a deadly weapon, armed robbery, kidnapping, molestation of a child, sexual abuse, dangerous drugs, conspiracy, and more – just as we have seen every month we have looked at the statistics.

Finally, adding the numbers from the past seven months together, 3,168 ICE detainers were placed in incoming criminal offenders, and of those, a stunning 1,149, or 36.3%, more than one-third, were repeat offenders.

Let us use one example alone to exemplify the horrific reality behind these statistics. Armando Rodriguez was arrested on February 13, 2014, and charged with theft and giving false information to a law enforcement officer. This was not Mr. Rodriguez's first arrest; indeed, he had been previously arrested on two separate occasions, beginning some thirteen years ago – a long time, not incidentally, to be living illegally in this country. In those instances, the charges included a variety of drug and burglary offenses. Thus, by the time of his February 13, 2014, arrest, Mr. Rodriguez, in addition to his current charges, had already compiled a record worthy of deportation under ICE guidelines. Nonetheless, he was released, for whatever reason, despite being given an ICE detainer. The result was that just five months later, on July 29, 2014, Mr. Rodriguez was arrested yet again and this time his charges were two counts of sexual conduct with a minor, three counts of attempted sexual conduct with a minor, kidnapping, aggravated assault, sexual abuse, molestation of a child, and furnishing obscene material to a child. It is hard to think of more terrible crimes, crimes that in

this instance, assuming the charges are proved true, could not have been committed if the federal government had done what it should have done - deported Armando Rodriguez.

That case, together with all the statistics, demonstrate what I have said over and over: That when local law enforcement arrests illegal immigrants on criminal charges and turns them over to the federal government, the federal government, in the form of Homeland Security and ICE, either quietly releases them back onto our streets or deports them, the result being they quickly and with obvious ease make their way back to our community.

Both actions are unacceptable. The first, releasing those with immigration detainers from jail without consequences, free to commit new crimes, is an outrage against the people of Maricopa County. The second, allowing those deported to so readily return to this country, is an insult to all Americans.

I am once again requesting a meeting with you to discuss this intolerable situation. I am ready to work with ICE on this matter. As you know, I have ICE officers in my jails, and ICE agents are cross-certified by me to function as deputy sheriffs in order to enforce the laws of Maricopa County.

I am prepared to put the considerable resources of my organization to use in helping ICE identify, track and re-arrest those criminals released in our county. After serving as the regional director for the US Drug Enforcement Administration (DEA) in Mexico, Central and South America, as well as in Texas and Arizona, I understand very well both the difficulties in securing the border as well as dealing with the complex issue of illegal immigration, and am always ready to work to resolve these problems.

After ignoring the growing problem for so long, it is interesting to watch the Administration scramble to handle the thousands upon thousands of children crossing the border. As important as dealing with that issue is, it pales in comparison with the reality that the federal government, sworn to protect us, simply releases illegal immigrants charged with serious crimes to roam free on our streets.

It has been widely reported that President Obama intends to declare some form of summary amnesty for perhaps millions of illegal immigrants sometime after Labor Day. Can the federal government guarantee that many among that enormous number will not be criminals, charged and yet released by that government? Can the government guarantee that those given amnesty will not commit more crimes against American citizens?

All these questions demand answers, and the situation as it now stands cannot be allowed to continue. I am determined to see this through on behalf of the people of Maricopa County.

Sincerely,

Joseph M. Arpaio
Sheriff

Exhibit 3

SER223



**Maricopa County Sheriff's Office Headquarters**

*Joe Arpaio*
*Sheriff*

Ph: 602-876-1801
Switchboard: 602-876-1000
www.mcso.org

550 West Jackson Street
Phoenix, AZ 85003

June 30th, 2014

The Honorable Jeh Johnson
Secretary of Homeland Security
Washington, D.C. 20258
Fax (202) 282 8408

Dear Secretary Johnson,

I am aware through various published reports that you visited Arizona last week in response to the crisis over the thousands of children pouring over the U.S-Mexico border. Unfortunately, you did not take the opportunity to meet with me while you were visiting the southernmost area of the state for, as my previous letters to you have indicated, there is another calamity unfolding as a result of the federal government's unwillingness to secure the homeland.

As my preceding correspondence suggests, Immigration and Customs Enforcement (ICE) continues to release illegal immigrants who have been arrested by local law enforcement in Maricopa County, returning them to the streets of this community. Many of these illegal aliens, if not most, have been previously arrested on a broad range of serious criminal charges. In fact, this month saw that of 375 detainers placed on criminally charged illegal aliens, 141 had prior bookings with detainers. That means that the total for the past six months equals 2,775 ICE detainers placed on incoming criminal offenders, and of those, a stunning 1,010 were repeat offenders.

We know this because by my order, the Maricopa County Sheriff's Office has been compiling and analyzing the data on a continual basis. We have also sent the uncovered information to Homeland Security asking the department to review the facts and alter its strategy which, by the way, violates its own policies.

Of course, despite our monthly requests, complete with our data, for an investigation, we have received nothing other than one letter that could generously be described as perhaps a half-step above a form letter from – frankly – a relatively low-level official assuring us, in typical bureaucratic language, that ICE is "committed to sensible, effective immigration enforcement that focuses on public safety, national security threats, and individuals apprehended at the border while attempting to unlawfully enter the United States."

SER224

As actions still speak louder than words, this assertion is simply nonsensical, given ICE's flouting of its own stated priorities and responsibilities.

Regardless, we will continue to press ICE to investigate and conform to not only its policies, but to what is right and necessary for the people of Maricopa County who are placed in danger, every day, by the U.S. government's casual disregard for their safety.   In addition, the Maricopa County Sheriff's Office is the fourth largest Office and jail system in the nation. Therefore, the actions by Homeland Security impact my Office on both ends: from the deputies who must confront these criminals without knowledge of their criminal history, to the Sheriff's detention officers who deal with them in this federally caused revolving door.  Of course, the extra burden on my Office's resources cost considerable funds, an unfair penalty on taxpayers.

Given that our appeals for an inspection by Homeland Security have gone unheeded, I am now requesting a more direct approach, specifically, a meeting between you and me.  I welcome the chance to explain to you the problem and to talk about solutions.  Remember, that while you are still new on your job, I have extensive federal experience as the head of the U.S. Drug Enforcement Administration (DEA) in Mexico, Central and South America, and also in Texas and then in Arizona, with more than a dozen years on one side of the border or another.  I have been Sheriff of Maricopa County, the fifth largest county in the nation (which incidentally extends to within 30 miles of the border) for 22 years.  Between these experiences running sizeable operations for both local and federal government, you might find that I have something of value to impart to you as you become familiar with your new position.

Thus, in order to best serve the public interest, not to mention to improve local/federal cooperation, it is important for us to meet.

I await your response.

Sincerely,

Joseph M. Arpaio
Sheriff




# MARICOPA COUNTY SHERIFF'S OFFICE

550 West Jackson Street, Phoenix, Arizona  85003
Joseph M. Arpaio
Sheriff

## Facsimile Transmittal Cover Sheet

To:   **The Honorable Jeh Johnson, Secretary of Homeland Security,
Washington, D.C. 20258**

Facsimile Telephone:  **(202) 282-8408**

From: **Desk of Sheriff Arpaio**

MCSO File Number:  **none**

Left with Fax Operator

Date: **05/30/14**                    Time: **05:00 PM**

Total Pages Transmitted, Including this Cover Page:  **3 pages**

Comments or Instructions to Receiver:  **Please see attached correspondence.**

---

To be completed by fax operator

| Transmitted | Date: _June 30, 2014_ Time: _5:05 pm_ |
|---|---|

MCSO Return Facsimile Number:
(602) 876-0867;

If there was a problem with this transmission, please call: _Amy Lake_
(602) 876-1829.

5000-458 R9-93 (MW97 v1.0 07/15/97

SER226

*Office of the Director*



U.S. Department of Homeland Security
500 12th Street, SW
Washington, D.C. 20536

U.S. Immigration
and Customs
Enforcement



MAY 0 2 2014

Joseph M. Arpaio
Sheriff, Maricopa County
550 West Jackson Street
Phoenix, Arizona  85003

Dear Sheriff Arpaio:

Thank you for your April 1, 2014 letter to Secretary Johnson regarding individuals arrested by local law enforcement in Maricopa County and then subsequently transferred to U.S. Immigration and Customs Enforcement (ICE) custody.  Your letter was referred to ICE for response.

While we continue to work with Congress to enact common sense immigration reform, ICE remains committed to sensible, effective immigration enforcement that focuses on public safety, national security threats, and individuals apprehended at the border while attempting to unlawfully enter the United States.  Over the past several years, ICE has focused and prioritized its immigration enforcement efforts.  In particular, ICE implemented civil enforcement priorities, refined the use of prosecutorial discretion, and implemented a sustained focus on the identification and removal of convicted criminals and other priority removable individuals.

ICE exercises discretion on a case-by-case basis to focus its resources on the agency's enforcement priorities.  Such decisions are based on individualized assessments of the facts, including any criminal history, length of presence in the United States, ties to the community, and other relevant factors.  ICE reviews every case to ensure that dangerous criminals and national security threats are detained and removed from the United States, with a particular emphasis on violent criminals, felons, and repeat offenders.  ICE's partnerships with local law enforcement are a crucial part of advancing our agency's public safety mission, and we look forward to collaborative partnership with local law enforcement throughout the United States.

Again, thank you for your letter.  Should you have any further questions or concerns, please do not hesitate to contact my office at (202) 732-3000.

Sincerely,

Thomas S. Winkowski
Principal Deputy Assistant Secretary

*Maricopa County Sheriff's Office*
*Joe Arpaio, Sheriff*

# NEWSRelease

**For Release:** March 20, 2014          **CONTACT:** Joaquin Enriquez (480)318-4846

## Arrest Data Suggests Disturbing Recidivism Rate Amongst Illegal Immigrants

### *Sheriff on Deportations:*
### *Are Feds Dishonest, Incompetent or Both?*

(Phoenix, AZ) Maricopa County Sheriff Joe Arpaio says a review of arrest data by his Office revealed that one in three illegal aliens booked into jail over a recent three-month period were previously arrested by local law enforcement on various criminal charges, despite being turned over to the federal government for deportation proceedings.

This alarming rate of recidivism by illegal immigrants leads to an undeniable deduction: The federal policy of stopping illegal immigration through arrest and deportation is failing through an apparent combination of incompetence and intention.

"One of two things is happening," said Sheriff Arpaio, "either the federal government is quietly ushering illegal aliens out its back doors and back onto our streets, or our border is still so wide open that deportees continue to re-enter the country illegally with remarkable ease."

This situation leads to an unavoidable conclusion, Arpaio reasons, and one with far-ranging political consequences for law enforcement in general and for the entire nation as a whole.

Arpaio contends that the federal government authorities stopped the Sheriff from enforcing immigration laws in order to allow them to take over the task of immigration enforcement in Arizona.

Furthermore, as the data suggests, the federal government assumed the responsibility of controlling the arrest and disposition of illegal immigrants to ensure that no enforcement of the law would actually occur.

SER228

The government's intent, Arpaio says, was to quietly achieve its broader agenda: to stop Arpaio's enforcement of immigration laws and loudly discourage all other law enforcement agencies from doing the same.

Their refusal to do the job of enforcing immigration laws translates to a high level of frustration by local law enforcement which faces a large revolving population of criminal illegal aliens who appear to be violating laws with minimal fear of deportation or being held accountable for their crimes.

In fact recent congressional testimony points to a further shell game by the Obama administration which loudly claims record numbers of deportations. Congress heard just this week that the administration has been employing a misleading methodology to inflate deportation numbers.

This serious and disturbing state of affairs, says Sheriff Arpaio, has remained unaddressed by the federal government since the Maricopa County Sheriff's Office began enforcing immigration laws over eight years ago.

A three-month snapshot of jail records indicated that 31% of illegal alien criminal offenders booked into the Maricopa County Jail system were returning to jail shortly after being turned over to the federal government with immigration holds.

Of the 1348 illegal immigrants held by MCSO at the request of Immigration Customs and Enforcement in the examined three-month period, 419 (31%) were previously arrested despite being turned over to ICE for deportation proceedings. Many of the reoffending 31% had *several* previous bookings into the county jail – some more than twenty times. The recidivism data has Sheriff's officials concerned that local tax dollars are wasted by placing immigration holds and turning illegal alien offenders over to the federal government only to find that they are coming back as often as they are.

A cursory look at the records of some of those arrested again is revealing, both in regard to the quantity of arrests and the nature of those arrests.

Many illegals had 5 or 6 arrests, while others had far more. One man had 9 prior arrests; another numbered 15; and still another totaled an astonishing 19 previous arrests and bookings. Many of the cases examined had been charged with 'level one' crimes – the criteria by which the federal government says would mandate their deportation.

Then there are the actual charges, which span a wide range of major crimes, from kidnapping to sexual abuse to organized retail theft to molestation of minors to forgery to aggravated assault to DUI to weapon possession to resisting arrest to the

100 West Washington, Suite 1900, Phoenix, Arizona 85003 | Phone (602)876-1801 | Fax: (602)258-2081 | Media Contact: mediarequest@mcso.maricopa.gov

2   SER229

entire scope of drug-related offenses, from possession to sale to conspiracy, on and on.

These are not minor crimes, but dangerous and destructive to individuals and society. And the issue does not end there, as Sheriff Arpaio pointed out. Compounding the problem is the significant impact that the recidivism data has on taxpayers.

"Clearly, local tax dollars are being wasted," declared the Sheriff. "Law enforcement across the county arrests these offenders, officers place immigration holds to keep the offenders in jail, and then they are turned over to the federal government that brags about 'record deportations.' Yet our statistics paint a very different picture. These 'deportations' are either not happening or are exceptionally ineffective and that means Washington is failing the American people and hiding the truth."

Arpaio said Maricopa County taxpayers need to demand answers from responsible federal authorities.

"Every time we place a hold on criminal aliens at the request of Immigration and Customs Enforcement," said the Sheriff, "it translates into money and manpower. Why are we wasting our valuable resources in the jails and on the streets if there is no intention on the federal government's part to either deport these people or to increase security on the border?

"Let me make this clear," said Arpaio, "this might be politics for the President but for law enforcement this is a practical issue, because law enforcement cannot protect the community if critical facts are being withheld by the federal government. We want ICE to open its records and tell us who they are releasing onto our streets and why. Going forward, we need to establish rational reporting procedures. On our behalf, we are going to publish statistics showing how many illegal aliens are arrested and then released every month until this situation is resolved."

Arpaio concluded, "American citizens who commit crimes also re-offend at an alarming rate, so this problem is not unique to illegal aliens. However, the difference is while we can't absolutely stop US citizens from re-offending, we can with illegal aliens. Simply stated: they cannot commit crimes if they are no longer in the country. The solution is that simple."

100 West Washington, Suite 1900, Phoenix, Arizona 85003 | Phone (602)876-1801 | Fax: (602)258-2081 | Media Contact: mediarequest@mcso.maricopa.gov

3    SER230

*Maricopa County Sheriff's Office*

*Joe Arpaio, Sheriff*

# NEWSRelease

**For Release:** April 1, 2014      **CONTACT:** Sheriff Joe Arpaio

## SHERIFF JOE ARPAIO CALLS ON DHS SECRETARY TO INVESTIGATE WHY HIS DEPARTMENT VIOLATES OWN DEPORTATION POLICIES

### THE SHERIFF DEMANDS EXPLANATION

(Phoenix, AZ) Sheriff Joe Arpaio today sent US Secretary of Homeland Security Jeh Johnson a letter demanding an explanation as to why Immigration and Customs Enforcement (ICE) is violating its own policies in releasing illegal immigrants booked into Maricopa County jails by local enforcement on a variety of criminal charges instead of processing them for deportation.

Accompanying the letter is a list of 419 criminally charged individuals, along with those charges, to assist in his investigation.

As previously noted by the Maricopa County Sheriff's Office, a review over a recent three-month period that one out of three illegal immigrants arrested by local law enforcement in Maricopa County and booked into jail had previously been arrested on a a wide range of serious criminal charges – most multiple times, many more than a dozen times - despite being turned over to ICE. The aforementioned 419 individuals constitute 31% of a total of 1,348 illegal aliens arrested and booked during the three-month period examined.

"ICE might want to ignore this situation, or dismiss it as unimportant," asserted Sheriff Arpaio, "but it is not unimportant to my deputies and other law enforcement officers who put their lives in danger confronting these criminals on the streets every day. Nor is it unimportant to the citizens of Maricopa County, who, with hundreds of people whose actions necessitate their incarceration or deportation but are instead walking our streets essentially free and clear, pay first in diminished public safety, and then financially, as this revolving door wastes taxpayer money."

550 West Jackson Street, Phoenix, Arizona 85003 | Phone (602)876-1801 | Fax: (602)258-2081 | Media Contact: mediarequest@mcso.maricopa.gov

SER231

Furthermore, stated the Sheriff, "these 419 people are not only charged with breaking the law but have reached ICE's own criteria for deportation as Level 1 and 2 violators."

Arpaio pledged to evaluate and release to the public the numbers of those illegal immigrants arrested and turned over to ICE every month until this matter is resolved.

"This entire issue puts a spotlight on the federal government's hiding its true intentions on immigration," stated the Sheriff. "And I will continue to press for answers until the people of Maricopa County can be satisfied that the Obama Administration is acting in their best interests, and not using immigration for cheap political gains."

SER232



**Maricopa County Sheriff's Office Headquarters**

*Joe Arpaio*
*Sheriff*

Ph: 602-876-1801
Switchboard: 602-876-1000
www.mcso.org

550 West Jackson Street
Phoenix, AZ 85003
April 1, 2014

The Honorable Jeh Johnson
Secretary of Homeland Security
Washington, D.C. 20258

Dear Secretary Johnson:

As someone who spent years serving as the regional director for the US Drug
Enforcement Administration (DEA) in Mexico, Central and South America, as well as
in Texas and Arizona, I am well aware of the difficulties in securing the border and
contending with the complex issue of illegal immigration. Nonetheless, I am
distressed to find that these difficulties and complexities are not being addressed in
a manner that the law demands, but rather that the will of the both the people and
the intent of the law is being circumvented by Immigration and Customs
Enforcement (ICE), an agency under your command.

A review by my office over a recent three-month period revealed that one out of
three illegal immigrants arrested by local law enforcement in Maricopa County and
booked into my jails had previously been arrested on a wide range of serious
criminal charges, despite being turned over to ICE. Four hundred nineteen out of
1,348 illegal aliens, fully 31%, who had been arrested and charged often multiple
times – many more than a dozen times – in our county, who should have been
deported as a minimal, automatic response to their arrests. This recidivism rate
means one of two things: either ICE is choosing not to detain, let alone deport, these
prisoners, and instead quietly releasing them back onto our streets, or the federal
effort to control the border is a spectacular failure, with many of these illegal
immigrants crossing and recrossing the border at will.

This flagrant disregard of the law, or incompetence in enforcing it, endangers both
my deputies, other police officers, and the entire community when ICE releases
dangerous individuals, a problem compounded when ICE doesn't bother to alert law
enforcement beforehand. In addition, this is costing the taxpayers a fortune to pay
for this charade of arresting, releasing, re-arresting, so on, causing law enforcement
to spend its officers' time on this pointless carousel instead of stopping and
investigating other crimes.

The federal government, and presumably your department, must address and fix these issues. A real policy must be put into place concerning illegal immigration, a policy that is aboveboard, consistent, and in compliance with the law. As a start, I request that you investigate and provide information that explains how and why ICE has acted as it has, and what it intends to do moving forward.

I am enclosing the names of those 419 illegal immigrants booked into our county jail, who had previously been criminally charged, and who have met ICE's own criteria for deportation as Level 1 and 2 offenders, only to appear in our custody again, for your investigation.

For my part, I will continue to evaluate the numbers of those arrested with illegal immigration charges placed on them, and see how many are neither deported nor detained, and simply let go back into Maricopa County without penalty. I will release these figures every month so we can all stay on top of this matter.

I look forward to hearing from you.

Sincerely,

Joseph M. Arpaio
Sheriff

## CIVIL COVER SHEET

JS-44 (Rev. 7/13 DC)

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| JOSEPH M. ARPAIO | BARACK OBAMA, JEH JOHNSON, LEON RODRIQUEZ, ERIC HOLDER JR., ET AL. |

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF _88888_
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
**(IN U.S. PLAINTIFF CASES ONLY)**
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Larry Klayman
2020 Pennsylvania Ave. NW, Suite 345
Washington, D.C. 20006

ATTORNEYS (IF KNOWN)

### II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

- ○ 1 U.S. Government Plaintiff
- ○ 3 Federal Question (U.S. Government Not a Party)
- ◉ 2 U.S. Government Defendant
- ○ 4 Diversity (Indicate Citizenship of Parties in item III)

### III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) FOR DIVERSITY CASES ONLY!

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

### IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place an X in one category, A-N, that best represents your Cause of Action and one in a corresponding Nature of Suit)

**○ A. Antitrust**

- ☐ 410 Antitrust

**○ B. Personal Injury/ Malpractice**

- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury
- ☐ 362 Medical Malpractice
- ☐ 365 Product Liability
- ☐ 367 Health Care/Pharmaceutical Personal Injury Product Liability
- ☐ 368 Asbestos Product Liability

**○ C. Administrative Agency Review**

- ☐ 151 Medicare Act

**Social Security**
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

**Other Statutes**
- ☐ 891 Agricultural Acts
- ☐ 893 Environmental Matters
- ☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

**○ D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

**◉ E. General Civil (Other)     OR     ○ F. Pro Se General Civil**

**Real Property**
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent, Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

**Personal Property**
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

**Bankruptcy**
- ☐ 422 Appeal 27 USC 158
- ☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Conditions
- ☐ 560 Civil Detainee – Conditions of Confinement

**Property Rights**
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

**Federal Tax Suits**
- ☐ 870 Taxes (US plaintiff or defendant)
- ☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 690 Other

**Other Statutes**
- ☐ 375 False Claims Act
- ☐ 400 State Reapportionment
- ☐ 430 Banks & Banking
- ☐ 450 Commerce/ICC Rates/etc.
- ☐ 460 Deportation
- ☐ 462 Naturalization Application
- ☐ 465 Other Immigration Actions
- ☐ 470 Racketeer Influenced & Corrupt Organization

- ☐ 480 Consumer Credit
- ☐ 490 Cable/Satellite TV
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 896 Arbitration
- ☒ 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- ☐ 950 Constitutionality of State Statutes
- ☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act)

SER235

| ○ G. Habeas Corpus/ 2255 | ○ H. Employment Discrimination | ○ I. FOIA/Privacy Act | ○ J. Student Loan |
|---|---|---|---|
| ☐ 530 Habeas Corpus – General<br>☐ 510 Motion/Vacate Sentence<br>☐ 463 Habeas Corpus – Alien Detainee | ☐ 442 Civil Rights – Employment (criteria: race, gender/sex, national origin, discrimination, disability, age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loan (excluding veterans) |

| ○ K. Labor/ERISA (non-employment) | ○ L. Other Civil Rights (non-employment) | ○ M. Contract | ○ N. Three-Judge Court |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 740 Labor Railway Act<br>☐ 751 Family and Medical Leave Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 440 Other Civil Rights<br>☐ 445 Americans w/Disabilities – Employment<br>☐ 446 Americans w/Disabilities – Other<br>☐ 448 Education | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights – Voting (if Voting Rights Act) |

**V. ORIGIN**

◉ 1 Original Proceeding   ○ 2 Removed from State Court   ○ 3 Remanded from Appellate Court   ○ 4 Reinstated or Reopened   ○ 5 Transferred from another district (specify)   ○ 6 Multi-district Litigation   ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

5 U.S.C. § 701 - Administrative Procedure Act

| **VII. REQUESTED IN COMPLAINT** | CHECK IF THIS IS A **CLASS ACTION** UNDER F.R.C.P. 23 | **DEMAND $** | Check **YES** only if demanded in complaint |
|---|---|---|---|
| | | **JURY DEMAND:** | YES ☐   NO ☒ |

| **VIII. RELATED CASE(S) IF ANY** | (See instruction) | YES ☐   NO ☒ | If yes, please complete related case form |
|---|---|---|---|

DATE: 11/20/2014    SIGNATURE OF ATTORNEY OF RECORD _____

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
**Authority for Civil Cover Sheet**

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and services of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the cover sheet.

I.    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff if resident of Washington, DC, 88888 if plaintiff is resident of United States but not Washington, DC, and 99999 if plaintiff is outside the United States.

III.    CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.    CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of the case.

VI.    CAUSE OF ACTION: Cite the U.S. Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.    RELATED CASE(S), IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.

SER236

CLOSED

# U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: 1:14-cv-01966-BAH

ARPAIO v. OBAMA et al                          Date Filed: 11/20/2014
Assigned to: Judge Beryl A. Howell            Date Terminated: 12/24/2014
Case in other court: USCA, 14-05325           Jury Demand: None
Cause: 05:551 Administrative Procedure Act    Nature of Suit: 899 Administrative
                                              Procedure Act/Review or Appeal of
                                              Agency Decision
                                              Jurisdiction: U.S. Government
                                              Defendant

**Plaintiff**

**JOSEPH M. ARPAIO**          represented by  **Larry E. Klayman**
                                              LAW OFFICES OF LARRY
                                              KLAYMAN
                                              2020 Pennsylvania Avenue, NW
                                              Suite 345
                                              Washington, DC 20006
                                              (310) 595-0800
                                              Fax: (310) 275-3276
                                              Email: leklayman@gmail.com
                                              *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**BARACK H. OBAMA**          represented by  **Adam D. Kirschner**
                                              U.S. DEPARTMENT OF JUSTICE
                                              20 Massachusetts Avenue, NW
                                              Washington, DC 20530
                                              (202) 353-9265
                                              Email: adam.kirschner@usdoj.gov
                                              *LEAD ATTORNEY*
                                              *ATTORNEY TO BE NOTICED*

                                              **Kathleen Roberta Hartnett**
                                              UNITED STATES DEPARTMENT OF
                                              JUSTICE
                                              Civil Division
                                              950 Pennsylvania Avenue, N.W.
                                              Washington, DC 20530
                                              (202) 514-2331
                                              Fax: (202) 514-8071

SER237

Email: kathleen.r.hartnett@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**JEH CHARLES JOHNSON**                 represented by **Adam D. Kirschner**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kathleen Roberta Hartnett**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**LEON RODRIGUEZ**                      represented by **Adam D. Kirschner**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kathleen Roberta Hartnett**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**ERIC H. HOLDER, JR.**                 represented by **Adam D. Kirschner**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kathleen Roberta Hartnett**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 11/20/2014 | 1 | COMPLAINT against All Defendants ( Filing fee $ 400 receipt number 0090-3912973) filed by JOSEPH M. ARPAIO. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Civil Cover Sheet, # 5 Summons, # 6 Summons, # 7 Summons, # 8 Summons)(Klayman, Larry) (Entered: 11/20/2014) |
| 11/20/2014 |  | Case Assigned to Judge Beryl A. Howell. (sth, ) (Entered: 11/21/2014) |
| 11/21/2014 | 2 | SUMMONS (4) Issued Electronically as to ERIC HOLDER, JR., JEH CHARLES JOHNSON, BARACK OBAMA, LEON RODRIQUEZ. |

STAYED

# U.S. District Court
## SOUTHERN DISTRICT OF TEXAS (Brownsville)
## CIVIL DOCKET FOR CASE #: 1:14-cv-00254

State of Texas et al v. United States of America et al
Assigned to: Judge Andrew S. Hanen
Case in other court: 107th District Court, Cameron County,
                  Texas, 2015-DCL-662-A
Cause: 05:551 Administrative Procedure Act

Date Filed: 12/03/2014
Jury Demand: None
Nature of Suit: 899 Other Statutes:
Administrative Procedures Act/Review
or Appeal of Agency Decision
Jurisdiction: U.S. Government
Defendant

**Plaintiff**

**State of Texas**                     represented by   **Andrew Stephen Oldham**
Texas Attorney General's Office
PO Box 12548 (MC: 059)
Austin, TX 78711-2548
512-936-1862
Email:
andy.oldham@texasattorneygeneral.gov
*TERMINATED: 03/02/2015*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Adam Nicholas Bitter**
Office of the Attorney General
PO Box12548
Austin, TX 78711-2548
512-936-2422
Email: adam.bitter@texasattorneygeneral.gov
*ATTORNEY TO BE NOTICED*

**Angela V Colmenero**
Texas Office Of The Attorney General
P O BOX 12548
Capitol Station
Austin, TX 78711-2548
512-475-4100
Email:
angela.colmenero@TexasAttorneyGeneral.gov
*ATTORNEY TO BE NOTICED*

**Arthur D'Andrea**
Office of the Attorney General
209 W 14th St

Bristol, RI 02806
Email: pmargulies@rwu.edu
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

Amicus

**Josh Blackman**                    represented by **Leif A. Olson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

Amicus

**Jeremy A. Rabkin**                 represented by **Leif A. Olson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

Amicus

**Major Cities Chiefs Police**       represented by **Chirag G. Badlani**
**Association, et al.**                              Hughes Socol Piers Resnick & Dym, Ltd.
70 W. Madison St. Ste. 4000
Chicago, IL 60602
312-604-2776
Email: cbadlani@hsplegal.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

Amicus

**State of Washington**              represented by **Anne E Egeler**
Washington Office of Attorney General
1125 Washington Street SE
Olympia, WA 98504-0100
360-753-7085
Email: anneE1@atg.wa.gov
*ATTORNEY TO BE NOTICED*

Amicus

**Joe Arpaio**                       represented by **Jonathon Alden Moseley**
*Sheriff*                                           Freedom Watch Inc.
2020 Pennsylvania Avenue NW
Ste 345
Washington, DC 20006
703-656-1230
Email: Contact@JonMoseley.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**Bill de Blasio**                    represented by  **Richard Dearing**
*Mayor, City of New York*                             New York Law Department
                                                      100 Church St
                                                      New York, NY 10007
                                                      212-356-2500
                                                      Fax: 212-356-2509
                                                      Email: rdearing@law.nyc.gov
                                                      *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*

**Amicus**

**Harold William Van Allen**          represented by  **Harold William Van Allen**
                                                      (See above for address)
                                                      PRO SE

**Amicus**

**Judicial Watch, Inc.**              represented by  **Mitchell Lee Herren**
                                                      Hinkle Law Firm LLC
                                                      8621 East 21st Street North, Suite 200
                                                      Wichita, KS 67206-2991
                                                      316-267-2000
                                                      Fax: 316-630-8375
                                                      Email: mherren@hinklaw.com
                                                      *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 12/03/2014 | 1 | COMPLAINT against All Defendants (Filing fee $ 400 receipt number 0541-14130337) filed by South Dakota, Louisiana, C.L. "Butch" Otter, Alabama, Texas, West Virginia, Patrick L. McCrory, Kansas, Georgia, Nebraska, Utah, Wisconsin, Paul R. LePage, Montana, Idaho, Phil Bryant, South Carolina, Indiana. (Attachments: # 1 Civil Cover Sheet)(Oldham, Andrew) (Entered: 12/03/2014) |
| 12/03/2014 | 2 | NOTICE of Appearance by Arthur C. D'Andrea on behalf of Phil Bryant, Paul R. LePage, Patrick L. McCrory, C.L. "Butch" Otter, State of Louisiana, State of Alabama, State of Georgia, State of Idaho, State of Indiana, State of Kansas, State of Montana, State of Nebraska, State of South Carolina, State of South Dakota, State of Texas, State of Utah, State of West Virginia, State of Wisconsin, filed. (D'Andrea, Arthur) (Entered: 12/03/2014) |
| 12/03/2014 | 3 | NOTICE of Appearance by Jonathan F. Mitchell on behalf of Phil Bryant, Paul R. LePage, Patrick L. McCrory, C.L. "Butch" Otter, State of Louisiana, State of Alabama, State of Georgia, State of Idaho, State of Indiana, State of Kansas, State of Montana, State of Nebraska, State of South Carolina, State of South Dakota, State of Texas, State of Utah, State of West Virginia, State of Wisconsin, filed. (Mitchell, Jonathan) (Entered: 12/03/2014) |

| | | |
|---|---|---|
| | | Hanen (original). Court Reporter/Transcriber: Barbara Barnard, filed. (dahumada, 1) (Entered: 01/16/2015) |
| 01/16/2015 | 101 | AO 435 TRANSCRIPT ORDER FORM by Karen C. Tumblin. This is to order a transcript of Preliminary Injunction Hearing held on 1/15/15 before Judge Andrew S. Hanen (copy). Court Reporter: Barbara Barnard, filed. (jtabares, 1) (Entered: 01/16/2015) |
| 01/16/2015 | 102 | ORDER granting 97 Motion to Appear Pro Hac Vice, for attorney Gabriel Markoff.(Signed by Judge Andrew S. Hanen) Parties notified.(bcampos, 1) (Entered: 01/16/2015) |
| 01/16/2015 | 103 | ORDER granting 93 Motion to Appear Pro Hac Vice, attorney Jonathon A Moseley.(Signed by Judge Andrew S. Hanen) Parties notified.(bcampos, 1) (Entered: 01/16/2015) |
| 01/16/2015 | 104 | ORDER granting 98 Motion to Appear Pro Hac Vice.(Signed by Judge Andrew S. Hanen) Parties notified.(avleal, 1) (Entered: 01/16/2015) |
| 01/16/2015 | 105 | MOTION for Jonathan F. Mitchell to Withdraw as Attorney by Phil Bryant, Paul R. LePage, Patrick L. McCrory, C.L. "Butch" Otter, Bill Schuette, State of Louisiana, State of Alabama, State of Arizona, State of Arkansas, State of Florida, State of Georgia, State of Idaho, State of Indiana, State of Kansas, State of Montana, State of Nebraska, State of North Dakota, State of Ohio, State of Oklahoma, State of South Carolina, State of South Dakota, State of Texas, State of Utah, State of West Virginia, State of Wisconsin, filed. Motion Docket Date 2/6/2015. (Attachments: # 1 Proposed Order Proposed Order) (Oldham, Andrew) (Entered: 01/16/2015) |
| 01/20/2015 | 106 | TRANSCRIPT re: Preliminary injunction hearing held on 1/15/15 before Judge Andrew S. Hanen. Court Reporter/Transcriber Barbara Barnard. Ordering Party Kyle Freeny Release of Transcript Restriction set for 4/20/2015., filed. (bbarnard, ) (Entered: 01/20/2015) |
| 01/20/2015 | 107 | Unopposed MOTION for Leave to File Friend of the Court Brief by Joe Arpaio, filed. Motion Docket Date 2/10/2015. (Attachments: # 1 Supplement Proposed Amicus Curiae Brief by Sheriff Joe Arpaio, # 2 Affidavit Stating Data published by Defendants re: Funding Requests for Enforcement of Immigration Laws, attested to by Jonathon Moseley in Arpaio v. Obama case, # 3 Proposed Order)(Moseley, Jonathon) (Entered: 01/20/2015) |
| 01/20/2015 | 108 | MOTION for Leave to File Amicus Brief in Support of Plaintiffs' Motion for Preliminary Injunction by Joe Arpaio as Sheriff of Maricopa County by Joe Arpaio, filed. Motion Docket Date 2/10/2015. (Attachments: # 1 Proposed Order, # 2 Amicus Brief in Support of Plaintiffs' Motion for Preliminary Injunction by Joe Arpaio as Sheriff of Maricopa County)(jtabares, 1) (Entered: 01/20/2015) |
| 01/20/2015 | 109 | ORDER granting 105 Motion to Withdraw as Attorney. Attorney Jonathan F. Mitchell terminated.(Signed by Judge Andrew S. Hanen) Parties notified. (jtabares, 1) (Entered: 01/20/2015) |
| 01/20/2015 | 110 | |

SER242

| | | |
|---|---|---|
| | | AO 435 TRANSCRIPT ORDER FORM by Ilya Shapiro. This is to order a transcript of Hearing held on 1/15/2015 before Judge Andrew S. Hanen (Copy Order). Court Reporter: B. Barnard, filed. (pcrawford, 4) (Entered: 01/21/2015) |
| 01/21/2015 | 111 | MOTION for Adam P KohSweeney to Appear Pro Hac Vice by Jane Doe #1, Jane Doe #2, Jane Doe #3, filed. (Bar Membership verified) Motion Docket Date 2/11/2015. (bcampos, 1) (Entered: 01/21/2015) |
| 01/21/2015 | 112 | ORDER granting 108 Motion for Leave to File to Participate as Amici Curiae in Support of Plaintiffs by Sheriff Joe Arpaio.(Signed by Judge Andrew S. Hanen) Parties notified.(bcampos, 1) (Entered: 01/21/2015) |
| 01/21/2015 | 113 | Amicus BRIEF in Support of Plaintiffs' Motion for Preliminary Injunction by Joe Arpaio as Sheriff of Maricopa County, filed.(bcampos, 1) (Entered: 01/21/2015) |
| 01/21/2015 | 114 | ORDER granting 111 Motion to Appear Pro Hac Vice as to attorney, Adam P. KohSweeney.(Signed by Judge Andrew S. Hanen) Parties notified.(bcampos, 1) (Entered: 01/21/2015) |
| 01/23/2015 | 115 | SUPPLEMENT to 14 Amended Complaint/Counterclaim/Crossclaim etc.,, by Phil Bryant, Paul R. LePage, Patrick L. McCrory, C.L. "Butch" Otter, Bill Schuette, State of Louisiana, State of Alabama, State of Arizona, State of Arkansas, State of Florida, State of Georgia, State of Idaho, State of Indiana, State of Kansas, State of Montana, State of Nebraska, State of North Dakota, State of Ohio, State of Oklahoma, State of South Carolina, State of South Dakota, State of Texas, State of Utah, State of West Virginia, State of Wisconsin, filed.(Oldham, Andrew) (Entered: 01/23/2015) |
| 01/27/2015 | 116 | Certified Mail Receipt Returned, executed on 1/20/15 re: 76 Document(s) Sent - receipt attached, access restricted to court users for privacy reasons -, filed. (mperez, 1) (Entered: 01/27/2015) |
| 01/27/2015 | 117 | NOTICE of Fraud/ Misrepresentation Committed by Orly Taitz, filed. (Attachments: # 1 attachment)(sbejarano, 1) (Entered: 01/27/2015) |
| 01/27/2015 | 118 | ORDER Striking Document re: 117 Notice of Fraud/ Misrepresentation(Signed by Judge Andrew S. Hanen) Parties notified.(sbejarano, 1) (Entered: 01/27/2015) |
| 01/27/2015 | 119 | MOTION for Richard Dearing to Appear Pro Hac Vice by Bill de Blasio, filed. Motion Docket Date 2/17/2015. (mperez, 1) (Entered: 01/27/2015) |
| 01/27/2015 | 120 | MOTION for Leave to File Brief Amici Curiae In Support of Defendants and Opposition to Plaintiff's Motion for Preliminary Injunction by Bill de Blasio, filed. Motion Docket Date 2/17/2015. (Attachments: # 1 Proposed Order) (mperez, 1) (Entered: 01/27/2015) |
| 01/27/2015 | 121 | BRIEF for the Amici Curiae the Mayors of New York and Los Angeles, the Mayor of Thirty-One Additional Cities, the United States Conferences of Mayors, and the National League of Cities in Opposition to Plaintiffs' Motion for Preliminary Injunction by Bill de Blasio, filed.(mperez, 1) (Entered: 01/27/2015) |
| | | |

SER243

| | | Certified Mail Receipt Returned, executed on 3/16/15 re: 192 Document(s) Sent - receipt attached, access restricted to court users for privacy reasons -, filed. (mperez, 1) (Entered: 03/25/2015) |
|---|---|---|
| 03/25/2015 | 218 | Certified Mail Receipt Returned, executed on 3/20/15 re: 198 Document(s) Sent - receipt attached, access restricted to court users for privacy reasons -, filed. (mperez, 1) (Entered: 03/25/2015) |
| 03/26/2015 | 220 | Opposed MOTION to Intervene by Joe Arpaio, filed. Motion Docket Date 4/16/2015. (Attachments: # 1 Exhibit Memorandum of Law in Support of Motion)(Moseley, Jonathon) (Entered: 03/26/2015) |
| 03/27/2015 | 221 | MOTION for Bradley Heath Cohen to Appear Pro Hac Vice by Jeh Johnson, R. Gil Kerlikowske, Leon Rodriguez, Sarah R Saldana, United States of America, Ronald D. Vitiello, filed. Motion Docket Date 4/17/2015. (Cohen, Bradley) (Additional attachment(s) added on 3/30/2015: # 1 Verified Motion PHV) (mperez, 1). (Entered: 03/27/2015) |
| 03/30/2015 | 222 | Letter from Mitchell Williams, Appellant re: letter dated 3/13/15, filed. (rnieto, 1) (Entered: 03/30/2015) |
| 03/30/2015 | 223 | ORDER granting 221 Motion for Bradley H. Cohen to Appear Pro Hac Vice for the United States. (Signed by Judge Andrew S. Hanen) Parties notified. (rnieto, 1) (Entered: 03/30/2015) |
| 03/31/2015 | | Filing fee refunded to Harold William Van Allen in the amount of $505.00 on 3/31/2015 re: 197 Order,, filed. (knguyen, 4) (Entered: 03/31/2015) |
| 04/07/2015 | 224 | REQUEST for Electronic Copy of Certified Record on Appeal re: 149 Notice of Appeal, by American Center for Law & Justice, filed.(Sekulow, Jay) (Entered: 04/07/2015) |
| 04/07/2015 | 225 | ORDER denying 150 Motion to Stay. Having considered the Emergency Motion to Stay [Doc. No. 150], the briefing filed by both sides, and the argument of counsel, the Court hereby denies the Governments Motion to Stay its February 16, 2015 Order of Temporary Injunction.(Signed by Judge Andrew S. Hanen) Parties notified.(rdv, 1) (Entered: 04/07/2015) |
| 04/07/2015 | 226 | ORDER regarding 183 Opposed MOTION for Discovery . The Government has until April 21, 2015, to comply with this Order. Following their review of the documents produced, the Plaintiff States shall file with the Court a list of any further discovery that they may deem necessary, with a brief summary of why that discovery is relevant. The States have until May 1, 2015, to do so. The Government shall have until May 8, 2015, to respond to the States request. The Court will then consider those requests and issue an appropriate order as promptly as its schedule allows.(Signed by Judge Andrew S. Hanen) Parties notified.(rdv, 1) Modified on 4/8/2015 (bcampos, 1). (Entered: 04/07/2015) |
| 04/08/2015 | 227 | Transmittal Letter on Appeal re: 149 Notice of Appeal,. The electronic record on CD is being sent to Attorney for Amici Curiae, Jay Alan Sekulow via regular mail. (USCA No. 15-40238), filed. (bcampos, 1) (Entered: 04/08/2015) |
| 04/09/2015 | 228 | |

SER244

|            |     | SUPPLEMENT to Motion Hearing,,, by Jeh Johnson, R. Gil Kerlikowske, Leon Rodriguez, Sarah R Saldana, United States of America, Ronald D. Vitiello, filed. (Attachments: # 1 Attachment A)(Kirschner, Adam) (Entered: 01/08/2016) |
| 01/08/2016 | 332 | Summary of the Supplemental Brief, filed. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(dahumada, 1) (Entered: 01/08/2016) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 01/13/2016 15:54:46 | | | |
| **PACER Login:** | cb0916:2520705:0 | **Client Code:** | 990999.08578.08908 |
| **Description:** | Docket Report | **Search Criteria:** | 1:14-cv-00254 |
| **Billable Pages:** | 30 | **Cost:** | 3.00 |